#06 8488 original

ORIGINAL

FILED
AUG 1 9 2008
U.S. COURT OF
FEDERAL CLAIMS

THE UNITED STATES COURT OF FEDERAL CLAIMS

FRED RIGGS, DONNA SINGER, AL DICKSON,
ALL INDIANS WITHIN THE UTAH ANETH
EXTENSION OF THE NAVAJO NATION
*Plaintiffs,*

v.

UNITED STATES OF AMERICA
*Defendants.*

NO. 08-592 L

**PLAINTIFFS'**
**COMPLAINT FOR DAMAGES**
**IN THE AMOUNT OF $85, 220, 000.00**

SUSAN ROSE (UTAH BAR NO. 7985)
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
susan_rose@comcast.net
(801) 572-3363; (801) 674-9304; fax (801) 545-0441

THE UNITED STATES COURT OF FEDERAL CLAIMS

FRED RIGGS, DONNA SINGER, AL DICKSON,
ALL INDIANS WITHIN THE UTAH ANETH
EXTENSION OF THE NAVAJO NATION
*Plaintiffs,*

v.

UNITED STATES OF AMERICA
*Defendants.*

NO. ____________________

**PLAINTIFFS'**
**COMPLAINT FOR DAMAGES**
**IN THE AMOUNT OF $85, 220, 000.00**

SUSAN ROSE (UTAH BAR NO. 7985)
ATTORNEY FOR THE PLAINTIFFS
9553 South Indian Ridge Drive
Sandy, Utah 84092
susan_rose@comcast.net
(801) 572-3363; (801) 674-9304; fax (801) 545-0441

# COMPLAINT

NOW COMES THE PLAINTIFFS, by and through undersigned counsel, pursuant to the Court of the Federal Claims Rules of Civil Procedure, hereby allege, the following is true according to their best belief and information:

## I. CHARGES

Express and implied contract; accord and satisfaction; prima facie breach; breach of contract; breach of the United States (" US") fiduciary duty; breach of good faith and fair dealing; repudiation of treaties and contracts; illegal contracts; and violation of U. S. Con. Articles I, II, VI; BIA-adopted and partially funded; Navajo Nation (NN) inherent sovereign law; U. S. Constitution 5th Am. Takings; Damages.

## II. RELIEF REQUESTED

1. Payment of all fines ordered by the NN District Court;
2. Payment of all NN Plaintiffs' damages as pled in the NN District Court by the Plaintiffs, for which they can not now obtain redress, as in the only US recognized court.
3. Payment of all the legal fees, costs, and expenses of these NN Plaintiffs.
4. **Plaintiffs are NOT seeking enforcement of the NN District Court orders *against the NN Defendants*, as Plaintiffs are currently enjoined from doing so in any forum by the Article III U.S. District Court, central division of Utah, case no. 2:00cv0584 (*MacArthur et al v. San Juan County et al*), as of July 2, 2008.**

## III. JURISDICTION

5. This Court has jurisdiction to entertain this Complaint by and through Article I of the United States ("US") Constitution, 28 U.S.C. §1491 (a)(1) [[1] ] and 28 U.S.C. §1505 (Indian Tucker Act), and the US Constitution Fifth Amendment, and all the following law in support thereof. Pleading must meet RCFC rule 9(h)(1) and (3).

## IV. OVERVIEW

6. These NN Court Plaintiffs are seeking damages for Article III Federal Courts' refusal to enforce four NN Court orders. NN Plaintiffs allege the lack of enforcement of the orders is a Treaty, contract, and fiduciary duty violation, with money damages. Plaintiffs, specifically due to Federal Article III Courts refusing to uphold by full force and effect, the NN Court orders, are denied due process.

7. These Plaintiffs are like situated as a class with all persons injured within the NN Aneth Extension by Non Indians, or by non Indian federal independent sub contractors, or non Indian state political subdivisions, administrators, employees, or by all non Indian counterclaimants fully litigating their claims in NN court for NN relief for alleged legal injuries. Equal protection is non existent for Plaintiffs.

## V. PROCEDURAL HISTORY

8. On April 12, 1999, a civil Complaint in behalf of these three Plaintiff whistleblowers was filed in Navajo Nation District Court, District of Shiprock,

[1] Id. "The United States Court of Federal Claims shall have jurisdiction to render judgment upon *any* claim against the United States founded either upon the Constitution, or *any* Act of Congress or *any* regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

case No. SR–CV–162–99–CV.[2] The NN Defendants counterclaimed for relief under NN law. The NN Court issued the foregoing judgments as a result of extensive hearings fully participated in by all parties.

9. NN Court Plaintiffs sought enforcement of four written orders entered by the Navajo Nation District Court for the Shiprock, New Mexico Judicial District: (1) the "Findings, Opinion and Judgment at Preliminary Injunction," dated December 28, 1999, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR–CV– 162–99–CV (Navajo Nation District Court, Shiprock District) (the "December 28, 1999 Order") (App. Pg. 25-45); (2) the "Order Denying Defendants' Motion to Dissolve or Modify the Preliminary Injunction Order," entered March 1, 2000 (the "March 1, 2000 Order") App. Pg. 100-115; (3) the "Special Order in Aid to Satisfaction of Preliminary Injunction," signed March 6, 2000 (the "March 6, 2000 Order") App. Pg. 116-117; and (4) the "Order Mandating that All Defendants' to be Bound by the Preliminary Injunction Order," entered March 15, 2000 (the "March 15, 2000 Order") App. Pg. 118-120. All incorporated herein.

10. Under the analysis of the Federal Circuit Court in *Navajo Nation v. United States*, (No. 2006-5059 (Fed. Cir. 09/13/2007), these Plaintiffs identify the Federal Government's fiduciary duty to uphold, protect, and fully ratify all Navajo Nation Courts actions by full force and effect or full faith and credit. The fiduciary duty

---

[2] **MacArthur 2005 at 902**

under *Navajo Nation*'s Federal Circuit Court analysis is founded in Treaties, agreements, and a network of law in support thereof, identified below.

## VI. ALL FEDERAL COURTS REFUSE TO UPHOLD NN COURT ORDERS

11. Plaintiffs have now exhausted all federal remedies and are enjoined from seeking further enforcement of the NN orders in any forum, as follows:

(a) *MacArthur v. San Juan County*, 2000 U.S. Dist. LEXIS 16859 (D. Utah, Oct. 30, 2000)

*(b) MacArthur v. San Juan County*, 2002 U.S. App. LEXIS 20987,*;309 F.3d 1216 (vacate and remand for *National Farmer*'s [*infra*] analysis and application of the *Montana v. U. S.* [*infra*] doctrine) **(MacArthur 2002)**

(c) US Supreme Court certiorari denied by *Riggs v. San Juan County*, 539 U.S. 902, 123 S. Ct. 2246, 156 L. Ed. 2d 110, 2003 U.S. LEXIS 4286 (2003)

(d) US Supreme Court certiorari denied by *San Juan County v. Riggs*, 539 U.S. 902, 123 S. Ct. 2252, 156 L. Ed. 2d 110, 2003 U.S. LEXIS 4287 (2003)

(e) US Supreme Court certiorari denied by *San Juan Health Servs. v. Riggs*, 539 U.S. 902, 123 S. Ct. 2252, 156 L. Ed. 2d 110, 2003 U.S. LEXIS 4288 (2003)

(f) Motions ruled upon by *MacArthur v. San Juan County*, 416 F. Supp. 2d 1098, 2005 U.S. Dist. LEXIS 25235 (D. Utah, 2005)

(g) *MacArthur v. San Juan County*, 391 F. Supp. 2d 895, 2005 U.S. Dist. LEXIS 31702 (D. Utah, 2005) **(MacArthur 2005)**

(h) *MacArthur v. San Juan County* 2007 U.S. App. LEXIS 17010,*;495 F.3d 1157 **(MacArthur 2007)**

(i) US Supreme Court certiorari denied by *Macarthur v. San Juan County*, 2008 U.S. LEXIS 1381 (U.S., Feb. 19, 2008)

(j) *MacArthur v. San Juan County* , case no. 2:00cv 0584 orders enjoining Plaintiffs from seeking further enforcement of the NN Court orders, as issued July 2, 2008.

## VI. APPLICABLE LAW

12. Under *Navajo Nation* analysis, and a *Medellin v. State of Texas* 128 S. Ct. 1346; 170 L. Ed. 2d 190; 2008 U.S. LEXIS 2912 (treaty analysis and Article VI Constitutional analysis) only Article VI full force and effect enforcement of NN Court orders, decrees or judgments carries out Treaty-protected NN sovereignty. Anything less limits NN sovereignty in unpredictable ways, without compensation to the NN, and without the NN being a party, without it waiving its sovereignty to be a party for a federal court to diminish its sovereignty.

## *VIII. OTHER PERTINENT MATERIAL FACTS*

### *a. Geography*

*13.* The Navajo Nation is a federally recognized US sovereign Indian Nation incorporating a land size equivalent to New York, New Jersey, Connecticut, and Rhode Island.

*14.* For purposes of this case, the NN borders are circumscribed by mutual agreement in the Treaties of 1849 and 1868, and the 1933 Aneth Extension statute [[3]],

[3] The Aneth Extension Act (47 Stat. 1418), after describing the Aneth Extension by metes and bounds, provides that those public lands "be, and the same are hereby, permanently

whereby Utah and San Juan County agreed that the Navajo Nation was to permanently have surface rights control over ALL lands within Utah's extension, save for some mineral royalty rights under the Congressionally designated, and Utah insisted upon, Utah Navajo Trust Fund. Contrary to *MacArthur 2002, infra*, the *Navajo Nation purchased the lands* and surface rights on Utah trust lands, within the Aneth Extension from Utah with $20,000 by Utah and NN and US agreement supporting the 1933 statute. This amount was reimbursed to the Nation by the US Chapter570 August 9, 1937. | [H. R. 6958.] 50 Stat., 564. Kappler's Indian Affairs pg. 523. Contrary to *MacArthur* 2005 *infra*, at 960, reliance on *MacArthur* 2002 Tenth Circuit fact finding, Utah did not buy this land. **See the 72nd Congress 1st session Document 64 Senate Report.**

*15.* The U.S. Supreme Court found that Congress never intended to have a checkerboarded Utah/NN jurisdiction within this Aneth extension. [[4]]

*16.* The acts complained of by both the NN Plaintiffs and counterclaiming NN Defendants occurred at Montezuma Creek within the Aneth Extension. The surface rights of this Utah Trust Fund land were with the Navajo Nation, and some mineral rights with Utah beginning in 1933. The NN purchased those rights in 1933 with $20,000 of tribal funds. A finding by MacArthur 2002, is incorrect. Utah did not purchase these lands.

---

withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon". The NN exercised its power of exclusion in this NN case.

[4] **MacArthur 2005 at 960**

15. The Enrollment Act admitting Utah to the Union, upholding the Treaty of Guadalupe Hidalgo promises for Indian Nation independence from state control, provided:

"That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof; and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." 28 Stat. 108.

### *b. Navajo Nation Court jurisdiction*

17. The Navajo Nation on March 1, 2000 explained its jurisdiction over the Defendants, as follows:

> "The Court has jurisdiction over the defendants partly because they are the named parties who have committed acts within the Navajo Nation territorial boundaries, and as well because the defendants became plaintiffs by filing their counterclaims. In accord with *Dodge v.Nakai,* 298 F.Supp. 17 (Ariz.dist.1968) and *Clark v. Barnard,* 108 U.S. [436, 2 S.Ct. 878, 27 L.Ed. 780] (1883). This court has jurisdiction."

(March 1, 2000 NNDC Order at 10.)

17. The Treaty-protected and Statute- protected NN Court likewise cited to Bureau of Indian Affairs (BIAd) adopted (1) Navajo Nation common law, customs and traditions, mandate the NN Court protect the people [NN police powers]; (2) Navajo Nation statutory law and 7 NNC 253(B); (3) Navajo Nation Rules of Civil Procedure; (4) applicable U.S. law; (5) Navajo Nation Bill of Rights; (6) 1968 Indian Civil Rights Act. All provide for NN Court jurisdiction.

### c. *NN History Is the Antithesis of the Montana Doctrine*

18. Navajo Nation sovereignty, unlike States, is not derived from the Constitution, but existed for eons prior to the Nation's treaties of 1849 and 1868. It is a superior form of sovereignty. [5] 'The Navajo Nation exercises its inherent sovereignty through independent and co-equal branches of a tripartite Navajo government, including an independent Navajo judiciary. "[6]

19. The Navajo Nation common law has been declared its Constitution. Formally, it has no document called a Constitution but it did enact a Bill of Rights, prior to the Indian Civil Rights Act.

20. "The law of tribal sovereignty exemplified by cases such as *Williams v. Lee* has afforded the Navajo Nation ''the breathing room to develop consumer protection, employment, and other statutory laws that relate to core aspects of practical sovereignty, such as provision of jobs and protection from unfair economic practices.'' [7]

21. The Navajo Nation Courts involve about 220,000 citizens, with over a million visitors a year within their borders, process about 100,000 cases a year, involving both Indian and non Indians. It is not uncommon for non Indians to be plaintiffs in their Courts.

22. The Navajo Nation Supreme Court holds "Our jurisdiction statute, 7 NTC Sec. 253 ... provides for civil jurisdiction over all areas where the prior Navajo Tribal Courts of Indian Offenses had jurisdiction and those provided for by a resolution of the Tribal Council. Today we hold that there is *full civil jurisdiction over any person doing injury within the Navajo Nation* because of the inherent sovereignty of the Navajo Nation and because of the residual jurisdiction of the prior courts." [8]

---

5 **MacArthur 2002**
6 **MacArthur 2005 at 963-965**
7 **Id. At 965**
8 **Id at 968**

23. The BIA- Navajo Nation Indian Self Determination Act Contracts for judicial program services mutually oblige the NN to apply its law equally in a uniform and fair manner to all 'persons' under the Indian Civil Rights Act (ICRA) (App. Pg. 122, 132). No allowances for land ownership type or immunities is agreed to by the US and NN. App. Pg. 121-145.

24. As a government to government, sovereign to sovereign, agreement, this contract is the Article VI supreme law of the land. [ [9]]

25. Based upon the foregoing, there is nothing showing any US restrictions on NN civil jurisdiction over non Indians, a sovereignty preserved by Navajo-Mexico Treaties that Mexico preserved in the Treaty of Guadalupe Hidalgo, and has remained unrestricted since.

26. Civil authority of Indian Nations was observed to be unrestricted prior to the U. S. Supreme Court's transposition with Treaty limited criminal authority, and that the civil jurisdiction was not even a judiciable question for Article III Courts to entertain. See, fn. 43, *infra*.

***d. NN Court Orders Designates Plaintiffs to Seek Federal Court Enforcement of the NN Actions in Behalf of All Protected by the NN Actions***

[9] *Superior Oil Co. v. Merritt*, 619 F. Supp. 526 (1985); *Miner Electric, Co. Inc. v. Muscogee Nation*, No. 06-5216 (10th Cir. 09/19/2007); *Medellin v. Texas*, 552 U.S. ___ (2008) (No. 06-984). See Federalist Papers 78, 80, 84, 3, 7, 25. *Dames & Moore*, 453 U.S., at 679-680, 101 S. Ct. 2972, 69 L. Ed. 2d 918; *United States v. Pink*, 315 U.S. 203, 229, 62 S. Ct. 552, 86 L. Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 330, 57 S. Ct. 758, 81 L. Ed. 1134 (1937). *Missouri v. Holland*, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920). See Federalist Papers 78, 80, 84, 3, 7, 25.

27. On March 15, 2000 the Navajo Nation also issued a special order in satisfaction of the injunction, selecting these NN Court Plaintiffs seek enforcement of the orders in state or federal courts, "under comity or *applicable law*. " NN March 2, 2000 order pg. 2.

*28.* On March 15, 2000, the NN Court joined all Defendant parties together in liability, permanently for the case in chief, under NNRCivP at 65. [ [10]]

*29.* The NN Court spelled out in detail how its jurisdiction was essential for protecting the Plaintiffs and the public's happiness, peace, prosperity, and welfare, all police powers of the NN.

***f. Bad Men Among the Whites are Navajo Nation***

*30.* On December 28, 1999 the Navajo Nation Shiprock District Court issued an injunction order in behalf of the NN Plaintiffs, making a final finding of liability against NN Defendants San Juan County ("County"), San Juan Health Services District ("District"), ex County Commissioners and District Governance board members J. Tyron Lewis, Bill Redd, and Mark Maryboy (official capacity only), San Juan County Commission Administrator/District CEO Rick Bailey, County Attorney/District counselor Craig Halls, District trustees Patsy Shumway (official capacity only), John Lewis, Karen Adams, District administrators Reid Wood and Lauren Schafer. March 15, 2000, the NN District Court joined Truck/Farmer's Insurance/Zurich Financial Services, and Defendants Counsel Mr. R. Dennis Ickes, with all other Defendants. The Court identified how federal and Utah public policy was being violated by them, as well as, the NN public policy, and all parties were joined in these violations.

---

[10] **MacArthur 2005 at 926.**

*g. Navajo Nation Due Process and Equal Treatment*

*31.* On December 12, 1999, the Navajo Nation District Court, within its inherent sovereign authority, issued the first of several orders in behalf of the NN Plaintiffs, and I.H.S. patients in the Aneth Extension Utah area of the Navajo Nation, and for NN Court protection (a) after 32+ hours of hearings, (2) after 14,000 pages of documents, (3) after admission of all the Navajo law-counterclaiming Defendants' evidence into the record, (4) after the Defendants' unanimous representation by Navajo Bar Counsel, (5) after the Defendants' litigation funded by taxpayers and Truck/Farmer's Insurance/ Zurich Financial Services, (6) after Defendants filed two 'answers'; (7) after Defendants filed and argued motions; (8) while no NN Court rulings in any way prohibited them from filing motions, using a certified Court reporter, or participation as they so wished; (9) and after NN Parties conducted examination and cross examination of live witnesses by their NN bar counsel.

*32.* NN Plaintiffs and the NN Court did not prevent exhaustion of NN Defendants with NN Court remedies. NN Defendants waived this relief. NN Defendants NOW claim the injunction blocked them from exhausting their NN Court relief. NN Rules of Appellate Procedure provide for an IMMEDIATE NN Supreme Court jurisdictional analysis by way of filing a brief for mandamus or exceptional relief. During about 14 months of NN Court litigation, Defendants never sought such relief, and neither did they affirmatively seek relief from NN Court actions in Federal District Court, save Defendants Truck and Mr. Ickes. The Federal Courts, without Defendants requesting, essentially aided them under a doctrine that makes Federal Courts advocates for non

Indians. About Dec. 19, 2003, the NN Defendants did not wish the NN Supreme Court to review the NN Court's jurisdiction over them, and even FOUGHT AGAINST the NN Plaintiffs motion in Federal District Court to remand the case to NN Court so as to allow the NN Defendants and Plaintiffs that opportunity. The motion was withdrawn after the Defendants ardently objected to it in Federal District Court. **MacArthur 2005** pg. 906.

*33.* During the time of the NN case, the BIA regularly oversaw NN Court proceedings for any violations of the NN-US Self Determination Act contract obliging ICRA's application to NN Court proceedings, under penalty of withdrawal of funding. App. Pg. 121-145.

*34.* No violations were identified for this case by the BIA, or for any other NN Courts where non Indians are parties, very often Plaintiffs. Id.

*35.* The NN Court judge could not refuse the NN Defendants counterclaims by way of contract law, but more vitally, BIA-accepted and ratified and partly funded NN Bill of Rights and ICRA. App. Pg. 122.

***h. Navajo Nation Rule 65 Permanent Liability Findings***

36. ***Plaintiffs' harms***. The NN Court meticulously made factual findings as to how these NN whistleblowing Plaintiffs' injury claims were all well founded in Navajo Nation laws, Bill of Rights, common law of customs and traditions, with tortuous injuries and how they were mistreated and further tortiously injured by the NN Court processes abused by the NN defendants with their Truck/Farmer's Ins./Zurich Financial ("Truck") litigation and through Truck's hired counsel. The NN Court identified that the misrepresentation of fact to the Court that the Plaintiffs were 'bold faced liars' was relied

upon to lift a TRO, thus further injuring the Plaintiffs and public and Court machinery itself. (App. Pg. 25-46, 109-110)

37. ***NN Patient Harms***. The Navajo Nation Court also found the Plaintiffs' claims for and in behalf of the NN Aneth extension patients was well founded under NN customs and traditions.

38. The NN Court Defendants' permanently liable for damages to the area's Indian Health Service I.H.S. patients, especially clinically-dependant and insulin-dependant diabetics who stopped going to the local defendant-operated independent subcontractor I.H.S. clinics in Montezuma Creek and Monument Valley. The Navajo Nation Court found the defendants were turning I.H.S. from local clinic care, in an isolated wilderness 65-100+ miles from the next nearest I.H.S. hospital by the Defendants (a) demanding payment at time of service; (b) demanding they produce a Certified Degree of Indian Blood Certificate at time of service; and (c) privately billing these I.H.S patients, convincing them their Treaty-guaranteed health care was no longer available. Eventually the Defendants contracted with a private collection company, who summoned these poorest of the poor I.H.S. patients, often non English speaking, often without a phone or electrical communications, often without transportation, into *state* Court, outside the Navajo Nation exterior borders, forcing them to pay bills, with threats of jail, and threats of taking their cattle, sheep, or couch, or only vehicle, sole possessions, to obtain payment of medical bills, some of which had already been paid. As late as 2003, and estimated several hundred people were still not going to the clinics for care, due to these local government's actions.

39. The NN Defendants knew the harms to the Plaintiffs and people and Courts they were causing to a unique vulnerable group of aboriginal people, and continued their actions anyway. Their own monthly statistics showed a sharp drop in patient care. The NN Court placed them on judicial notice of a 250% drop in insulin dependent diabetics. The Defendants administrators, officials, and staff of physicians, physician assistants, and nurses were well aware of the medically and clinically dependent populations. The reason they sought to be an I.H.S. contractor was to support northern county tax payers with reservation population federal guaranteed revenues from these same dependent populations. These Defendants knew and understood the area was a diabetic epidemic area with insulin and clinic dependent population. All Defendants knew and understood what dangers face this poor, uneducated, largely non English speaking people, 65-100 miles, over dirt and dangerous roads, from any other health care. They understood that if this population thought they now had to pay for their care and went no where else, or could not afford to go anywhere else, what would happen to them. ***Upon judicial notice of these dangers, they knowingly continued their billing processes that were driving patients away.*** Despite the NN Court's order, they did NOTHING to educate the population that they could be seen without payment. We now know the local population was even more vulnerable to requiring clinic care due to radiation and hazardous and toxic waste exposure *for decades* as reported by the L.A. times writer Judy Pasternak reports[[11]], and Congressman Waxman's Oct. 23, 2007 House Committee Government Oversight and Reform hearing[[12]].

[11] http://www.latimes.com/news/nationworld/nation/la-na-

40. NN Court injuries: The NN Court found that its machinery had been interfered with (App. Pg. 19-110) by numerous rule violations; spoliation, sandbagging, and withholding evidence; hiding witnesses; intimidating witnesses. (App. Pg. 25-46).

## IX. COUNT ONE: THE IMPLIED DIVESTITURE DOCTRINE VIOLATES AND REPUDIATES THE EXPRESS AND IMPLIED TREATY-PROMISES AND US FIDUCIARY GUARDIANSHIP DUTY OF PROTECTING SELF-DETERMINATION, RESIDUAL INHERENT SOVEREINGTY, AND PROMISES OF PEACE, HAPPINESS, PROSPERITY

41. Most notably, the U.S. District Court of Judge Bruce S. Jenkins (**"MacArthur 2005"** or "Jenkins Court") would *not* have applied the 'implied divestiture' doctrine

---

navajo19nov19,0,1645689.story?page=8

[12] Hearing on the Health and Environmental Impacts of Uranium Contamination in the Navajo Nation http://oversight.house.gov/story.asp?ID=1560; http://www.radiationcontrol.utah.gov/Board/Agenda.pdf

> "Over the years, open pit mines filled with rain, and Navajos used the resulting pools for drinking water and to water their herds. Mill tailings and chunks of uranium ore were used to build foundations, floors, and walls for some Navajo homes. Families lived in these radioactive structures for decades. Radioactive dust from abandoned mines and waste piles blew in the air and was inhaled by those who lived nearby. Navajo children played in the mines and the piles of radioactive debris. They drank contaminated water that came straight from the mines. ....
> Navajo kids were swimming in open pit uranium mines in the 1990s. When the U.S. EPA took readings at one mine site, the radium levels were over 270 times the EPA standard. That was last year. And American citizens are still drinking contaminated water, breathing in radioactive dust, and likely living in radioactive homes — today. That's happening today. Right now. .....If a fraction of the deadly contamination the Navajos live with every day had been in Beverly Hills or any wealthy community, it would have been cleaned up immediately. But a different standard applied to Navajo lands. Half-measures or outright neglect has been the official response. It's hard to review this record and not feel ashamed. What's happened just isn't right."

Id.

found in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) ("Montana") and its progeny [[13]] to deny NN Court authority over these NN Court Defendants, save the Tenth Circuit Court ordered his Court to apply this doctrine. [ [14]]

42. The "*Montana*" 'implied divestiture' doctrine was applied to these NN Plaintiffs, in spite of, contrary to, the Jenkins' Court's exhaustive examination of all other law under a *Nat'l Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. at 851, 105 S.Ct. 2447, 85 L.Ed.2d 818 analysis, as also ordered by the Tenth Circuit Court. See, **MacArthur 2002.** The *Montana* doctrine conflicts with the *National Farmer* analysis.

**43.** The Jenkins Court meticulously, over a 2.5 year time period, identified how *the entire body of American Indian law* consisting of the United States (A) Congress and (B) Executive and (C) pre 1981 Supreme Court case law, *consistently*, and *without exception* (i) recognizes the Navajo Nation Courts are the *exclusive* Courts for resolving civil disputes within the Navajo Nation (save the Price-Anderson Act and other very specific exceptions), for Indian and non Indian alike, *equally*; (ii) recognizes the NN self determination and inherent sovereignty; and (iii) NN Court civil authority is regardless of the type of land ownership or right-a-way or race, ethnic, or political affiliations of the parties. *Montana* and its progeny are to the contrary.

**44.** The Jenkins Court relied on *Williams v.Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) and its progeny, and all other legal sources and the unique NN

---

[13] *Atkinson Trading Post v. Shirley*, 532 U.S. 645, 653 (2001); *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997); and *Nevada v. Hicks*, 533 U.S. 353 (2001)

[14] MacArthur et al v. San Juan County et al, U. S. District Court, Utah, Central Division, case no. 2:00cv0584, 391 F.Supp.2d 895, fn. 35 and fn. 105 (D.Utah 2005) (**"MacArthur 2005"**)

history to find the U. S. Supreme Court probably erred in *Atkinson, supra*. Id. Fn. 3. See, *Williams v. Lee*, ; *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 690 (1965) .

46. Treaties are Contracts. The BIA-Navajo Nation Indian Self Determination Act judicial program agreements are contracts. All are drafted by the US. Any restrictions upon NN civil court authority must be specifically expressed under contract law. Any ambiguities are construed against the drafter. Navajo Nation unrestricted sovereign authority over all 'persons' or 'people' Indian and non Indian alike is the express or implied promise of these Treaties. Id.

## X. COUNT TWO: VIOLATIONS OF NETWORK OF LAW ARE VIOLATIONS OF US FIDUCIARY DUTY TO INDIVUAL INDIANS (Treaty of 1849) AND THE NAVAJO NATION

47. The U.S. Article III Court's refusal to enforce the NN Court orders, by full force and effect under US Constitution Article VI, or full faith and credit under Article IV, and federal supremacy doctrines, violates the contractual Treaty-protected NN inherent sovereignty, and undermines US Article I and II branches of government attempts to uphold NN Court independence and Congressionally- and Executive- unrestricted sovereignty and self-determination as follows:

***a. Article II Treaties, Executive memorandum and orders, Government to Government agreement, Navajo Nation boundary extension Statute; UN Treaties supported by statutes***

**(A)** U. S. –Mexico Treaty of Guadalupe Hidalgo Article XI

"And, finally, the *sacredness of this obligation shall never be lost sight of by the said Government*, when providing for the removal of the Indians from any portion of the said territories, or for its being settled by citizens of the United States; but, on the contrary, *special care shall then be taken not to place its Indian occupants under the necessity of seeking new homes, by committing those invasions which the United States have solemnly obliged themselves to restrain"*

**(B)** United States -Navajo Nation Treaty of 1849 [[15]] promises to the 'tribe' and to 'Navajoes' individually;

Article I.

" The said Indians do hereby acknowledge that, by virtue of a treaty .....of Guadalupe Hidalgo, ....the said tribe was lawfully placed under the *exclusive* jurisdiction and *protection* of ...the said United States, and that they are now, and *will forever remain*, under the aforesaid jurisdiction and protection."

Article II

"That from and after the signing of this treaty, hostilities between the contracting parties *shall cease*, and *perpetual peace and friendship shall exist;* the said tribe hereby solemnly covenanting ...they will remain at peace, and treat honestly and humanely all persons and powers at peace with the said States; and all cases of aggression against said Navajoes by citizens or others of the United States, ... shall be referred to the Government of said States for adjustment and settlement."

Article III

"The Government of the said States having ***the sole and exlusive right of regulating the trade and intercourse with the said Navajoes***, it is agreed that the laws now in force regulating the trade and intercourse, and for the preservation of peace with the various tribes of Indians ***under the protection and guardianship of the aforesaid Government***, shall have the same force and efficiency, and shall be as binding and as obligatory upon the said Navajoes [not 'tribe'], and executed in the

[15] (September 9, 1849, 9 Stat. 974,Ratified September 9, 1850. Proclaimed Sept. 24, 1850)

same manner, as if said laws had been passed for *their sole benefit and protection..*"

Article VI

"Should any citizen of the United States, or other person or persons subject to the laws of the United States, murder, rob, or otherwise maltreat any Navajo Indian or Indians, he or they shall be arrested and tried, and, *upon conviction*, [criminal] shall be subjected to all the penalties provided by law for the protection of the persons and property of the people of the said States."

Article VI

Relying confidently upon the justice and the liberality of the aforesaid Government, and anxious to remove every possible cause that might disturb their peace and quiet, it is agreed by the aforesaid Navajoes that the Government of the United States shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries,and *pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians [not 'tribe']*

Article X

*For and in consideration of the faithful performance of all the stipulations herein contained by the said Navajo Indians*, the Government of the United States will grant to said Indians such donations, presents, and implements, and ***adopt such other liberal and humane measures, as said Government may deem meet and proper.***

**(C)**United States -Navajo Nation Treaty 1868 [[16]]

Article I

"*If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians,* the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and *also to reimburse the injured persons for the loss sustained.*"

---

[16] (June 1, 1868 15 Stat. L. 667. Ratified July 25, 1868. Proclaimed Aug. 12, 1868)

> *If the bad men among the Indians shall commit a wrong or depredation* upon the person or property of any *one, white, black, or Indian*, subject to the authority of the United States and at peace therewith, the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws'

Article 10

> No future treaty for the cession of any portion or part of the reservation herein described, which may be held in common, *shall be of any validity or force against said Indians unless agreed to and executed by at least three-fourths of all the adult male Indians occupying or interested in the same*; and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him provided in article 5 of this treaty.

Article 13

> "... the territorial reservations set apart for the *exclusive use and occupation* of the Indians...."

All the foregoing provisions of these Treaties are violated when Article III Federal Courts refuse to uphold the Executive and Congressional laws supporting NN jurisdiction over non Indians; and interpret the Treaties and statutes there under, Article VI supreme law of the land, contrary to the NN and the drafters that could have prohibited NN civil authority over non Indians, in clear and express terms, and did not.

**(D)** U.S.-NAVAJO BIA INDIAN SELF DETERMINATION ACT CONTRACT, App. Pg. 121-145, as executed by the President, and supported by statutes, demands Navajo law and the Indian Civil Rights Act as the law the NN is to provide judicial services to apply, protect and uphold within NN borders without exclusion for land ownership or type or immunities.

***b. Executive Branch Upholds NN Court Authority over Non Indians By Not Expressly Denying it, and by Executing Laws Supporting It***

**(E)** Executive Orders and Memorandum [[17]] that totally approve, accept and ratify Navajo Nation statutory expressions of their sovereignty within the exterior borders of what is known as the Navajo Nation that extends its protections of the law to all persons, Indian and non Indian alike.

**(F)** 1933 Aneth Extension Act;

**(G)** a sovereign – to- sovereign, government-to-government [[18]] Executive Agreement contract as found in U.S.-Navajo Nation Indian Self Determination Act ("ISDA") (25 U.S.C. §§450a-n) contracts and funding agreements for the Navajo Nation to provide judicial services applying Navajo Nation law equally

---

[17] MacArthur et al v. San Juan County et al, U. S. District Court, Utah, Central Division, case no. 2:00cv0584, 391 F.Supp.2d 895, fn. 75 pg. 943 (D.Utah 2005) (**"MacArthur 2005"**) ("*Government–to–Government Relations with Native American Tribal Governments:Memorandum for the Heads of Executive Departments and Agencies,* 59 Fed.Reg. 22951 (1994); 19 Weekly Comp. of Pres. Doc. 98 (1983) (*President Reagan* reaffirming the rejection of termination as a policy and announcing the goal of decreasing tribal dependence on the Federal Government);
**Id at 943 fn. 75** ("United States Transmitting Recommendations for Indian Policy, dated July 8,1970, H.R. Doc. No. 91–363, 91st Cong., 2d Sess. (1970), *President Richard M. Nixon*");
**Id at 945** (*See, e.g.,* Department of Justice Policy on Indian Sovereignty and Government–to–Government Relations, 61 Fed.Reg. 29424 (June 10, 1996), *current version available at http://www.usdoj.gov/otj/sovtrb.htm;* Memorandum for the Heads of Executive Departments and Agencies: Government–to–Government Relationship with Tribal Governments, dated September 23, 2004,*available at http://www.whitehouse.gov/news/releases/2004/09/20040923–4.html* (The *Bush Administration* ''is committed to continuing to work with federally recognized tribal governments on a government- to-government basis and strongly supports and respects tribal sovereignty and self-determination for tribal governments in the United States.'').

[18] Executive Order 13084 of May 14, 1998 [Federal Register: May 19, 1998 (Volume 63, Number 96)]; Executive Order Executive Order 13175 November 6, 2000 (The Federal Government has enacted numerous statutes and promulgated numerous regulations that establish and ***define a trust relationship with Indian tribes***.)

and uniformly by agreement and under the Indian Civil Rights Act Appendix Exhibits incorporated herein;

**(H) BIA protected** Navajo Nation inherent sovereign law including court statutes originally approved by the Secretary of the Interior, with that approval binding the United States to upholding this law. *See, Navajo Tribe v. Udall*, 306 F. 2d 819 (C.A.D.C. 1962), cert. den. 372 U.S. 908.;

**(I)** Other International Treaties confirming U.S. agreed promotion of Indian Nation self-determination. U.N. International Covenant on Civil and Political Rights (UNICPCR) 2200A(xxi) OF 16 Dec. 1966 entry into force **23 March 1976**, in accord with article 49. [[19]] The Courts [within the United States] shall apply the laws to 'everybody' equally. Part III, Art. 14 Sec. 1. *Supported by the statutes of* ***1975*** *Indian Self Determination Act Pub. L. 93–638, § 2, Jan. 4, 1975, 88 Stat. 2203.) codified as 25 U.S.C. 450 et seq; the 1968 Indian Civil Rights Act (25 U.S.C. 1302(8) and 1301(2); 1321-1326)and Utah Enabling Act and Constitution Art. III 'ordinance' disclaimer provisions.*

***c. Article I Congressional Statutes Mandating NN Equal Protection of Laws for All Persons Within the NN, excluding all other Law and Courts***

The following statutes are a network of law, in keeping with the NN Treaties that demand full force and effect enforcement of NN orders, decrees and judgments under the U.S. Constitution's Article VI, as the supreme law of the land, and under federal

[19] The U.S. has committed to this international body to "promote the realization of the right of self-determination and shall respect that right, in conformity with the provisions of the Charter of the United Nations" for 'persons' living on trust lands. UNICPCR Part I Art. 1, sec. 3.

supremacy doctrines in the Article I Indian Commerce clause and the express wording of the Treaties, as cited above.

**(J)** The Indian Civil Rights Act of 1968, Pub.L. No. 90–284, 82 Stat. 77 (1968), *codified at* 25 U.S.C.A. §§ 1301–1326 (2001) ("ICRA");

**(K)** 25 U.S.C.§§450a-n (Indian Self Determination Act contracts);

**(L)** Tribal Self–Governance Act of 1994, Pub.L. 103–413, title II, 108 Stat. 4270 (1994) (25 U.S.C. §§ 458aa–458hh (2000));

**(M)** Indian Tribal Regulatory Reform and Business Development Act of 2000; Pub.L. No. 01–511, Title VIII, § 8077(b), (c), 104 Stat. 1892 (1990), *codified at* 25 U.S.C.A. §§4301 et seq. and note (2001);

**(N)** Indian Tribal Justice Act of 1993, Pub.L. No. 103–176, 107 Stat. 200, *codified at* 25 U.S.C.A. §§3601 *et. seq.* (2001);

**(O)** Indian Tribal Justice Technical and Legal Assistance Act of 2000, Pub.L. No. 106–559, 114 Stat. 2778,*codified at* 25 U.S.C.A. §§ 3651 *et seq.* (2001);

**(P)** 25 U.S.C. §3631 (Tribal sovereignty not impaired or diminished);

**(Q)** 25 U.S.C. §111;

**(R)** 8 U.S.C. §1401(b) ( individual Navajo Nation members are U.S. citizens entitled to just compensation for takings of their property rights)

**(S)** Congress intends for Article III Courts to have no authority over Tribal Courts, shown by the Supreme Courts acknowledgement of Congress' refusal to enact legislation for federal courts to have such authority was also violated. *Santa Clara*, and *Dodge v.Nakai*, 298 F. Supp. 17 (Ariz. dist. 1968) .

## XI. SPECIFIC HARMS TO THE PLAINTIFFS AND NN DUE TO LACK OF ENFORCEABILITY OF NN COURT ORDERS AS AGAINST THOSE CAUSING ACTS TO OCCUR WITHIN THE NN WHILE LOCATED OUTSIDE THE NN

48. Commensurate with CFCRCP at Rule 9, the actions denying enforcement of these NN Court orders, and thus the denial of the US Treaty-, Agreement-, Statutory-, fiduciary- protected entitlements of due process, equal protection, and all other remedies under NN law, are set out as follows:

49. The *Montana* Implied divestiture Doctrine Reads as follows:

> "*Though* Oliphant *only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.* Williams v. Lee, supra, *at 358 U. S. 223;* 194 U. S. 152-154. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *See Fisher v. District Court,* 424 U. S. 382, 424 U. S. 386; *Williams v. Lee, supra* at 358 U. S. 220; *Montana Catholic Missions v. Missoula County,* 200 U. S. 118, 200 U. S. 128-129; *Thomas v. Gay,* 169 U. S. 264, 169 U. S. 273. [Footnote 15]"

*Montana v. United States*, 450 U.S. 544, 565 (1981)

*The Montana Court exempted the Choctaw and Cherokee Nations in fn. 5.*

50 . Each *MacArthur* Court above, applied the judicial doctrine of *Montana* and its progeny, ultimately, to the exclusion of all other Indian law eliminate Defendants' NN Court finally-found liability under NNRCP at 65, because defendants were non Indian.

Santa Clara, and Dodge v.Nakai, 298 F. Supp. 17 (Ariz. dist. 1968). It is for Congress and the Executive and Navajo Nation to interpret these agreements, not the Article III federal courts when *parties* to the agreement are not challenging these Petitioners' interpretation. Id.

51. Though human lives, public safety, livelihoods, personal injuries and Treaties were involved, and ability of Indian Nations to carry out their police powers, the US Supreme Court refused to even accept and hear the Plaintiffs' petitions to enforce BIA approved Navajo law, and the NN Court BIA contracted authority as the only Federally recognized Court within the NN.

52. The 2001 District Court and 2002 Tenth Circuit Court made factual findings that essentially eliminate the need for any insurer of a non Indian within Indian Country have to worry about paying off on a policy. Contrary to the District Court 2001 factual findings, the Clinic was insured and the employees, including these Plaintiffs, covered by that policy. Truck had contracts with Indians, and protected Indian defendants in litigation. No statutes give Federal Courts fact finding capabilities for Indian Nation cases. *Santa Clara, infra*. Notably, the Navajo Nation Court fully understood San Juan County controlled the daily operations of the San Juan Health Services District, and they were one and the same. Despite the trial record being placed into the Federal Court 2:00cv0584 record, colloquy of opposing counsel was relied upon for finding the County was not involved with the District. The NN Court and Plaintiffs understood every time the word 'district' was used, 'county' was one with the 'district'. All were joined as parties for a reason the 10th cir. 2007 displaces. Appendix pg 118-119.

53. The 2002 Tenth Circuit court refused to find state immunity for the Defendants, however, the 2005 MacArthur court applied qualified immunity for 42 U.S.C. §1983 to cloak the Indian defendants residing within the NN. Qualified immunity is unmoored from any statute. 42 U.S.C. §1983 was not created to limit Navajo Nation Court authority, or to displace the NN Bill of Rights or the Indian civil Rights Act guarantees in 25 U.S.C. 1302(8) applicable within NN borders.

54. The 2007 MacArthur Court applied state immunity to NN defendants who counterclaimed in NN Court, fully litigated their NN common law tort claims, and jointly and severally violated federal, state, and NN public policy and law, for which there are no immunities under the US promise to enact legislation in the Indians best interests. The 2002 *MacArthur* ruling refused to apply state immunity. Without a required *en banc* hearing, the 2007 *MacArthur* 10th Circuit ruling applied state immunity without identifying any state public policy that warrants NN defendants actions, and without citing to any authority for the Utah legislature to pass laws within the NN, given 25 U.S.C. §§1321-1326, requiring events to occur within the NN before Utah can take control, and Utah's Enabling Act and Const. 'ordinance' disclaimer provisions. *Williams, McClanahan, supra.*

55. The 'implied divestiture' theory as in *Montana* and its progeny, is unmoored [[20]] from and violating Article I statutory language and intent, and Article II Executive intent

[20] MacArthur 2005 at 989 fn. 139

[[21]], and Article III limitations that require Congress to act to give Federal Courts ancillary or supplemental jurisdiction over Indian Nations.

56. The *Montana* Doctrine, *as applied to these Plaintiffs civil claims*, by the Federal Courts identified in Par. 8, harms the Plaintiffs and Navajo Nation public, and NN Courts. The *Montana* doctrine;

(a) *violates* the intent of the signers of the US NN treaties who would never have agreed to federal Courts eventually destroying the due process and equal protection, happiness, peace, prosperity of the people in the ONLY federally recognized courts of the area, and further civilly immunizing and advocating for, the 'bad men among the whites' from any harms to the people, and without payment for those harms;

(b) *violates* the individualized US- Indian Nation Treaties that consider the unique needs, history, and customs and traditions of the Navajo Nation, and its people and cultural norms, separate and apart from, *Crow Nation* history, *allotment act* history (now repealed 28 U.S.C. 331-333 (2000)), *Montana* state history, as federal courts in a cookie cutter fashion now apply to *all* Indian Courts, and to these Plaintiffs and the Navajo Nation Courts; {[22]}

(c) *violates* the intent of Congressional statutes that recognize, adopt, ratify Navajo law as the only law to be applied within the Navajo Nation, Par. 16 *supra*;

---

[21] MacArthur 2005 at 940-943

[22] MacArthur 2005 at 960 fn. 105 (*Atkinson* Court erred).

(d) *violates* the intent of Executive Orders and Memorandum of Presidents Nixon, Reagan, Bush, and Clinton[[23]] that have regulations and government to government agreements supporting NN self determination, lack of interference by state or political subdivisions, and supporting NN police powers;

(e) *violates* and eliminates altogether, the Congressional and Executive-recognized power of the Navajo Nations' Court's ability to define Treaty terms of 'peace', 'prosperity', 'happiness', or determine what measures best redress injuries under Navajo Nation norms of restorative justice, and unique interpretations of their own Indian Nation's cultural and societal norms and Navajo Nation legal protections as to human and civil legal rights protections for all people, Indian and non Indian alike, Id. ;

---

[23] **MacArthur 2005 At 943** ("*Government–to–Government Relations with Native American Tribal Governments:Memorandum for the Heads of Executive Departments and Agencies,* 59 Fed.Reg. 22951 (1994); 19 Weekly Comp. of Pres. Doc. 98 (1983) (*President Reagan* reaffirming the rejection of termination as a policy and announcing the goal of decreasing tribal dependence on the Federal Government");
**Id at 943 fn. 75** ("United States Transmitting Recommendations for Indian Policy, dated July 8,1970, H.R. Doc. No. 91–363, 91st Cong., 2d Sess. (1970), *President Richard M. Nixon*");
**Id at 945** (*See, e.g.,* Department of Justice Policy on Indian Sovereignty and Government–to–Government Relations, 61 Fed.Reg. 29424 (June 10, 1996), *current version available at http://www.usdoj.gov/otj/sovtrb.htm;* Memorandum for the Heads of Executive Departments and Agencies: Government–to–Government Relationship with Tribal Governments, dated September 23, 2004,*available at http://www.whitehouse.gov/news/releases/2004/09/20040923–4.html* (The *Bush Administration* "is committed to continuing to work with federally recognized tribal governments on a government- to-government basis and strongly supports and respects tribal sovereignty and self-determination for tribal governments in the United States.").

(f) *violates* the Congressionally- insisted upon Utah Enabling Act and Constitutional 'Ordinance' disclaimer provisions consistent with the Treaty of Guadalupe Hidalgo [[24]] eliminating all state authority of any kind in the area;

(g) *violates* the Congressional intent of the Aneth Extension [[25] ] of the Navajo Nation to ***expand*** Navajo Nation territory and PERMANENT civil authority over lands occupied for hundreds of years by Navajo and other aboriginal people, including surface rights over state trust lands, with Utah reserving some measure of authority over mineral rights;

(h) *violates* the Executive's BIA's execution of Congressional statues supporting Navajo Nation inherent sovereign self determination Court application of Navajo due process and equal protection standards, that exceed the U. S. Constitution's [[26]];

(i) *violates* the promises of the United States to the Navajo Nation members (all people) in exchange for the Navajo Nation's compliance with their Treaty and Agreement obligations [[27]] under the Indian Civil Rights Act mandates;

(j) *violates* the Congressionally recognized (25 U.S.C. §1301(2)) Navajo Nation government's inherent sovereignty, including its Courts, to exercise its police powers to protect all people within its borders so as to preserve the peace and safety of all persons, by here, eliminating the redress and protections it extends to these Plaintiffs and others injured by non Indians [[28]];

---

[24] MacArthur 2005 at 956 fn. 95.
[25] MacArthur 2005 at 959-960
[26] MacArthur 2005 at 1031.
[27] MacArthur 2005 at 955
[28] MacArthur 2005 at 972 fn. 122.

(k) *violates and extinguishes* the inherent sovereign authority of the Navajo Court finding of final liability against these Navajo Nation Court defendants under the BIA-adopted, ratified NNRCivP at Rule 65 [[29]];

(l) *violates* and reverses 200 years of Article III Courts construing Treaty provisions, contract agreements, and statutes favorably for the Indians, as a fiduciary---- to now federal courts becoming a fiduciary to *all those* "person or persons subject to the laws of the United States, who .... or otherwise maltreat any Navajo Indian or Indians..." , [[30]] leaving Plaintiffs, who had their federally contracted-for due process, without redress, ANYWHERE, save now for compensation by the U.S. .... "to reimburse the injured persons for the loss sustained." Treaty of 1868 Art. 1;

(m) *exemplifies* how every single legal nightmare associated with Federal Courts reviewing Tribal Courts, that *de facto* extinguishes Indian Nation laws, is found here-- as predicted--- in *Santa Clara Pueblo v. Martinez* 436 U.S. 49, 55, 67-68, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) prohibiting displacing Navajo law and Navajo Court authority with federal law. The *MacArthur* Courts (i) supplemented, displaced, or misinterpreted Tribal Court factual findings based upon colloquy of counsel or evidence withheld from NN scrutiny in light of all other evidence, (ii) disallowed the doctrine of joint and several liability, (iii) resulted in years of interminable litigation in Federal Courts not speaking the Indians language or familiar with Navajo common law customs or Navajo Court

---

[29] MacArthur 2005 at 926

[30] See, *Navajo Nation v. United States,* (No. 2006-5059 (Fed. Cir. 09/13/2007) *Kinney v. Clark*, 1844 U.S. LEXIS 322,*;43 U.S. 76; *Anthony v. United States*, 987 F.2d 670 (10th Cir. 1992) (U.S. must deal honorably with those with whom it contracts, and contracts are construed against the drafter.)

procedures, hundreds of miles away from the local area,[[31] ](iv) promoted exhaustion of Plaintiffs into submission with the government- and insurance-funded wealthy defendants, and now with, (v) applied immunity unheard of in U. S. history for NN Defendants violating federal contracts for which there is no immunity, violating NN law for which there is no immunity, and violating Utah law while acting in a proprietary fashion, for which there is no immunity, (vi) contrary to the intent of the Treaties signers intent ;

(n) allows federal courts to displace the NN understanding of 'peace' 'prosperity' 'happiness' , with an implied divestiture doctrine unheard of in 1849 or 1868. Here, the federal court-defined as meanings say an Indian's 'peace' 'prosperity' or 'happiness' means having no legal redress against non Indians proven to have committed the injuries complained of after all due process possible in the only federally recognized courts of the area. **MacArthur 2005** at 956 fn. 90.

(o) has *de facto* obliterated the Congress and Executive ratified civil authority of Navajo Nation Courts, without compensation for taking those authorities, and without the Navajo Nation agreeing to the taking;

(p) takes all NN Plaintiffs' NN legal property rights to their names, reputations, professions, livelihoods, interferes with their professional licenses, (i) for the public purpose of diminishing NN legal authority to protect them, (ii) for carrying out a *de facto* termination policy Congress and the Executive have rejected and repudiated as violating Treaty protected happiness, peace, and prosperity of individuals and Indian Nations, (iii)

---

[31] **MacArthur 2005** at 934

makes all a target of non Indians who would civilly injure anyone within Indian Nations, (iv) takes all rights of injured to insurance policy payments if the injured is an Indian under MacArthur 2001 and 2002, unjust enrichment for insurers falling within the regulatory authority of the NN - and – (v) all without the Nation being a party to the suit- *something no one could do, if the Nation were a named party and did not consent to the suit, Miner Electric, Co. Inc. v. Muscogee Nation*, No. 06-5216 (10th Cir. 09/19/2007);

(q) gives *de facto* given the lowest level minor political subdivision's employee, more 'state sovereignty' for nonexistent state policy and state policy *violations,* than all of the 'sovereignty' of the Navajo Nation, and with a MacArthur 2007 Tenth Circuit ruling that directly contradicts the MacArthur 2002 ruling as to state immunity being applied to these political subdivisions, without an *en banc* hearing as is required to change pre existing law [[32]];

(r) has completely eliminated and extinguished the 200 years of pre 1981 U. S. Supreme Court law supporting the Navajo Nation's Court's EXCLUSIVE civil authority, without any limitations upon the Navajo Nation by Congress or the executive that would warrant changing pre 1981 Supreme Court case law. MacArthur 2005 at 945; *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 690 (1965); *Williams v. Lee*, 358 U.S. 217, (1959));

[32] Without one iota of proof, the 2007 *MacArthur* 10th Circuit decision, contrary to fn. 5 in the 2002 MacArthur 10th Circuit decision in case no. 01-4001, finds these political subdivision officials were the State, without an 'arm of the state' analysis, for the first time since Lord Coke in England. *Cook County, Illinois v. U.S. ex rel Chandler,* 538 U.S. 119 (2003), without an en banc hearing. *Burlington Northern & Santa Fe Ry. Co. v. Burton*, 270 F.3d 942 (10th Cir. 2001).

(s) has made the NN Court authority a judiciable question, even though the Supreme Court steadfastly for 200 years, even in *United States v. Lara,* 541 U.S. 193, 200-201,124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) says that if NN authority is to be limited it is for Congress to do so in explicit terms through its 'plenary' and 'exclusive' powers ('plenary' and 'exclusive' defined as to having not exceptions to the authority); [[33]]

(t) violates International Treaties that warrant Navajo Nation Courts exercising self determination, and equal protection of its laws [[34]] and individual civil rights protections as human rights the US verifies in its Magna Carta and Declaration of Independence, for ALL US citizens;

(u) violates the current Congressional and Executive Indian self determination doctrines held to be in the best interest of Indians, by *de facto* replacing them with the old 'assimilation' or 'allotment' and 'termination' doctrines Congress and the Executive

---

[33] MacArthur 2005 fn. 93. See also *Ex Parte Crow Dog*, 109 U.S. 556, 557, 572 (1883); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) and *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 67-68, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

[34] The United States Treaty of Guadalupe Hidalgo (1848)(promising U.S. federal exclusive authority over Navajo Nation (see Treaty of 1849 sec. 1);
U.N. International Covenant on Civil and Political Rights (UNICPCR) 2200A(xxi) OF 16 Dec. 1966 entry into force **23 March 1976**, in accord with article 49. The U.S. has committed to this international body to "promote the realization of the right of self-determination and shall respect that right, in conformity with the provisions of the Charter of the United Nations" for 'persons' living on trust lands. UNICPCR Part 1 Art. 1, sec. 3. The Courts [in the United States] shall apply the laws to 'everybody' equally. Part III, Art. 14 Sec. 1. *Supported by the **1975** Indian Self Determination Act <u>Pub. L. 93-638</u>, § 2, Jan. 4, 1975, <u>88 Stat. 2203</u>.) codified as 25 U.S.C. 450 et seq; the 1968 Indian Civil Rights Act (25 U.S.C. 1302(8) and 1301(2); 1321-1326)and Utah Enabling Act and Constitution Art. III 'ordinance' disclaimer provisions.*

branches has so ardently and consistently renounced since at least about 1933's new deal era;

(v) applies an allotment act case to the Aneth Extension, never intended to be part of the now repealed allotment act. Courts should not apply appealed law if it was never intended for the area, particularly.

(w) converts the well understood lack of felony criminal authority over non Indians in Indian Nation Courts to a similar prohibition for civil authority, such that redress ability for injuries by the U.S. is justified by the Treaty of 1868 Article I;

(x) *eliminates* NN Court authority to protect itself from those who would violate its rules and undermine its ability to protect its citizens.

(y) extinguishes NN common law proportionally to how many non Indians are within its borders.

57. Ultimately, Plaintiffs had only ONLY Court Congress and the Executive recognizes for their legal injuries. Without that Court, there is no other Court for them. See, 25 USC 1321-1326, *Williams* and its progeny (no state law), and *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55, 67-68, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)(no federal court authority as Congress has not enacted the statutes giving federal court authority over Indian Courts, save 25 U.S.C. 1303, habeas relief).

58. *Montana*'s application directly interferes with NN court, judicical machinery, their ability to issue any number of 'unfinal' orders, such as subpoena's for information from non Indians located outside the NN exterior borders, summons, or the like, all essential tools that are BIA approved in the NN Rules of Civil Procedure.

59. *Montana's* application here is after the final finding of liability, to protect non Indians contemptuous of the NN proceedings they sought and abused and lost before. Had they prevailed, would the Article III courts uphold the ruling as against mostly Indian plaintiffs? *See, Santa Clara, supra.*

60. Congress recognizes NN Courts as the sole authority in its borders by Executive Agreement, government to government, contracts, drafted by the US, memorialized in statutes 25 USC 450(a)-(n), that demands the ICRA be applied.

61. The wording and intent of ICRA has been reviewed by the Supreme Court as intending 'persons' in 25 USC 1302(8) to mean Indian and non Indian alike, even though the wording 'Indians' was proferred to Congress to use, which Congress rejected. *Santa Clara Pueblo, Dodge, supra.*

62. The NN gave its Treaty protections to all 'people' in its NN Bill of Rights enacted prior to the ICRA that does not limit it. The Executive ratifies that meaning in its BIA contracts attached and incorporated herein.

63. *Montana* facially, and as applied, violates all the foregoing law, and thus, the Federal Court violates its fiduciary duty to the NN and by treaty, and U.S. law, and these Plaintiffs, and patients, and NN Court, who are denied all their available due process.

64. All documents attached in the Appendix are incorporated herein.

## XII. COUNT FOUR: FIFTH AMENDMENT TAKINGS

65. All NN parties, judges, are US citizens. All have had their Article VI treaty protections taken for Article III Federal Court purposes, and without compensation, as the Treaties warrant.

66. The Congressional and Executive design in their network of laws to protect NN Court and legal sovereignty, allows for no exceptions, or for other courts where Plaintiffs can seek compensation.

67. The taking of Indian sovereignty has been compensate able since the British first purchased land from the Indians. Here, NN sovereignty is at issue, where they were not even a party to the suit. A*s the NN recognizes* under *NN law*, restorative justice provides compensation for taking these Plaintiffs rights, names, reputations, as justified by implication or express terms in the 1849 Treaty Article VI, Article I-VI, and the 1868 Treaty Article 1-13 that apply to individual Indians. The extension of promises of peace and prosperity and happiness to non Indians is by NN authority, BIA approved, and Congressionally demanded.

68. The *Montana* application also breaches the 1849 promise that others would not invade the NN and harm or treat persons malevolently.

## XIII. COUNT FIVE: BREACH OF ACCORD AND SATISFACTION

69. The BIA, by mutual agreement, regularly examines the NN courts for compliance with the BIA contract. No failings by the NN Court was found for this case or any other cases. The agreements demands that the NN comply with NN and ICRA law, are satisfied in accord with the intent of the agreement parties. The US implicitly or expressly implies all NN court actions, are fully US enforceable.

70. If not expressed, it is implied the US will enforce all NN *bona fide* actions.

71. Nothing in the BIA contracts for judicial services indicated a judicial doctrine of Montana, as unmoored from any statutes, treaty provisions, or Constitutional authority, a common law, supercedes NN common law application within the NN.

72. Under *Montana*, the BIA contract has been ignored largely, or viewed as a mere contract, not as an Article VI Executive Agreement contract, and construed against all parties to the contract, i.e. that NN law should be equally applied to all persons and NN courts open to all in a fair and uniform manner.

73. If in some mystical way the Montana doctrine is found to apply to Treaties and BIA contracts, here there was harm to the public, the Defendants had thousands of contracts to provide services to I.H.S. patients, the Defendant Truck contract was inherent in all the patient contracts, the Defendants entered a contract with the NN Courts when they counterclaimed for damages seeking relief under NN common law, the Defendants made a noxious use of the clinic by driving people away, and *Montana*'s exceptions should have been applied, and were not due to *Montana*'s placing the Federal Courts in a position of having to protect non Indians based upon a judicial presumption that deprived Plaintiffs of not only the US fiduciary duty to protect them, but from any impartiality, as the **MacArthur 2005** might have given them, save for 10th Cir. 2002 demands.

**74.** All the foregoing denial of enforcement of NN actions is a breach of trust, a breach of contract, a breach of good faith and fair dealing, breach of the accord and satisfaction the NN has rendered, directly damaging these Plaintiffs and all others.

## XIV. STANDING

71. **Standing** for Plaintiffs to bring their claims and others' claims as designated by the NN Court in their behalf is founded in BIA approved NN law, customs and traditions, and also 25 USC §§111 and 185 and Tucker Act and Indian Tucker Act authorities for these claims of breaches of fiduciary duty most particularly. Their damages are (1) palpable, concrete, particularized, (2) are directly due to the US breach of its fiduciary and contractual duties, at least implying that NN Court rulings will be valid under fair dealing and good faith, and under US guardianship which they comply, and (3) warrant money damages for the United States breach of its duties to uphold its promises and guarantees to the NN Courts, individuals, and Aneth I.H.S. patients that involve NN police powers to protect. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

72. The NN would never have entered Treaties or US BIA agreements if it understood its Courts actions, all of them, would be unenforceable anywhere outside the NN, particularly given how many people travel through and in it.

## *XV. DAMAGES PRAYER FOR RELIEF*

72. Wherefore, based upon the foregoing, the Plaintiffs hereby make demand upon the United States of America, in the amounts as follows:

73. On March 1, 2000 the NN Court finding contempt if the orders were not obeyed, determined fines of $10,000 a day, and $1000 from each defendant, daily, until the NN Court's actions were enforced, to be paid to the NN Court. App. Pg. 115.

The amount due this day for the $10,000 a day fines is $30,850, 000.00 The NN identified ten defendants. The amount owed for all ten is $30,850, 000.00. Altogether this amount is $61,700,000.00 as of Aug. 12

74. The amount asked for by the Plaintiffs (App. Pg. 92) in the first amended complaint is for " each of the defendants, both jointly and severely [sic], be ordered to pay damages to the plaintiffs in the amount of $18,000,000 USD (Eighteen Million Dollars)" . laintiffs, under NN custom of looking out for all other Navajo members, prayed for the following relief, "each of the defendants, both jointly and severely [sic], be ordered to pay additional damages to the plaintiffs pursuant to *7* NCC *701* in the amount of $6,000,000 USD (Six Million Dollars) *to be paid directly to Montezuma Creek Clinic* ….." App. Pg. 92. The total amount for the First Amended Complaint is **$24,000,000**.00 dollars. The total amount of money damages that Plaintiffs seek is

Total **$85, 220, 000.00. as of Aug. 12**

75. Plaintiffs also pray for payment of all attorneys fees and costs, beginning on the date the January 1, 1998 when investigation began for the original complaint, as yet to be determined at the end of this Court proceeding.

76. Plaintiffs pray this Court will grant them all that is fair in equity and just under the law, as this Court so finds their relief to be.

So signed this 14th of August, 2008

Susan Rose Susan Rose

Susan Rose (Utah Bar no. 7985)
*Counsel for the Plaintiffs*
9553 South Indian Ridge Drive
Sandy, Utah 84092
susan_rose@comcast.net
(801) 572-3363; (801) 674-9304 fax (801)545-0441

CERTIFICATE OF SERVICE

Service on the United States is to be made by this Court.

Susan Rose S. Rose