# U.S. TREATY WITH THE NAVAJOS, 1849

September 9, 1849
9 Stat. 974.
Ratified September 9, 1850.
Proclaimed Sept. 24, 1850

The following acknowledgements, declarations, and stipulations have been duly considered, and are now solemnly adopted and proclaimed by the undersigned; that is to say, John M. Washington, governor of New Mexico, and lieutenant-colonel commanding the troops of the United States in New Mexico, and James S. Calhoun, Indian agent, residing at Santa Fe, in New Mexico, representing the United States of America, and Mariano Martinez, head chief, and Chapitone, second chief, on the part of the Navajo tribe of Indians:

Navajo under jurisdiction of the United States.

I. The said Indians do hereby acknowledge that, by virtue of a treaty entered into by the United States of America and the United Mexican States, signed on the second day of February, in the year of our Lord eighteen hundred and forty-eight, at the city of Guadalupe Hidalgo, by N. P. Trist, of the first part, and Luis G. Cuevas, Bernardo Couto, and Mgl Atristain, of the second part, the said tribe was lawfully placed under the exclusive jurisdiction and protection of the Government of the said United States, and that they are now, and will forever remain, under the aforesaid jurisdiction and protection.

Perpetual peace to exist.

II. That from and after the signing of this treaty, hostilities between the contracting parties shall cease, and perpetual peace and friendship shall exist; the said tribe hereby solemnly covenanting that they will not associate with, or give countenance or aid to, any tribe or band of Indians, or other persons or powers, who may be at any time at enmity with the people of the said United States; that they will remain at peace, and treat honestly and humanely all persons and powers at peace with the said States; and all cases of aggression against said Navajoes by citizens or others of the United States, or by other persons or powers in amity with the said States, shall be referred to the Government of said States for adjustment and settlement.

Laws now inforce regulating trade and peace to be binding upon the Navajo.

III. The Government of the said States having the sole and exlusive right of regulating the trade and intercourse with the said Navajoes, it is agreed that the laws now in force regulating the trade and intercourse, and for the preservation of peace with the various tribes of Indians under the protection and guardianship of the aforesaid Government, shall have the same force and efficiency, and shall be as binding and as obligatory upon the said Navajoes, and executed in the same

manner, as if said laws had been passed for their sole benefit and protection; and to this end, and for all other useful purposes, the government of New Mexico, as now organized, or as it may be by the Government of the United States, or by the legally constituted authorities of the people of New Mexico, is recognized and acknowledged by the said Navajoes; and for the due enforcement of the aforesaid laws, until the Government of the United States shall otherwise order, the territory of the Navajoes is hereby annexed to New Mexico.

The Navajo to deliver to the Uniteds States murderer or murderers of M. Garcia.

IV. The Navajo Indians hereby bind themselves to deliver to the military authority of the United States in New Mexico, at Sante Fe, New Mexico, as soon as he or they can be apprehended, the murderer or murderers of Micente Garcia, that said fugitive or fugitives from justice may be dealt with as justice may decree.

Captives and stolen property to be delivered to United States, by the 9th Oct., 1850.

V. All American and Mexican captives, and all stolen property taken from Americans or Mexicans, or other persons or powers in amity with the United States, shall be delivered by the Navajo Indians to the aforesaid military authority at Jemez, New Mexico, on or before the 9th day of October next ensuing, that justice may be meted out to all whom it may concern; and also all Indian captives and stolen property of such tribe or tribes of Indians as shall enter into a similar reciprocal treaty, shall, in like manner, and for the same purposes, be turned over to an authorized officer or agent of the said States by the aforesaid Navajoes.

Citizens of the United States committing outrages upon Navajo to be subjected to the penalties of law.

VI. Should any citizen of the United States, or other person or persons subject to the laws of the United States, murder, rob, or otherwise maltreat any Navajo Indian or Indians, he or they shall be arrested and tried, and, upon conviction, shall be subjected to all the penalties provided by law for the protection of the persons and property of the people of the said States.

Free passage through their territory.

VII. The people of the United States of America shall have free and safe passage through the territory of the aforesaid Indians, under such rules and regulations as may be adopted by authority of the said States.

Military posts and agencies to be established.

VIII. In order to preserve tranquility, and to afford protection to all the people and interests of the contracting parties, the Government of the United States of America will establish such

military posts and agencies, and authorize such trading-houses, at such time and in such places as the said Government may designate.

The United States to adjust territorial boundaries.

IX. Relying confidently upon the justice and the liberality of the aforesaid Government, and anxious to remove every possible cause that might disturb their peace and quiet, it is agreed by the aforesaid Navajoes that the Government of the United States shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries,and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians.

Donations, presents, and implements to be given.

X. For and in consideration of the faithful performance of all the stipulations herein contained by the said Navajo Indians, the Government of the United States will grant to said Indians such donations, presents, and implements, and adopt such other liberal and humane measures, as said Government may deem meet and proper.

To be binding after signed, and to receive a liberal construction.

XI. This treaty shall be binding upon the contracting parties from and after the signing of the same, subject only to such modifications and amendments as may be adopted by the Government of the United States; and, finally, this treaty is to receive a liberal construction, at all times and in all places, to the end that the said Navajo Indians shall not be held responsible for the conduct of others, and that the Government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians.

In faith whereof, we, the undersigned, have signed this treaty, and affixed thereunto our seals, in the valley of Cheille, this the ninth day of September, in the year of our Lord one thousand eight hundred and forty-nine.

J. M. Washington,
Brevet Lieutenant-Colonel Commanding.

James S. Calhoun,
Indian Agent, residing at Santa Fe.

Mariano Martinez,
Head Chief, his x mark,

## U.S. TREATY WITH THE NAVAJOS, 1868

**ANDREW JOHNSON,** President of the United States of America, to all and singular to whom these presents shall come, greetings:

Whereas a Treaty was made and concluded at Fort Sumner, in the Territory of New Mexico, on the first day of June, in the year of our Lord one thousand eight hundred and sixty-eight, by and between Lieutenant General W.T. Sherman and Samuel F. Tappan, Commissioners, on the part of the United States, and Barboncito, Armijo, and other Chiefs and Headmen of the Navajo tribe of Indians, on the part of said Indians, and duly authorized thereto by them, which Treaty is in the words and figures following, to wit:

**June 1, 1868**
15 Stat. L. 667.
Ratified July 25, 1868.
Proclaimed Aug. 12, 1868

Articles of a treaty and agreement made and entered into at Fort Sumner, New Mexico, on the first day of June, one thousand eight hundred and sixty-eight, by and between the United States, represented by its commissioners, Lieutenant General W. T. Sherman and Colonel Samuel F. Tappan, of the one part, and the Navajo Nation or tribe of Indians, represented by their chiefs and head-men, duly authorized and empowered to act for the whole people of said nation or tribe, (the names of said chiefs and head-men being hereto subscribed), of the other part, witness:

Peace and friendship

**ARTICLE 1.** From this day forward all war between the parties to this agreement shall forever cease. The Government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they now pledge their honor to keep it.

Offenders among the whites to be arrested and punished.

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to

be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

Offenders among the Indians to be given up to the United States. Rules for ascertaining damages.

If the bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they willfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this treaty, or any others that may be made with the United States. And the President may prescribe such rules and regulations for ascertaining damages under this article as in his judgment may be proper; but no such damage shall be adjusted and paid until examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss whilst violating, or because of his violating, the provisions of this treaty or the laws of the United States, shall be reimbursed therefor.

Reservation boundaries. Who not to reside thereon.

**ARTICLE 2.** The United States agrees that the following district of country, to wit: bounded on the north by the 37th degree of north latitude, south by an east and werst line passing through the site of old Fort Defiance, in Canon Bonito, east by the parallel of longitude which, if prolonged south, would pass through Old Fort Lyon or the Ojo-de-oso, Bear Spring, and west by a parallel of longitude about 109 degree 30' west of Greenwich, provided it embraces the outlet of the Canon-de-Chilly, which canon is to be all included in this reservation, shall be, and the same is hereby, set apart for the use and

occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with te consent of the United States, to admit among them; and the United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employees of the Government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in the article.

Buildings to be erected by the United States.

**ARTICLE 3.** The United States agrees to cause to be built, at some point within said reservation, where timber and water may be convenient, the following buildings: a warehouse, to cost not exceeding twenty-five hundred dollars; an agency building for the residence of the agent, not to cost exceeding three thousand dollars; a carpenter-shop and blacksmith-shop, not to cost exceeding one thousand dollars each; and a schoolhouse and chapel, so soon as a sufficient number of children can be induced to attend school, which shall not cost to exceed five thousand dollars.

Agent to make his home and reside where.

**ARTICLE 4.** The United States agrees that the agent for the Navajos shall make his home at the agency building; that he shall reside among them, and shall keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by or against the Indians as may be presented for investigation, as also for the faithful discharge of other duties enjoined by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his finding, to the Commissioner of Indian Affairs, whose decision shall be binding on the parties to this treaty.

Heads of fami y desiring to commence farming may select lands, etc. Effect of such selection.

**ARTICLE 5.** If any individual belonging to said tribe, or legally incorporated with it, being the head of a family, shall desire to commence farming, he shall have the pivilege to select, in the presence and with the assistance of the agent then in charge, a tract of land within said reservation, not exceeding one hundred and sixty acres in extent, which tract, when so selected, certified, and recorded in the "land book" as herein described, shall cease to be held in common, but the same may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long a she or they may continue to cultivate it.

Persons not heads of families.

Any person over eighteen years of age, not being the head of a family, may in like manner select, and cause to be certified to him or her for purposes of cultivation, a quantity of land, not exceeding eight acres in extent, and thereupon be entitled to the exclusive possession of the same as above directed.

Certificates of selection to be delivered, etc., To be recorded.

For each tract of land so selected a certificate containing a description thereof, and the name of the person selecting it, with a certificate endorsed thereon, that the same has been recorded, shall be delived to the party entitled to it by the agent, after the same shall have been recorded by him in a book to be kept in his office, subject to inspect, which said book shall be known as the "Navajo Land Book."

Survey.

The President may at any time order a survey of the reservation, and when so surveyed, Congress shall provide for protecting the rights of said settlers in their improvements, and may fix the character of the title held by each.

Alienation and descent of property.

The United States may pass such laws on the subject of alienation and descent of property between the Indians and their descendants as may be thought proper.

The Navajo People must give up the education of their children, between the ages of 6 and 16, to the white man (by attending school). Duty of agent. Schoolhouses and teachers.

**ARTICLE 6.** In order to insure the civilization of the Indians entering into this treaty, the necessity of education is admitted, especially of such of them as may be settle on said agricultural parts of this reservation, and they therefore pledge themselves to compel their children, male and female, between the ages of six and sixteen years, to attend school; and it is hereby made the duty of the agent for said Indians to see that this stipulation is strictly complied with; and the United States agrees that, for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided, and a teacher competent to teach the elementary branches of an English education shall be furnished, who will reside among said Indians, and faithfully discharge his or her duties as a teacher. The provisions of this article to continue for not less than ten years.

Seeds and agricultural implements.

**ARTICLE 7.** When the head of a family shall have selected lands and received his certificate as above directed, and the agent shall be satisfied that he intends in good faith to commence cultivating the soil for a living, he shall be entitle to receive seeds and agricultural implements for the first year, not exceeding in value one hundred dollars, and for each succeeding year he shall continue to farm, for a period of two years, he shall be entitled to receive seeds and implements to the value of twenty-five dollars.

Delivery of articles in lieu of money and

**ARTICLE 8.** In lieu of all sums of money or other annuities provided to be paid to the Indians herein named under any treaty or treaties heretofore made, the United

annuities.

States agrees to deliver at the agency house on the reservation herein named, on the first day of September of each year for ten years, the following articles, to wit:

Indians to be furnished with no articles they can make. Clothing, etc. Census.

Such articles of clothing, goods, or raw materials in lieu thereof, as the agent may make his estimate for, not exceeding in value five dollars per Indian--each Indian being encouraged to manufacture their own clothing, blankets, etc.; to be furnished with no article which they can manufacture themselves. And, in order that the Commissioner of Indian Affairs may be able to estimate properly for the articles herein named, it shall be the duty of the agent each year to forward to him a full and exact census of the Indians, on which the estimate for year to year can be based.

Annual appropriation in money for ten years. May be changed. Army officer to attend delivery of goods.

And in addition to the articles herein named, the sum of ten dollars for each person entitled to the beneficial effects of this treaty shall be annually appropriated for a period of ten years, for each person who engages in farming or mechanical pursuits, to be used by the Commissioner of Indian Affairs, in the purchase of such articles as from time to time the condition and necessities of the Indians may indicate to be proper; and if within the ten years at any time it shall appear that the amount of money needed for clothing, under the article, can be appropriated to better uses for the Indians named herein, the Commissioner of Indian Affairs may change the appropriation to other purposes, but in no event shall the amount of this appropriation be withdrawn or discontinued for the period named, provided they remain at peace. And the President shall annually detail an officer of the army to be present and attest the delivery of all the goods herein named to the Indians, and he shall inspect and report on the quantity and quality of the goods and the manner of their delivery.

Stipulations by the Indians as to outside territory.

**ARTICLE 9.** In consideration of the advantages and benefits conferred by this treaty, and the many pledges of friendship by the United States, the tribes who are parties to this agreement hereby stipulate that they will relinquish all right to occupy any territory outside their reservation, as herein defined, but retain the right to hunt on any unoccupied lands contiguous to their reservation, so long as the large game may range thereon in such numbers as to justify the chase; and they, the said Indians, further expressly agree:

Railroads.

**1st.** That they will make no opposition to the construction of railroads now being built or hereafter to be built across the continent.

**2d.** That they will not interfere with the peaceful construction of any railroad not passing over their reservation as herein defined.

Residents, travelers, wagon trains.

**3d.** That they will not attack any persons at home or traveling nor molest or disturb any wagon trains, coaches, mules, or cattle belonging to the people of the United States, or to persons friendly therewith.

Women and children.

**4th.** That they will never capture or carry off from the settlements women or children.

Scalping.

**5th.** They will never kill or scalp white men, nor attempt to do them harm.

Roads or stations.

**6th.** They will not in future oppose the construction of railroads, wagon roads, mail stations, or other works of utility or necessity which may be ordered or permitted by

the laws of the United States; but should such roads or other works be constructed on the lands of their reservation, the government will pay the tribe whatever amount of damage may be assessed by three disinterested commissioners to be appointed by the President for that purpose, one of said commissioners to be a chief or head man of the tribe.

Military posts and roads.

**7th.** They will make no opposition to the military posts or roads now established, or that may be established, not in violation of treaties heretofore made or hereafter to be made with any of the Indian tribes.

Cession of reservation not to be valid unless, etc.

**ARTICLE 10.** No future treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force against said Indians unless agreed to and executed by at least three-fourths of all the adult male Indians occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him provided in article 5 of this treaty.

Indians to go to reservation when required.

**ARTICLE 11.** The Navajos also hereby agree that at any time after the signing of these presents they will proceed in such manner as may be required of them by the agent, or by the officer charged with their removal, to the reservation herein provided for, the United States paying for their subsistence en route, and providing a reasonable amount of transportation for the sick and feeble.

Appropriations, how to be disbursed.

**ARTICLE 12.** It is further agreed by and between the parties to this agreement that the sum of one hundred and fifty thousand dollars appropriated or to be appropriated

shall be disbursed as follows, subject to any condition provided in the law, to wit:

Removal.

**1st.** The actual cost of the removal of the tribe from the Bosque Redondo reservation to the reservation, say fifty thousand dollars.

Sheep and goats.

**2d.** The purchase of fifteen thousand sheep and goats, at a cost not to exceed thirty thousand dollars.

Cattle and corn.

**3d.** The purchase of five hundred beef cattle and a million pounds of corn, to be collected and held at the military post nearest the reservation, subject to the orders of the agent, for the relief of the needy furing the coming winter.

Remainder.

**4th.** The balance, if any, of the appropriation to be invested for the maintenance of the Indians pending their removal, in such manner as the agent who is with them may determine.

Removal, how made.

**5th.** The removal of this tribe to be made under the supreme control and direction of the miltary commander of the Territory of New Mexico, and when completed, the management of the tribe to revert to the proper agent.

Penalty for leaving reservation.

**ARTICLE 13.** The tribe herein named, by their representatives, parties to this treaty, agree to make the reservation herein described their permanent home, and they will not as a tribe make any permanent settlement elsewhere, reserving the right to hunt on the lands adjoining the said reservation formerly called theirs, subject to the modifications named in this treaty and the orders of the commander or the department in which said reservation may be for the time being; and it is further

agreed and understood by the parties to this treaty, that if any Navajo Indian or Indians shall leave the reservation herein described to settle elsewhere, he or they shall forfeit all the rights, privileges, and annuities conferred by the terms of this treaty; and it is furhter agreed by the parties to this treaty, that they will do all they can to induced Indians now away from reservation set apart for the exclusive use and occupation of the Indians, leading a nomadic life, or engaged in war against the people of the United States, to abandon such a life and settle permanently in one of the territorial reservations set apart for the exclusive use and occupation of the Indians.

In testimony of all which the said parties have hereunto, on this the first day of June, one thousand eight hundred and sixty-eight, at Fort Sumner, in the Territory of New Mexico, set their hands and seals.

W.T. Sherman,
Lieutenant General, Indian Peace Commissioner.

S.F. Tappan,
Indian Peace Commissioner.

**Navajo Chiefs:**
(Each signed with an X)

| | |
|---|---|
| Barboncito (Moustached Short Man), Principal Chief | Chiqueto (Small Man) |
| Armijo (Former NM Governor's name) | Muerto de Hombre (Killer of Men) |

Delgado
(Thin)
Manuelito (Emmanuel - God With Us, Messiah)
(Little Messiah)
Largo
(Tall)
Herrero
(Smith)

Hombre
(The Man)
Narbona
(A former Colonel's name)
Ganado Mucho
(Many Cattle)
Narbono Segundo
(Narbona the Second)

**Navajo Head Men:**
(Each signed with an X)

Rique (Rico - Rich)
Juan Martin
Serginto (Sargento - Sergeant)
Grande (Large)
Inoetenito
Muchachos Mucho (Many Kids)
Chiqueto (Chiquito) Segundo
(Little Man the Second)
Cabello Amarillo
(Yellow Hair)
**Francisco**
(Harrison Lapahie Jr's Great Great Great Grandfather)

Torivio
Desdendado (Toothless)
Juan
Guero (Guerrero - Warrior)
Gugadore (Jugador - Gambler)
Cabason (Cabezon - Head)
Barbon Segundo
(Beard the Second)
Cabares (Caballos) Colorados
(Red Horses)

**ATTEST**

Geo. W.G. Getty, Colonel Thirty-Seveth Infantry, Brevet Major - General U.S. Army

B.S. Roberts, Brevet Brigadier - General U.S. Army, Lieutenant - Colonel Third Cavalry

J. Cooper McKee, Brevet Lieutenant - Colonel, Surgeon U.S. Army

Theo. H. Dodd, United States Indian Agent for Navajos.

Chas. McClure, Brevet Major and Commissary of Subsistence, U.S. Army

James F. Weeds, Brevet Major and Assistant Surgeon, U.S. Army

J.C. Sutherland, Interpreter

William Vaux, Chaplain U.S. Army

**In Executive Session, Senate of the United States**

Resolved, (two-thirds of the senators present concurring) That the Senate advise and consent to the ratification of the treaty between the United States and the Navajo Indians, concluded at Fort Sumner, New Mexico, on the first day of June, 1868.

**Attest:**

Geo. C. Gorham,
Secretary.

By W.J. McDonald,
Chief Clerk.

Now, therefore, be it known that I, ANDREW JOHNSON, President of the United States of America, do, in pursuance of the advice and consent of the Senate, as expressed in its resolution of the twenty-fifth of July, one

thousand eight hundred and sixty-eight, accept, ratify, and confirm the said treaty.

In testimony whereof, I have hereto signed my name, and caused the seal of the United States to be affixed.

Done at the City of Washington, this twelfth day of August, in the year of our Lord one thousand eight hundred and sixty-eight, and of the Independence of the United States of America, the ninety-third.

**ANDREW JOHNSON**

By the President:
W. Hunter
Acting Secretary of State.

**§ 1. Other rights not impaired; deletion or abridgment only by public referendum**

The enumeration herein of certain rights, shall not be construed to deny or disparage others retained by the people. No provision of this chapter, the Navajo Nation Bill of Rights, shall be abridged or deleted by amendment or otherwise, except by referendum vote of the Navajo electorate, in accordance with applicable provisions of the laws of the Navajo Nation.

^ Back to top

**§ 2. Equality of rights not abridged by entitlements, benefits or privileges; nor by affirmative action necessary to support rights of the Navajo People to economic opportunity**

Recognition, enactment, lawful implementation and enforcement of provisions for specific entitlements, benefits, and privileges based upon membership in the Navajo Nation or in other recognized Tribes of Indians and affirmative action in support of Navajo or other Indian preference in employment and business contracting or otherwise necessary to protect and support the rights of Navajo People to economic opportunity within the jurisdiction of the Navajo Nation, shall not be abridged by any provision herein nor otherwise be denied.

^ Back to top

**§ 3. Denial or abridgment of rights on basic of sex; equal protection and due process of Navajo Nation law**

Life, liberty, and the pursuit of happiness are recognized as fundamental individual rights of all human beings. Equality of rights under the law shall not be denied or abridged by the Navajo Nation on account of sex nor shall any person within its jurisdiction be denied equal protection in accordance with the laws of the Navajo Nation, nor be deprived of life, liberty or property, without due process of law. Nor shall such rights be deprived by any bill of attainder or ex post facto law.

^ Back to top

**§ 4. Freedom of religion, speech, press, and the right of assembly and petition**

The Navajo Nation Council shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of people preaceably to

assemble, and to petition the Navajo Nation government for a redress of grievances

^ Back to top

**§ 5. Searches and seizures**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

^ Back to top

**§ 6. Right to keep and bear arms**

The right of the people to keep and bear arms for peaceful purposes, and in a manner which does not breach or threaten the peace or unlawfully damage or destroy or otherwise infringe upon the property rights of others, shall not be infringed.

^ Back to top

**§ 7. Rights of accused; trial by jury; right to counsel**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, and shall be informed of the nature and cause of the accusation; shall be confronted with the witnesses against him or her; and shall have compulsory process for obtaining witnesses in their favor. No person accused of an offense punishable by imprisonment and no party to a civil action at law, as provided under 7 N.N.C. § 651 shall be denied the right, upon request, to a trial by jury of not less than six (6) persons; nor shall any person be denied the right to have the assistance of counsel, at their own expense, and to have defense counsel appointed in accordance with the rules of the courts of the Navajo Nation upon satisfactory proof to the court of their inability to provide for their own counsel for the defense of any punishable offense under the laws of the Navajo Nation.

^ Back to top

**§ 8. Double jeopardy; self-incrimination; deprivation of property**

No person shall be subject for the same offense to be twice put in jeopardy of liberty, or property; nor be compelled in any criminal case to be a witness against themselves; nor shall private property be taken nor its lawful private use be impaired for public or governmental purposes or use, without

just compensation.

^ Back to top

**§ 9. Cruel and unusual punishment; excessive bail and fines**

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.

William P. Battles, Counsel for Plaintiffs
Wm. P. Battles and Associates
202 Shento Boulevard
Window Rock, Navajo Nation (AZ) 86515
Phone: 1-520-861-2525
Fax: 1-520-861-2526

Susan R. Schildmeyer, Utah State Bar No. 7985
Counsel for the Plaintiffs
11091 S. Shilling Ave. Suite 2452
Sandy, Utah 84094
Phone/fax: 1-801-576-0091

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF SHIPROCK

DONNA SINGER, Fred Riggs C#18570; Alison Dickson C#212,765,
Plaintiffs

vs.

SAN JUAN COUNTY; San Juan Health Service District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy; John Lewis; Commission J. Tyron Lewis; Karen Adams; Patsy Shumway; and other John and Jane Does as yet unnamed in their personal and official capabilities.
Defendants.

SR-CV-162-99-CV

PLAINTIFFS' SUPPLEMENTAL PLEADINGS TO THE ORIGINAL PLEADINGS

NOW COME THE PLAINTIFFS, by and through undersigned counsels, and pursuant to the Navajo Nation Rules of Civil Procedure (NNRCP) at Rule 15(e) respectfully pray the Court to grant leave to the Plaintiffs to supplement their initial pleadings by making the following additions thereto and in duty to the inclusion of parties herein as such and as so captioned under the defendants identified as "John and Jane Does" as follows:

*Additional Parties*

1. The plaintiffs add the defendants Dennis Ickes and Farmer's Insurance Companies and Truck Insurance Companies as defendants in caption and otherwise to these subject proceedings; and,

*Supplemental Claims*

2. The plaintiffs supplemental claims do not supplant the original claims.
3. The plaintiffs add the assertions of:
   a. Obstruction of Justice; and,
   b. Misuse of Judicial Process; and,
   c. Defamation, per se; and,
   d. Denial of Due Process; and,
   e. Denial of Equal Protection; and,
   f. The endangerment of Navajo patients at Montezuma Creek Clinic as an addition to their claims.

*Injuries Arising Since the Filing of the Original Pleadings*

4. These assertions are based upon the Court's Findings of Fact in the Court's Preliminary Injunction Order issued on the 28th day of December, 1999.
5. The Court's factual findings therein pertaining to the defendant's counsel including the now named defendants of Farmer's Insurance Companies and Truck Insurance Companies, Dennis Ickes':
   a. misrepresentations of fact and law to the Court; and,
   b. spoliation/destruction and sandbagging of evidence; and,

c. violation of Rule 9 that require specific pleadings and legitimate and valid proofs in issues of fraud; and,

d. intentional and malicious disruption of operations and services of the Montezuma Creek Health Clinic.

*Supplemental Prayer for Relief*

6. The plaintiffs add the following prayer for relief, referencing back to the original prayer for relief and not supplanting the original prayer for relief.

7. The plaintiffs pray -

a. That each of the defendants, both jointly and severely, be ordered to pay damages to the plaintiffs in the amount of $18,000,000.00 USD (Eighteen Million Dollars); and,

b. That each of the defendants, both jointly and severely, be ordered to pay additional damages to the plaintiffs pursuant to 7 NNC 701 in the amount of $6,000,000.00 USD (Six Million Dollars) to be paid directly to Montezuma Creek Clinic to be used as the management of Montezuma Creek Clinic sees fit in the best interest of the Native American People, and not to be used for employment compensation or to take the place of the insurance payments made in behalf of the Native American patients, without express authority of this Court; and,

c. That the defendants, and each of them, jointly and severely, publicly retract all defamatory or other libelous statements made of any of the plaintiffs or other litigants or counsels herein, by publication in the local newspapers, and radio stations of local circulation to Montezuma Creek

Health Clinic and the places of residence of each of the plaintiffs, and the general coverage of the Navajo Nation, retracting any and all statements made in respect to any of the plaintiffs herein, and issuing statements of apology which are deemed appropriate by this Court and the plaintiffs by prior review; and,

8. That the Court grant such other and further relief as the Court deems fit and proper within the bounds of Navajo customs and traditions of fairness and justice.

So signed this 26 day of January, 2000

William P. Battles, Counsel for Plaintiffs
Wm. P. Battles and Associates
203 Shonto Boulevard
Window Rock, Navajo Nation (AZ) 86515
Phone: 1-520-861-2525
Fax: 1-520-861-2526

Susan R. Schildmeyer, Utah State Bar no. 7985
11091 S. Shilling Ave, Suite 2452
Sandy, Utah 84094
Phone Fax: 1-801-576-0091

I HEREBY CERTIFY THAT A TRUE COPY OF THE FOREGOING WAS DELIVERED TO THE OPPOSING PARTY ON THIS 26 DAY OF January 2000 BY:

( ) PERSONAL HAND DELIVERY
( ) U.S. FIRST CLASS MAIL/POSTAGE PREPAID
(X) U.S. CERTIFIED MAIL/POSTAGE PREPAID
( ) PRIVATE SERVICE OF PROCESS
( ) FAX TRANSMITTAL/ORIGINAL BY MAIL

Wm. P. Battles and Associates

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

**THE DISTRICT COURT OF THE NAVAJO NATION**
**JUDICIAL DISTRICT OF**
**SHIPROCK**

RECEIVED FEB 22

| | | |
|---|---|---|
| **DONNA SINGER**; Fred Riggs C#18570; Alison Dickson C#212,765; Plaintiffs, | ) | SR-CV-163-99-CV |
| vs. | ) | |
| **SAN JUAN COUNTY**; San Juan Health Service District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy[1]; John Lewis; Commissioner J. Tyron Lewis; Karen Adams; Patsy Shumway[2], and other John and Jane Does as yet unnamed in their personal and official capabilities, Defendants. | ) | **ORDER FOR LEAVE TO SUPPLEMENT THE PLEADINGS** |

**NOW COMES THE COURT**, having received and reviewed the plaintiffs motion to supplement the pleadings, and the supplement to the pleadings, hereby Orders that the motion to supplement be granted, and the supplement to the pleadings be accepted by the Court, for good cause shown.

So Signed this 23 day of February, 2000.

Judge Raymond Begaye

[1]In his official capacity only.

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF SHIPROCK, NEW MEXICO

| | |
|---|---|
| DONNA SINGER; Fred Riggs C#18570; Alison Dickson C#212,765; Plaintiffs, | SR-CV-162-99-CV |
| vs. | |
| SAN JUAN COUNTY; San Juan Health Service District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner: Bill Redd; Roger Atcitty; Commissioner: Mark Maryboy; John Lewis; Commissioner: J. Tyron Lewis; Karen Adams; Patsy Shumway, and other John and Jane Does as yet unnamed in their personal and official capabilities, Defendants. | FINDINGS, OPINION AND JUDGMENT AT PRELIMINARY INJUNCTION |

THE COURT, having jurisdiction over these parties and proceedings made out on a territorial premise, that is, the area in which the subject health care facility is located is within the territorial jurisdiction of the Navajo Nation, and for further cause that two of the three plaintiffs are members of the Navajo Tribe of Indians, the third is married to an enrolled member, and they ALL have significant contact with the Navajo Nation, as does the clinic itself as a major health care provider to the Navajo and other local Native Americans who look to this Court for justice. Such contentions of jurisdiction are well founded by way of Montana v. United States, 450 U.S. 544 (1981) and the exception found in Strate, Associate Tribal Judge, Tribal Court of the Three Affiliated Tribes of the Fort Berthold Indian Reservation, et al, v. A-1 Contractors, U. S. Supreme Court, April 28, 1997, notwithstanding 7 NNC 253(B), and therefore, having now before it the above styled proceedings ripe for decision in the matter of the application of the plaintiffs for a preliminary injunction pursuant to Rule 65(c) of the Navajo Nation Rules of Civil Procedures, pending trial in chief in the matter of the initial complaint drawn by the plaintiffs against the defendants raising issues of:

denial of due process;

GS

considered in their zeal, the Court draws attention to the issues of injunctive relief as found at Rule 65(c) of the Rules of Civil Procedure, stating:

That the moving parties, the plaintiffs herein, must demonstrate to the Court that they have a claim framed in a protectable right or interest and have a high likelihood of success on the merits; and,

That the plaintiffs then must further demonstrate that they are likely to suffer irreparable injury, loss, or damage to that protectable right or interest unless injunctive relief is issued; and,

That the likely injury, loss, or damage to the plaintiffs are substantial in nature and character; and finally

That the plaintiffs do not have an otherwise available and adequate remedy at law.

The Court is mindful that the issuance of injunctive relief is clearly within the sound discretion of the trial court. Kenai Oil & Gas, Inc. v. Department of Interior, 671 F.2d 858, 866 (10th Cir. 1982).

Accordingly, the Court makes the following findings based on the testimony before it:
That as to the matter of plaintiff Fred Riggs:
That Mr. Riggs is a Physicians Assistant and a permanent regular employee of the San Juan Health Services District at the Montezuma Creek Clinic; and, on or about the 11th day of November, 1998, Mr. Riggs was RIF and rehired with a $10,000.00 pay cut; was made to start using a time card; and lost three years of raises, including his raise for being a Navajo-English interpreter; and,
That the RIF was not done in compliance with the Navajo Preference in Employment Act (NPEA) in as much as there was no written justification as to just cause for the RIF; nor was a warning of the RIF made to Mr. Riggs; nor was Mr. Riggs RIF last, as a Navajo Physician Assistant; and, Prior to November of 1998 Mr. Riggs had 30 years of unblemished employment as a Physicians Assistant, and had not prior to November 1998 ever been required to have hourly time keeping responsibilities; and,

That in the second week of November, 1998, or thereabouts, on Mr. Riggs first ever time card, Mr. Riggs accidentally represented 8.4 hours as a day and a half, or 12 hours; and,

That as a result of this time card mistake Mr. Riggs was disciplined from the 2nd day of December, 1998 to the 8th day of December 1998 by:

Being placed on administrative leave, and being told that he could not speak or associate with other clinic employees; and, being charged with fraud, in writing, and the same being placed in his personnel file as a disciplinary measure; and,

Being placed on probation for the term of 30 days, creating fear from the loss of his employment; and, given further warnings that he may be terminated for repeating such time card errors; and,

That Mr. Riggs never received any warning letters; any time card instruction; nor any time to correct any alleged deficiencies, either prior to this November RIF, or the aforestated discipline or probation; and,

That within less than 10 (ten) days of being charged with fraud and being placed on administrative leave, and subsequently probation, Mr. Riggs was offered a promotion to fill the position made vacant by Ms. Singers termination, as manager of the Montezuma Creek Clinic; and,

That Mr. Riggs grieved his discipline as being discriminatory in a letter to Mr. Wood, and Mr. Wood nearly immediately withdrew the offered promotion because Mr. Riggs had accused him of discrimination; and,

That the personnel policies and procedure of the San Juan Health Services District prohibit punishment of employees who make discrimination grievances such as Mr. Riggs had done; and,

That Mr. Riggs has specialized medical training and has not been on hourly time card keeping requirements in the 30 years or so prior to November of 1998, and that as a bona fide professional, is exempt from time card keeping requirements; and,

That Mr. Reid Wood stated that time cards were a problem throughout the San Juan Health Service Districts payroll activities and had to be stopped; and,

That after Mr. Riggs grievance hearing he was placed on an additional 30 days probation without justification; and,

That Rick Bailey found Reid Wood had falsely informed Bailey of the breadth of discipline meted out to Riggs, and Wood was never disciplined for telling his superior a falsehood; and,

That the spread sheet analysis of Bryan Bolander, and the time cards submitted to the Court show similar and multiple errors on the time cards throughout the San Juan Health Services District; and,

That particular time cards showed, for example, that even in the first week of November, 1998, just one week prior to Mr. Riggs being disciplined, Reid Woods time card had ink; cross outs; and write ins, errors for which others, notably the plaintiffs, were disciplined, however Reid Woods was not similarly disciplined for his time cards errors; and,

That a second example is the time cards of Bruce Bryant, a caucasian physician assistant, had time cards showing he was not required to punch in or out, either before or after the November, 1998, RIF; and,

That a third noted example are the time cards of Mary Nielson, again showing ink; cross outs; and white outs, while Mr. Riggs and Ms. Singer were being severely disciplined for like infractions, no discipline was taken in respect to Ms. Nielson; and,

The defendants offered absolutely no credible evidence of the San Juan Health Services District affording any evidence of Mr. Riggs receiving any due process; evidence of any degree of equal protection of the policies and procedures, as well as the law, applicable to his employment; no evidence of any consideration of the Navajo Preference in Employment Act in its actions towards Mr. Riggs; and no evidence that the San Juan Health Services District had not intentionally used the reputation of Mr. Riggs without his permission essentially to stop the time card problems throughout the San Juan Health Services District; and,

The defendants did not offer any evidence that the defendants had not administratively conspired to continue to use Mr. Riggs reputation and case as a means of arbitrarily; capriciously, and abusively making an example of what happens to people who take grievance of decisions of the San Juan Health Services District, and who make allegations of racial or other discrimination; and,

Testimony of Ms. Singer:

Ms. Singer was a permanent employee and manager of the Montezuma Creek Clinic; and,

Mrs. Singer had previously helped set up and manage the Blanding Urgent Care Center, and the

5

Blanding Birthing Center; and,

That Ms. Singers career started as an x-ray technician working up to being the manager of three different health care clinics; and, that for some of Ms. Singers career as a clinic manager she did not have to punch in and out on time cards; and,

That the San Juan Health Services District recognized managers as FSLA exempt as a matter of policy; and, Ms. Singer had three job assignments with the San Juan Health Services District 0 (1) as an x-ray technician; (2) an Ultrasound technician; and (3) the Manager of the Montezuma Creek Clinic; and,

That Ms. Singer worked approximately 3000 hours off the clock without being paid overtime; and,

That Ms. Singer had a great deal of latitude in making management decisions since Montezuma Creek Clinic was so far from the Monticello, Utah, headquarters of the San Juan Health Services District and the District administrators seldom visited the Montezuma Creek Clinic; and,

That on the 13th day of November, 1998, Ms. Singer was unaware of another persons clocking in on her Montezuma Creek Clinic time card when she was in Blanding, Utah; and,

That Ms. Singer told the Chief Financial Officer of her whereabouts on the date in question; and,

That the purported time card error involved only four hours of work for which Ms. Singer was never paid, and Ms. Singer admitted to having made the time card error; and,

That Ms. Singer was charged with fraud; placed on administrative leave; told not to communicate with anyone at the clinic; and then terminated; and,

That Ms. Singer was not previously aware that Rick Bailey was the instigator of her termination until she received the Answer of the 14th of May, 1999, and suspected from the information therein provided that Mr. Bailey had authorized her termination; and,

That Rick Bailey testified that he felt uncomfortable being Ms. Singers grievance hearing officer because he had actually participated in the decision to terminate Ms. Singer, and he testified further that he relied on Craig Halls' advice to proceed as her grievence hearing officer anyway in spite of Utah Supreme Court law to the contrary and further Mr. Bailey and Mr. Wood concealed this information from Ms. Singer; and,

That Ms. Singers future in public health and in her small community where she resides has been harmed due to the adverse publicity of the malicious and unfounded fraud charges against her;

and,

That Reid Wood likewise threatened Ms. Singer by telling her "she needed to remember who she worked for" after speaking out in public San Juan Health Services District board meetings; and,

That Rick Bailey told Ms. Singer that she was viewed as an "enemy to the hospital"; and,

Mark Maryboy, San Juan County Commissioner, testified that he was concerned that Ms. Singer be given due process and that all protocols be followed since he knew from previous experience that people who spoke out in respect to the San Juan Health Services District were viewed as troublemakers and dealt with by the San Juan Health Services District and San Juan County, accordingly; and,

That as to the testimony of Bryan Bolander regarding Ms. Singer:

That Bryan Bolander is a Certified Public Accountant with a professional background in working with time cards and as per his testimony he found no pattern of fraud in Ms. Singers time cards; and,

That as per the testimony of Mr. Bolander Ms. Singer documented things such as places; or times; in detail, which he testified is not consistent with the commission of time card fraud; and,

That as testimony of Mr. Bolander Ms. Singer's time cards showed she worked on holidays; weekends; and whenever an emergency arose; and,

That Mr. Bolander testified that he attributed Ms. Singers time card errors to the fact that she was required to be clocking in and out at three different work places and had so many responsibilities; and,

That Bolander further testified that it was his professional experience that managers are not usually required to use time cards because of their FSLA exemption; managers were expected to carry out many heavy responsibilities; and managers were usually expected to work in excess of 40 hours per week; and,

That Ora Lee Black, a similarly experienced manager with San Juan Health Services District, testified that she could not complete all her job duties in forty hours despite the fact that she did not have three jobs nor was she required to be in three different locations in the San Juan Health Service District to perform her management duties; and,

That likewise according to the time cards presented Mary Anderson, a caucasian manager of the

7

Monument Valley Clinic, also within the San Juan Health Services District, was not obliged to punch in and out on time cards; and,

That Mr. Bolander testified that as per his spread sheet analysis the number and types of errors commonly found by him to exist in the San Juan Health Services District that if everyone time cards were multiplied by three places of work and had to have documented time they would probably all look the same as Ms. Singer and Beverly Harris cards; and,

That as per Mr. Bolanders testimony, Beverly Harris time cards are worse than Singers and Ms. Harris was never disciplined; charged with fraud; or terminated; and,

That according to the further testimony of Ora Lee Black, caucasian, she testified that she had herself personally called into work to have someone clock in for her on numerous times, so numerous that Ms. Black when questioned could not recall how many times, and that to Ms. Black further knowledge that other nurses in Blanding, Utah, did likewise as a common practice, without being disciplined; charged with fraud; or terminated; and,

The defendants offered absolutely no credible no evidence of the San Juan Health Services District affording any evidence of Ms. Singer receiving any due process; evidence of any degree of equal protection of the policies and procedures, as well as the law, applicable to her employment; no evidence of any consideration of the Navajo Preference in Employment Act in its actions towards Ms. Singer; and no evidence that the San Juan Health Services District had not intentionally used the reputation of Ms. Singer without her permission essentially to stop the time card problems throughout the San Juan Health Services District nor did the defendants offer any evidence that the defendants had not administratively conspired to continue to use Ms. Singers reputation and case as a means of arbitrarily; capriciously, and abusively making an example, even as to trial by the media of what happens to people who stand up for their rights and take grievance of decisions of the San Juan Health Services District, and who make allegations of racial or other discrimination; and take any position in opposition to the San Juan Health Services District or the defendants themselves; and,

That as to the matter of Allison Dickson status of employment:

That Mr. Dickson started working for the San Juan Health Services District as a full time temporary fill-in in March of 1998 and in November of 1998 applied for full time employment status; and,

TR

4

That Mr. Dickson time cards and W-2 show that Mr. Dickson worked some 700 hours after his temporary fill-in position had expired; and,

That the policies and procedures of the San Juan Health Services District states that after an employee has worked for the total of 520 hours they will be made to be regular employees of the San Juan Health Services; and,

That the defendants acknowledge that Mr. Dickson formally requested in writing to Mary Nielson on the 11th day of December, 1998, that he be given regular employment status; and,

That Mr. Dickson signed an affidavit attesting to the highly racially inflammatory and insensitive comment of Reid Wood concerning Certificates of Degree of Indian Blood being equated with "dog tags"; and,

That the time cards entered into evidence demonstrates the current Montezuma Creek Clinic manager's nephew is working full time as a regular status employee and working for more hours than Mr. Dickson with less time in seniority; and,

That finally, the records of the San Juan Health Services District show that there is no other employee of the San Juan Health Services District with Mr. Dickson's time in service measure by regular work hours that is not a regular permanent employee with benefits of regular status employment.

Defendants' Evidence is completely Admitted

Commensurate with Navajo Nation Customs and Traditions that highly value fairness and everyone having their say, the Court allowed into the record all of the defendants' exhibits as follows:

All of Ms. Singer's time cards and payroll records, and the time cards of all other persons in the employ of the San Juan Health Services District, and a spreadsheet drafted by CPA Bolander explaining the patterns of mistakes and errors were admitted on behalf of the defendants.

a. The time cards show that errors were rampant throughout the San Juan Health Services District system and were not at all limited to just the time cards of the plaintiffs Mr. Riggs and Ms. Singer; and,

That three of the time cards of Ms. Singer were never given to either Singer at the time of her termination, nor used in any evaluation of Ms. Singers termination, nor provided to the counsels for the plaintiff despite appropriate discovery being timely requested; and,

4

b. That on the hearing of the 14th day of May, 1999, Mr. Bolander testified that the three time cards shown to him were not part of the cards he was previously provided with to examine either by the San Juan Health Services District or provided to plaintiffs counsels; and

A letter from Lauren Shafer critical of Ms. Singer was likewise accepted, and notably had a "check mark" in the upper right corner signifying it was not kept in Singer's ordinary personnel file, but a secret file in the CEO's office.

a. Lauren Schafer, a chief administrator with the San Juan Health Services District never rebutted in her testimony where the letter was kept; and,

b. That despite the inflammatory nature of the letter it was never placed in Ms. Singer's appropriate personnel file, nor did the prior Chief Executive Officer apparently consider the letter when Ms. Singer was given regular merit pay raises and additional duties and expanding management responsibilities; and,

c. The Court accordingly views the letter with substantial lack of importance; and,

That Lauren Schafer testified that after a "scrupulous examination" of Singer's records for over nine months, Ms. Schafer had not discovered one piece of evidence as to Ms. Singer's intent to commit fraud.

Ms. Singer testified that she never remembered doing anything to intentionally cheat the San Juan Health Services District or San Juan County out of anything; nor does any evidence presented otherwise indicate anything to the contrary; and,

Ms. Singer testified that she never remembered ever calling anyone to clock in for her on any occasion; nor does any credible evidence presented otherwise indicate anything to the contrary; and,

Contrary to the assertions of the defendants, Mr. Bolander testified that Ms. Singer's cards show that:

Ms. Singer documented where she was at on a consistent basis; and,

That Mr. Bolander could find no evidence whatsoever of fraud; and,

That Mr. Bolander's spreadsheet analysis, along with a multitude of time cards in comparison, illustrated plainly that time card errors were and are a problem in the district, and not at all limited to only Mr. Riggs and Ms. Singer; and,

That the defendants have all failed to submit even one piece of evidence rebutting the expert

74

10

testimony of Mr. Bolander, or his analysis, or his well-reasoned and documented findings which rely exclusively on the evidence which was in the possession of the defendants and tendered by the defendants to the Court as discussed in the foregoing.

LEGAL CONCLUSIONS AND FINDINGS

At first glance, and without the benefit of testimony, these proceedings appeared to have been framed solely as a labor-employment issue. Closer examination and scrutiny of the testimony before the Court it is not nearly so simply the case herein, especially in light of the sworn testimony. Discrimination never is obvious or simple. It is most commonly found in subtle subterfuge manifesting deceit and contempt for the human condition to which each of us are differently born, and for which, without the benefit of those strong enough to come forward through the feigned veil of petty righteousness and resulting humiliation, it can only be endured in the silent pain of accepting disgrace and indifference. It is always a sad and moment in the condition of mankind. No exception is found here.

With minor adaptation from the arguments delivered to the Court, the Court has largely adopted the position of the plaintiffs to the legal reasoning of these proceedings. Wherein the premise of the case before the Court is multi-faceted - framed in the original complaint, and now seeking parallel injunctive relief. Rule 65 of the Navajo Rules of Civil Procedure provides for the preservation and consequence of evidence and testimony, and further sets forth the legal basis for an injunction which lays in Navajo case law, and focuses to proving four criteria for an injunction.

Case Law

The case law of the Navajo Nation provides that an injunction is extraordinary relief that is granted when an injury is unquantifiable and when there is no adequate remedy at law. Gudac v. Marianto, 1 Nav. R. 385, Nav. App. Feb. 28, 1978. The United States Supreme Court has likewise found that while economic loss alone generally does not constitute irreparable injury, "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may be so far departed from the normal situation that irreparable injury might be found." Sampson v. Murray, 415 U.S. 61, 92 n. 68 (1974). Notably, and contrary to the contentions of the defendants, the factual circumstances of Sampson are well

11

seen to be nearly wholly unlike the factual circumstances here, but as so stated. Here, now having taken evidence and testimony, and on the examination of the Court, we have instead permanent employees or employees who qualify for regular employee status. Sampson involved a temporary employee with no vested interest in her employment. Sampson also had the availability of a completely impartial hearing panel. Here, it is noted from the testimony that such an impartial hearing panel was tainted in bias and deceit. The plaintiffs did not have the availablity of such an impartial panel. Further, and unlike Sampson that concerned only employee matters, these plaintiffs produced testimonial evidence and documentary evidence to support their claims of violation of civil and personal rights which are protected by the Navajo Nation Bill of Rights, notwithstanding the 1968 Indian Civil Rights Act, and as well the San Juan Health Services District's endangerment of the Native American and Navajo public that SJHSD did commercially and voluntarily within their corporate powers contract to provide services to.

As in the case of Halona v. Navajo Nation, 1 Nav. R. 189, the key to this case lies "not in non-Indian analysis." as to any matter of standing. Id. at 199. The fact that makes this case most distinguishable from Sampson in terms of the need for protection of the plaintiffs, is that the plaintiffs have a privilege and a duty under Navajo custom and tradition for Mrs. Singer in her tribal in-law status and Mr. Riggs and Mr. Dickson in their enrolled status, to look out for the welfare of their fellow Navajo "citizens". In Halona, this Tribal status raises issues "peculiar to Navajo tradition and law." The Navajo clan system, applicable to in-laws through their spouses, demonstrates the unique bonding of Navajo's to other Tribal members or non-tribal members as family, and the familial duties inherent to care for other members of the Tribal family as demonstrated by the plaintiffs in this case and by the common nature of Navajo custom and tradition, and not dissimilar from the familial duties as found among other tribes that remain likewise in their nearest to original condition in respect to their customs and traditions.

Further, and while not controlling it is at least instructive, that the Tenth Circuit has established the following four criteria for a preliminary injunction, not dissimilar to the requirements at Navajo law:

The movant must establish that the injunction would not be adverse to public interest; and,

76

12

That the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and,

That the movant will suffer irreparable injury unless the injunction issues; and,

That there is a substantial likelihood that the movant will eventually prevail.

Accordingly :

The Preliminary Injunction will not

Be Adverse to the Public Interest

In this case, a preliminary injunction will insure the protection of overwhelming public interest by way of the restoration and preservation of patients' welfare in the northeastern sector of of the Navajo Nation; restoration of the clinic operations of the Montezuma Creek Clinic that are sensitive to Navajo needs; customs; and economic levels; and eliminating nepotism and favoritism in employment; thereby improving adherence to the provisions, terms, and conditions of the Navajo Preference in Employment Act; and reducing the chilling effect on the people's rights as is so well evidenced here. The injunction will further support and sustain the local Chapters resolutions.

Patient Welfare

On November 9, 1999, the Court was given a letter from Nettie Pratt, the Montezuma Creek Clinic's diabetic clinician, indicating that there had been as much as a 250% drop in visits by diabetic patients alone to the Montezuma Creek Clinic, and many of these patients have now not been seen for three months or more. The reason these patients have not been coming in for life critical medical care is due to San Juan Health Service District's billing of IHS eligible patients, making them believe they must pay for medical services before receiving medical attention. Even one more month without effective management and adhering to compliance in stopping the billing, may lead to death, or serious irreversible eye or kidney damage to the patients, or other complications for the diabetic patients. Likewise in a similar vein, Debbie Benally, an Emergency Medical Technician for the Montezuma Creek Clinic, testified that when the ambulances were "locked down", Mrs. Singer, and plaintiffs attorneys, were the only one who cared, who called, and who tried to get something done about it despite the sneers and jeers of the defendants.

Smooth Clinic Operations

13

Brenda Brown, the current manager of the Montezuma Creek Clinic testified on September 24, 1999, that on numerous occasions the administration has refused to give even her the financial reports for the clinic that would have enabled her to do her job or otherwise effectively assist in the appropriate day to day management and operation of the Montezuma Creek Clinic especially in light of the now upcoming transition to local tribal control.

Limiting Nepotism

Nepotism, likewise contrary to the personnel policies and procedures of the San Juan Health Services District as per the testimony received, is rampant at Montezuma Creek Clinic in that, for example, the manager is the sister of the Chairman of the Board, and likewise San Juan Health Services District, also by testimony, employs the current managers aunt, cousin, and nephew all working at the same clinic despite policy otherwise.

NPEA Adherence

Testimony likewise reflected that employment positions throughout the San Juan Health Services District have not been advertised either "in house" to existing San Juan Health Services District employees or in the Navajo Times or KTNN Radio as required by the Navajo Preference in Employment Act. As a matter of the public policy of the Navajo Nation labor is regulated to a certain extent including the provisions of the Navajo Preference in Employment Act - which compels a competitive process for employment which does not exclude Navajos, and other particular persons, and creates a qualified preference pool of Navajo labor whenever possible ñ in that economic development and employment of the surplus Navajo work force are of significant public interest to the Navajo Nation and applicable whenever possible.

Little or No Damage to The Opposing Party

The defendants have confessed at the hearing of these proceedings on the 9th of November, 1999, that the Montezuma Creek Clinic will be removed from the control and supervision of the San Juan Health Services District beginning the 1st day of January, 2000, in part at least due to the impact of this litigation. The defendants therefore argue that if the injunction issues now, it will only have effect for one month. The plaintiffs offer that even if for only a short time, that time is still crucial to the clinic's existence.

The defendants can not complain of damage due to large sums of back pay if the defendants

14

could have cut the time very short by telling the truth on May 14, 1999. "Justice delayed is injustice" and "(N)o party can claim prejudice if the ability to prepare or raise claims was within his or her control, as here." *Plummer v. Plummer*, A-CV-30-89 at page 182.

Plaintiffs will Suffer Irreparable Injury if the Injunction Does Not Issue

If the injunction does not issue, people will consider the charges and actions against the plaintiffs to be true, and they will continue to suffer the irreparable harm to their names and reputations as attested to by the testimony of Pauline Oakley, George Jones and Debby Benally. These witnesses testified as to the harm to the Clinic, and to the plaintiffs, in specificity; (a) stoppage of ambulance services; (b) interference with pharmaceutical services; (c) stoppage of lab services; (d) harm to the reputations of Mr. Riggs and Ms. Singer; (e) and violations of rights of association of the plaintiffs.

There will be a chilling effect upon the rights of all Navajo citizens in the work place if they do not believe there can be redress against their employers for rights violations in the workplace. San Juan County Commissioner Mark Maryboy testified that San Juan County has a deliberate pattern of not treating the Navajo people equally; violating the rights of Navajo and other Native American employees, and retaliation and discrimination against Navajo and other Native Americans that has continued for generations.

The harm has been irreparable. Ms. Singer testified that the scarcity of her personal resources, and the length of time the defendants have stalled these proceedings by obstructive tactics and false statements to the Court, has necessitated her to become separated from her husband in order for the family to financially survive. One can not quantify and compensate for the total disruption of a marriage and home done simply at the folly of her oppressors.

Mr. Riggs attested that his uncle, a veteran of the United States Armed Forces, died for these rights and freedoms for all Americans, and that can never be adequately compensated for by money or by the law. How does the Court or defendants compensate for the loss of rights bought with Navajo blood? It can't. Still, an injunction will begin the process of healing and the removal of the indignation of the phony fraud charge that still maliciously clouds Mr. Riggs' and Ms. Singer's name.

wn

13

Pauline Oshley testified as to the "shabby" treatment the manager's family has been giving to her, and her small children. How is a young Brenda Brown, as Montezuma Creek Clinic manager, supposed to give orders or reprimands to her elder Aunt, Dorothy Kay, and stay in keeping with Navajo tradition and the family interrelationship of "Ke"?

Likewise, the plaintiff's legal fees and costs continue to escalate rapidly. One way irreparable injuries may be partially compensated for is by the payment of accrued legal fees and costs, and all expenses necessary for the plaintiffs to defend their rights as the Court will order herein.

There is Substantial likelihood the Movants Will Succeed on the Merits

The plaintiffs stand more than an excellent prospect of success of prevailing on the merits in these proceeding given the presentation and testimony to date. Pursuant to the FSLA, the time cards are irrelevant as a reason for disciplining or terminating Ms. Singer and Mr. Riggs. Even speaking in the opposite even if Singer's fraud charge (which has been found to be not true by this Court) were taken as possibly true, that does not excuse the denial of due process and equal protection as evidence I herein.

Defendants have produced no well-founded or substantial evidence to rebut the plaintiffs claims of rights deprivation; and, the defendants have placed at risk numerous patients by billing policies they are using to continue to turn away otherwise eligible Native Americans from vital medical and emergency care at the Montezuma Creek Clinic, in violation of IHS contracts and regulations â not to even mention elementary common human dignity for their fellow man.

Patterns of Bad Faith Toward the Court

Bad faith conduct towards the Court, and all the surrounding circumstances as are found to be true and appropriate in the sound discretion of this Court, can likewise be grounds for the plaintiffs to prevail. Herein, the Court sees as obvious the harm to the public and plaintiffs' rights and the waste of judicial processes in this Court by the plaintiffs repeated misrepresentations of fact and law; spoliation of evidence; witness intimidation and tampering; obstructing testimony; sandbagging of evidence; and repeated and substantive violations of the Navajo Nation Rules of Civil Procedure.

Misrepresentation of facts and law in violation of NNRCP at Rule 11. On May 14, 1999,

18

Rule Violations. The defendants' have accumulated and advanced a substantial and impressive list of substantive rule violations under the Navajo Nation Rules of Civil Procedure which remain currently before the Court in various summary motions. The defendants, for example, plead fraud, without one piece of evidence as to Singer's intent to commit fraud, and without the specificity of pleadings as required by the Navajo Nation Rules of Civil Procedure at Rule 9. Despite this, local and international newspaper coverage published the ill-plead claim since it was in the May 14, 1999, 'Answer' of the defendants. The defendants have purposefully subjected Ms. Singer; Mr. Riggs; and Mr. Dickson, to a trial by tabloid.

All of the above enumerated actions of the defendants and defendants' counsel, have here constituted a pattern of behavior that only magnifies and exemplifies past and continued deprivations of the plaintiffs' inalienable rights, be they tribal or federal in nature, and harm to Native American patients and community in the Montezuma Creek area of the Utah Strip. As like in Gudac, such actions demonstrate the arrogance of the defendants, their cultural insensitivity, and the contempt and disdain in which they hold this Court; the Navajo Nation judicial system; and Native Americans in general.

Damages such as deprivation of rights; discrimination; denial of due process; infringements on freedom of speech; denial of dignity; and impunity of a person's reputation are all deprivations that far exceed mere deprivation of money, or employment or embarrassment. These constitute "direct action.... potent with circumstances... irretrievable." Adams v. Vance, 570 F.2d 950, 953 (1978). No amount of money, no availability of any Order of the Court, can fully compensate the plaintiffs and the Native American population in the Montezuma Creek for these past and ongoing substantial and inestimable damages.

While not controlling in the Navajo Nation Court as a matter of law it is at least instructive that this Court look to our sister sovereign through its Tenth Circuit and see that when the United States of America finds that when the three requirements of injury, ongoing harm, and more potential harm to the plaintiffs outweighs the harm to the defendants, then the plaintiffs need "only show that they have raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation". Tri-State Generation and Transmission Association, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 358 (10th Cir. 1986). Here, to date, facts show, that not only are three

81

17

defendants called the plaintiffs 'bold faced liars' as to activities at the Clinic, injuries to the Native American patients of the Clinic, and misrepresented *Sampson v. Murray*, upon which the Court relied to discharge its TRO. If minimal research had been done by the defense, and the truth had been told, and which Navajo Nation case law depended upon, the TRO could have easily been simply replaced by the Preliminary Injunction on May 14, 1999, with no further deprivations to the plaintiffs of rights, time, money, embarrassment and loss of reputation by a trial by tabloid conjured by the defendants. Further, numerous diabetic patients would not have continued to go without treatment for a life threatening disease.

Spoliation of evidence. Evidence submitted with the time cards of the Districts time cards shows, Richard Bailey's time card, that was viewed by plaintiffs Counsel and Bryan Bolander, is missing. This card showed Bailey represented he worked 80 hours with a hand written '80' on a card he signed when he was working full time for San Juan County as the County Administrator, and as well claimed full time employment in the same time period with the San Juan Health Services District. Mr. Bailey was never disciplined for working in one place full time while he was employed full time at another and drawing full compensation from both positions at the same time.

Witness Intimidation. Debbie Benally testified she had never spoken with Mr. Wood prior to the day before her testimony, at which time he warned her over the telephone in the evening hours just before her anticipated testimony, as he did Ms. Singer personally, "you need to remember who you work for".

Ora Lee Black in her testimony stated the reason she did not wish to testify on Singer's behalf, or submit her affidavit which she declared to be true in all respects.

Ora Lee Black testified that she and the other nurses had been told "not to get involved" in the case by Reid Wood, after submitting their affidavits in support of Ms. Singer in respect to her position as manager of the Montezuma Creek Clinic.

Surprise and Prejudicial Evidence. Nearly all of the defendants' evidence was submitted to the Court, despite prior discovery applications as provided for in the Navajo Nation Rules of Civil Procedure, in the last hour or so of a 19 hour hearing, without notification or review by plaintiffs' counsel prior to its presentation in the September 24, 1999, hearing.

19

elements satisfied, but overwhelmingly, it is also the case that the fourth prong has been met.

The Navajo Preference in Employment Act defines the rights of employees in the work place of the Navajo Nation. The Navajo Preference in Employment Act has been violated by lack of clear warnings; lack of a fair hearing process; retaliation for grieving discriminatory acts; and lack of willingness to eliminate the problems. If the Navajo Preference in Employment Act has been violated, it is presumptive that the Native American employee's rights have been violated and Navajo Nation public policy has been undermined and disregarded for naught.

Chilling Effect

Resultantly if injunction does not issue herein the public, Native American and non-Native American alike, will believe erroneously that nothing can be done when the San Juan Health Services District, or when any other entity; organization; group; or individual violates their rights, and such an assumption will have a chilling effect upon others who may wish to come forward with similar claims, and suppress such efforts to the detriment of all Native Americans and non-Native Americans alike. Such is not the foundation of a free society, and shall not be commenced here.

Conclusion

The defendants have, compared:

Failed to show how a service district, a minor political subdivision, is an "arm of the state" with immunity under Alden, et al. v. Maine, ____ U.S. , Docket No. 98-436, when Alden exempts minor political subdivisions from immunity; and,

Failed to show how civil rights violations are given immunity, when Alden v. Maine exempts those types of injuries from immunity, and Alden did not address Navajo civil rights as defined within Navajo custom and traditions; and,

Failed to show how a special service district not implementing a merit system within the Utah Special District Personnel Management Act as "is established" by the Utah legislature, can be an "arm of the state" if it is violating the laws of the State within which it seeks to obtain immunity; and,

Failed to show how a minor political subdivisions limited governmental authority exceeds that of the entire Navajo Nation sovereignty, particularly when the injury sustained by the plaintiffs so specifically directly effects the health and welfare of the Navajo Nation chapters

19

and their residents pursuant to the Montana exception of Strait v. A-1 Contractors; and,

Failed to show how a minor political subdivision of a State can benefit itself an the taxpayers of the district by voluntarily seeking out and entering into contracts with Navajo citizens, within the Navajo Nation boundaries, and then treat the Navajo Nation's customs and traditions; Bill of Rights; the Navajo Preference in Employment Act; the Utah merit system requirements, and HIS contract obligations, all with impunity, and believe that the district is somehow now immune from claims injury; and further,

Failed to show, or raise any issue or defense, as to the transcription records of the proceedings herein being unavailable by their inaudibility, despite the order of the Court the 9th of November, 1999, to notify the Court of any problem, and therefore the Court finds that the parties have waived any such issue or defense thereto; and,

Accordingly, as set forth fully in the foregoing, injunctive relief is overwhelmingly justified and shall issue immediately. It is clear and convincing to the Court that the plaintiffs have (1) demonstrated to the Court that they have a claim framed in a protectable right or interest and have a high likelihood of success on the merits; (2) that are likely to suffer irreparable injury, loss, or damage to that protectable right or interest unless injunctive relief is issued; (3) that the likely injury, loss or damage to the plaintiffs are substantial in nature and character; and (4) that the plaintiffs do not have an otherwise available and adequate remedy at law. These protectable rights include denial of due process; denial of equal protection; denial of free speech and assembly; defamation; theft; conspiracy; and interference with the public policies of the Navajo Nation.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED:

That the defendants be and are hereby ordered to immediately reinstate Ms. Singer and Mr. Riggs to their previous positions of employment as was occurring on the 1st day of November, 1998; and,

That the defendants be and are hereby ordered to immediately tender to Mr. Dickson full time status as an employee of the Montezuma Creek Clinic and that he be paid all commensurate back pay and benefits as may be due to him from the occasion of being eligible for such status; and,

20

That the defendants be and are hereby ordered to immediately pay all lost income from whichever source derived within the District, including but not limited to full back pay and compensation as well as back benefits to the plaintiffs, including but not limited to retirement benefits and other compensations regularly received by the plaintiffs with all such compensations to be credited and/or paid immediately; and,

That the defendants be and are hereby ordered to delete and expunge all the charges and writings pertaining to the December 2nd through the December 8th 1998 charges of fraud, discipline, and termination, from Mr. Riggs and Ms. Singer's personnel file, with a letter so stating the expungement to the plaintiffs and to this Court; and,

That the defendants be and are hereby ordered to not put Ms. Singer, and other like managers, and Mr. Riggs, and other like Physicians Assistants, on hourly time card keeping requirements for the purposes of salary and compensations or otherwise; and,

That Ms. Singer be returned to her role and position as a technician for and on behalf of the San Juan Health Services District; and,

That the defendants be and are hereby ordered to not interfere with clinic operations or move any clinic personnel; and,

That the defendants be and are hereby ordered to issue full payment of attorney's fees, costs, and expenses associated with these proceedings to date to be paid by cashier's check within five working days of the issuance of the injunction and to be paid not later than the 31st day of December, 1999, by and through the Registry of this Court; and,

The Court orders a waiver of any security deposit due to (a) the limited financial circumstances of Ms. Singer, Mr. Dickson, and Mr. Riggs and (b) SJHSD's placing of Montezuma Creek Clinic employees in jeopardy as the transition from state to local tribal management nears; and,

The Court order that the defendants be and are hereby prohibited from:

Eliminating Emergency Medical Technician services and coverage within the territorial jurisdiction of the Navajo Nation in service to the local Navajo and other Native American population for or on behalf of the Montezuma Creek Clinic; and,

Interfering with the laboratory services to the Montezuma Creek Clinic; and,

Interfering with the pharmaceutical services provided to the Montezuma Creek Clinic, and

21

immediate payment of all current and past due billings; and,

Interfering with any form of patient care, by, among any other matter or things, billing IHS patients; and,

Interfering or harassing Ms. Singer as the manager of the Montezuma Creek Clinic; and,

The Court further hereby Orders the defendants to assist the Montezuma Creek Clinic and the local Navajo Chapters, and chapter governments, by any means necessary, including Navajo and Ute language announcements on Navajo Nation wide radio; letters, etc. to help diabetic IHS patients to return to the clinic for treatment, including informing such Native American patients that as an IHS patient they do not have to directly pay for their health care treatment at the Montezuma Creek Clinic; and,

The Court further Orders that the plaintiffs report any such interference, harassment, or intimidation of Montezuma Creek Clinic operations, patients, and employees immediately to this Court; and,

The proceedings in chief herein be and are hereby scheduled for initial pretrial conference by this court, unless these proceedings are not earlier settled and compromised by the parties by stipulation on the limited factual; legal; and damage issues remaining.

So Signed and Ordered this 28 day of December 1999, at 2:45 AM/PM.

The Honorable Raymond A. Begaye
District Trial Judge of the Navajo Nation

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE INSTRUMENT ON FILE IN THE COURTS OF THE NAVAJO NATION.
Mildred L. Mitchell
CLERK, COURTS OF THE NAVAJO NATION

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."
Clerk, District Court of the Navajo Nation

William P. Battles
Battles and Associates
*Attorney for the Plaintiff*
203 Shomo Blvd.
Window Rock, Navajo Nation (AZ) 86515
505-871-2525

Susan R. Schildmeyer, Utah State Bar No. 7985
*Attorney for Plaintiff*
11091 S. Shilling Ave. Suite 2452
South Jordan, Utah 84095
(801) 576-0091

**THE NAVAJO NATION DISTRICT COURT**
**JUDICIAL DISTRICT**
**OF SHIPROCK**

| | |
|---|---|
| DONNA SINGER; Fred Riggs C#18570; Alison Dickson C#212,765; Plaintiffs, | SR-CV-162-99-CV |
| vs. | |
| SAN JUAN COUNTY; San Juan Health rvice District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy[1]; John Lewis; Commissioner J. Tyron Lewis; Karen Adams; Patsy Shumway[2], R. Dennis Ickes, Truck/Farmer's Insurance Company, and other John and Jane Does as yet unnamed in personal and official capacities Defendants, | COMPLAINT FOR DAMAGES<br>(Modified)<br>(Jury Trial Requested) |

NOW COME THE PLAINTIFFS, Donna Singer (Mrs. Singer), Fred Riggs, (Mr. Riggs) and Alison Dickson (Mr. Dickson), by and through the undersigned counsels, and to the best of their information and belief, allege the following cause(s) of action

[1]In his official capacity only.
[2]In her official capacity only.

EXHIBIT P 33

against the defendants, and each of them, in their official and private capacities (except Mr. Mark Maryboy and Mrs. Patsy Shumway and Mary Nielson ) both jointly and severally at all times herein and throughout, in this modified complaint, wherein all modifications are identified with underlining, for the convenience of the Court and opposing counsel, in accord with traditional recognized methods used in modifying legislation , as follows:

THE PARTIES

As to the Defendants

1. That each of the defendants herein stated, with the exceptions of Mark Maryboy and Patsy Shumway and Mary Nielson, are sued, hereinafter and throughout this suit, in their official and individual capacities, both express and implied, jointly and severally; and,

2. That San Juan County, a Utah county, is sued as governing authority over the San Juan Health District and in its own right.

3. That San Juan Health Services District (SJHSD) is sued as the employer of the plaintiffs and, at all times herein and throughout this legal action, San Juan County's alter ego.

4. That Commissioner Bill Redd (Bill Redd) is sued as a San Juan County Commissioner and SJHSD Trustee and Administrative Board member.

5. That Commissioner J. Tyron Lewis 9Tyrone Lewis) is sued as a San Juan County Commissioner and SJHSD Trustee and Administrative Board member.

6. That Commissioner Mark Maryboy (Mark Maryboy) is *sued in his official capacity, express or implied, only,* as San Juan County Commissioner and SJHSD Trustee and Administrative Board member.

7. That Patsy Shumway (Mrs. Shumway) is *sued in her official capacity, express or implied, only,* as SJHSD Administrative Board member,

8. That Rick Bailey (Mr. Bailey ) is sued as San Juan County Administrative Aide and SJHSD interim Executive Director and CEO.

9. That Reid Wood (Mr. Wood) is sued as SJHSD interim CEO, and now permanent CEO.

10. Delete

11. That Lauren Shafer (Mrs. Shafer) is sued as SJHSD Personnel Director of Nursing.

12. That Roger Atcitty (Mr. Atcitty) is sued as Chairman of the SJHSD Board.

13. That Karen Adams (Mrs. Adams) is sued as a SJHSD board member.

14. That John Lewis (Mr. Lewis) is sued as a SJHSD board member.

15. That San Juan County Attorney Craig Halls (Mr. Halls) is sued as the San Juan County Attorney;

16. That Patsy Shumway (Patsy Shumway) *is sued in her official capacity, express or implied, only,* as a SJHSD board member; and,

Additional Parties

16a. The plaintiffs add the defendants Dennis Ickes and Farmer's Insurance

Companies and Truck Insurance companies as defendants in caption and otherwise to these proceedings.

17. That these proceedings are brought under Navajo law, including but not limited to, the *Navajo Nation Bill of Rights*, the *Navajo Nation code*, defendants contractual relationships-Utah Merit System Employment agreements, Utah Navajo Trust Fund agreements, Indian Health Service contracts, and Medicaid and Medicare contracts- conducted with the territorial jurisdiction of the Navajo Nation; *Navajo Custom and traditions*, the *Navajo Preference in Employment Act*, including the *United Nation Declaration of Human Rights*; *United Sates Bill of Rights*, the *Constitution of the State of Utah*, and the *Utah Code* under 17A, 9-9-208, 9-9-209. Exhibit 2,3,4,5,12 and 21.

18. That all Labor Commission and Office of Navajo Labor Relations claims of the Plaintiffs will not be prohibited from being heard in this Court, after such time as the plaintiff's employment claims have gone through their respective administrative process.

19. That this court has jurisdiction over the parties and subject matter pursuant to 7 NNC. 253 and 7 NNC 254, and the Navajo Nation's independent and inherent sovereignty that is encouraged by federal Statute at 25 U.S.C. 450a, and is undiminished by the Treaty of 1868, and Utah Code sections 9-9-208 and 9-9-209 among others, and the United States Supreme Court "*Montana* exception" in Montana V. United States, 450 US 544 at 565 to566 (11981). See likewise the

attached MEMORANDUM OF LAW, attached hereto as Attachment C.

STATEMENT OF FACTS

*Plaintiffs*

Mrs. Singer

20. Mrs. Singer has worked for San Juan County and the San Juan Health Care systems for approximately 18 years. Exhibit 64.

21. Mrs. Singer has been married to Louis Singer, en enrolled Navajo Nation member, at all times for 26 years. Exhibit 23.

22. The Singers' traditional residence is just outside Black Mesa, Navajo Nation.

23. Mrs. Singer has an employment record that demonstrates she received regular pay raise recommendations and implementations. Exhibit 24.

24. Mrs. Singer has steady increases in responsibility with management of Montezuma Creek Health Clinic as her last position. Exhibit 24.

25. Mrs. Singer was the manager of Montezuma Creek from the time it began SHJSD operations until on or about December 1, 1998. Exhibit 24.

26. Montezuma Creek was demonstrating profitable activities under Mrs. Singers leadership and management. Exhibits 15 and 16.

27. Mrs. Singer, without written 'just cause' at that moment in time, was told to leave the building and not come back on or about December 4, 1998. Exhibit 64.

28. Mr. Wood admitted he discharged Mrs. Singer by consulting with others.

29. Mr. Wood admitted that "time cards" were not the problem or cause of Mrs.

Singer's discharge from her employment. Exhibit 39.

30. Mr. Wood has called Mrs. Singer a 'liar and a cheat'; the 'enemy'; 'evil', and 'cancerous' with no evidence or foundation in fact.

31. Mrs. Nielsen has used these terms in aforestated in paragraph 41 to describe Mrs. Singer.

32. Mrs. Singer was discharged with an allegation of "time card fraud" and signing off on Mr. Biggs "erroneous time card". Exhibits 34-37.

33. Mrs. Singer over the years had made numerous minor time card mistakes. Exhibits 25,27,28,30,33 and 40.

34. Many people throughout the San Juan Health Services District system made time card mistakes. Exhibits 42.

35. Mrs. Singer made a mistake on the November 13, 1998 timecard. Exhibit 30.

36. Mrs. Singer was in Blanding when an unknown person at Montezuma Creek Health Clinic clocked in on her card. Exhibit 31.

37. Mrs. Singer received no official letter or notice with warning language concerning time card mistakes or errors in nearly 18 years of working for San Juan County and SJHSD. Exhibit 26.

38. Mrs. Singer received a letter from Mrs. Shafer congratulating her on the improvement in her time cards. Exhibit 29.

39. Mrs. Shafer knew Mrs. Singer had many serious and weighty matters to attend to at Montezuma Creek Health Clinic as part of her employment position and

yet did nothing to put the time card mistake into the perspective of a reasonable person, and did nothing to prevent her discharge. Exhibit 64 and 65.

40. Mrs. Nielsen from time to time does not give people overtime pay if it was not approved ahead of time. Exhibits 42 and 30.

41. Mrs. Singer was not allowed to have overtime. Exhibit 30.

42. Mrs. Singer as a manage, and under Board approved SJHSD policies and procedures, was a Fair Labor Standards Act exempt employee. Exhibit 38.

43. SJHSD'S placing Mrs. Singer on time cards was in violation of SJHSD board policies.

44. SJHSD never instructed Mrs. Singer in the very serious labor law implications of time cards, except the legal importance of writing on them clearly.

45. Mrs. Singer was not Mr. Riggs supervisor.

46. Mrs. Singer was not responsible for Mr. Riggs time card's approval.

47. Mr. Wood was Mr. Riggs supervisor.

48. Mr. Wood as Mr. Riggs supervisor was responsible for reviewing Mr. Riggs "time card".

49. SJHSD never produced any evidence supporting an allegation of fraud against Mrs. Singer or Mr. Riggs.

50. Mrs. Singer was asking questions about ambiguous budget expense items put onto Montezuma Creek Health Clinic's budget at a public meeting of the Administrative Control Board of the San Juan Health Services District regular

monthly scheduled meeting as a participating member of the audience. Exhibits 17 and 28.

51. Mrs. Singer was privately supportive of a private hospital coming into Blanding. Exhibit 64.

52. Prior to termination Mrs. Singer publicly supported the private hospital. Exhibit 64.

Mr. Riggs

53. Mr. Riggs is a Physician's Assistant at Montezuma Creek Clinic. Exhibit 45.

54. Mr. Riggs has worked for SJHSD for approximately four years.

55. Mr. Riggs had a *spotless* twenty three year career until December 1, 1998.

56. Mr. Riggs had a substantial reduction in pay in November 1998 due to an alleged "Reduction in Force". Exhibits 45,46.

57. SJHSD's Reduction in Force did not comply with a merit system.

58. SJHSD's Reduction in Force did not comply with the Navajo Preference in Employment Act.

59. SJHSD has not given Mr. Riggs any written notice explaining the NPEA's 'just cause' for his wage cut of November 1998.

60. That on the 11th day of November, 1998, Mr. Wood threatened Mr. Riggs employment when Mr. Riggs simply asked the administration how he was to paid for taking an emergency call scheduled later that day since he had just been put on time cards. Exhibit 45.

61. Mr. Wood is an FSLA exempt employee according to the SJHSD personnel policies and procedures.

62. Mr. Riggs was charged with "time card fraud" on or about 1st day of December, 1998. Exhibit 48.

63. Mr. Riggs was put on administrative leave with pay on or about December 1, 1998. Exhibit 48.

64. Mr. Riggs was allowed to return to work on a thirty day probation. Exhibit 50.

65. Mr. Riggs was kept on probation of over thirty days.

66. Mr. Riggs has not had the time card letters referring to 'fraud', 'misconduct', or 'violation' withdrawn from his file. Exhibit 48,49, and 50.

67. Mr. Wood, after the aforesaid discipline, offered a substantial promotion to Mr. Riggs. Exhibit 45.

68. Mr. Wood specifically wished to place Mr. Riggs over "time cards". Exhibit 45.

69. Mr. Wood has called Mr. Riggs "greedy".

70. Mr. Wood withdrew the aforesaid job promotion offered to Mr. Riggs because Mr. Riggs accused Mr. Wood of discrimination.

71. Mr. Wood lied to Mr. Bailey about the severity of discipline he gave Mr. Riggs. Exhibit 51.

Mr. Dickson

72. Mr. Dickson is a medical records and billing clerk (PAR).

73. Mr. Dickson has worked for six months as a 'temporary full time' employee.

74. Mr. Dickson continued working after the individual he was filling in for, returned from maternity leave.

75. SJHSD continued cutting checks to Mr. Dickson for his work.

76. SJHSD was aware Mr. Dickson had been working 40 hours a week.

77. Mr. Dickson has worked over 5520 hours, in addition to the six months temporary position. ONLR complaint [attached]

78. SJHSD Personnel Policy and Procedures mandates that a person 'will'' become a 'regular' employee after 520 hours. Exhibit 55.

79. Mr. Dickson has an excellent evaluation.

80. Mr. Dickson has requested hee be put on as a regular employee. ONLR complaint [attached]

81. Mr. Dickson has requested he be given permanent full time employee.

82. Mr. Dickson, pursuant to the applicable Personnel Policies and Procedures of the San Juan Health Services district, has been recommended for full time status employment. Exhibit 61.

83. Mr. Wood misrepresented Mr. Dickson's work experience with the San Juan Health Services District and the nature and resolve of Mr. Dickson's grievance complaint to Mr. Bailey, and insisted in writing that Mr. Dickson be denied a grievance hearing. Exhibit 56.

84. That Mr. Dickson was denied his rights to a grievance hearing.

85. Mr. Dickson, prior to Mr. Wood's misrepresentation to Mr. Bailey, signed an affidavit as to racially insensitive and derogatory remarks and policies by Mr. Wood. [delete]. Exhibit 57.

86. Mr. Dickson has not been given his permanent status with the accompanying pay raises and benefits.

87. Mr. Dickson, as a Montezuma Creek Health Clinic billing clerk, has been publicly called 'rebellious' and 'slanderous' by Mrs. Nielson.

88. Mrs. Nielson's defamatory and slanderous name calling was published in a newspaper.

89. Mrs. Nielson is attempting to have the billing clerk positions moved to Monticello hospital.

90. Mrs. Nielson told Mr. Wood that Mrs. Singer was/is dishonest.

91. Mrs. Nielson told Mr. Wood on or about, or prior to, December 1, 1998 that Mrs. Singer was not in Blanding, Utah on November 13, 1998 when her card was clocked in at 8:36 a.m.

102. Mrs. Nielson has represented to others that Mrs. Singer is dishonest.

103. Mrs. Nielson's defamatory and slanderous name calling of Montezuma Creek Health Clinic employees and plaintiffs' witnesses was reported on the radio.

104. Mrs. Nielsen told Mr. Dickson to cut his hours back to 32d and reminded him his position probably "wasn't that necessary". ONLR complaint [attached].

Defendants San Juan Health Service District and San Juan County

105. SJHSD is an alter ego of San Juan County.

106. San Juan County commissioners were members of the San Juan Health Service Board at the time the plaintiffs claims arose in November and December 1998.

107. San Juan County has given SJHSD money.

108. San Juan County has expanded the number of board members from five to six and then to seven.

109. San Juan County attorney held himself out as SJHSD's legal representative on January 19, 1999, due to his authority as a County Attorney.

110. Mr. Halls stated he had no private contracts with SJHSD.

111. Utah Code does not give the County Attorney the authority to represent a special service district, with the exception of advising board members of their duties.

112. Utah Code gives authority to a special service district to select their own legal counsel.

113. Mr. Halls was aware, or should have been aware, of the Special District Personnel Management Act in 1992 when it was adopted, or since the statutes adoption.

114. Mr. Halls has a responsibility to enforce the law in San Juan County.

115. Mr. Halls, as representative of San Juan Health Services District, had a responsibility to ensure that the San Juan Personnel and Policies adhered to the

NPEA and Utah Code 17A-2-601 -603.

116. Mr. Halls had a responsibility under Utah code to inform the San Juan Health Service's District's trustees of SJHSD's noncompliance with NPEA and the Utah Special District Personnel Management employment laws.

117. Mr. Halls had custody of Mrs. Singer's records prior to her receipt of them.

118. Mr. Halls had no authority to review Mrs. Singer's personnel file after her termination.

119. Mr. Halls counseled Mr. Wood, and/or SJHSD's employees, board members or their other agents, contractors, and/or other associates concerning Mrs. Singer and her discharge.

120. Mr. Halls counseled Mr. Wood, and/or SJHSD's employee's, board members, or their agents, contractors, and/or associates concerning Mr. Riggs and his discipline.

121. Mr. Halls never informed SJHSD Administrative Control Board that 'at-will' employment is illegal for a special district with revenues over $50,000.

122. Mr. Halls never informed San Juan County of SJHSD's noncompliance with NPEA and/or the Utah Codes.

123. SJHSD'S Administrative Control Board has a fiduciary responsibility to the taxpayer's of San Juan County.

124. SJHSD's Administrative Control Board has a fiduciary responsibility to the Navajo patients it serves.

125. SJHSD Administrative Control board had an obligation not to hear, or discuss, review plaintiffs' exhibits that was given to the San Juan County Commissioner's Redd and Maryboy and Mr. Halls without the plaintiff's presence.

126. SJHSD has a responsibility to respond to Government Records Access Management Act requests.

127. SJHSD has a responsibility to discipline employees in a uniform and unbiased fashion.

128. SJHSD's Administrative Control Board has a responsibility to know the law and follow it.

129. SJHSD's Administrative Control Board violated the NPEA and the Utah Code when it adopted its Personnel Policy and Procedures from 1993 forward.

130. SJHSD is not structured in accordance with Utah Code.

131. San Juan county is accountable for all the actions of SJHSD.

132. San Juan county has a responsibility to enforce the law.

133. San Juan county was aware of statutory violations and took no actions against the SJHSD.

134. San Juan County can withdraw SJHSD's delegated powers.

135. San Juan County was aware of contractual violations by SJHSD and took no formal actions to bring SJHSD into compliance.

136. SJHSD organization resolution of 1988 prohibits county commissioners from sitting on its administrative Control Board. Exhibit 5.

137. SJHSD is supposed to have liability insurance for its board members.

138. SJHSD board members had no liability insurance at the time the plaintiff's claims arose.

139. San Juan county is currently paying for an employee production survey for SJHSD.

140. San Juan county is currently paying for the legal fees of SJHSD's previous interim CEO, Mr. Bailey.

141. San Juan County is currently paying for SJHSD's legal fees previous legal counsel, Mr. Halls.

142. Mr. Halls has represented to others that Mrs. Singer is not honest.

143. San Juan county is currently responsible for paying SJHSD's legal counsel.

144. San Juan county is paying SJHSD's legal fees.

145. San Juan County Commissioners have a fiduciary responsibility toward the taxpayer's of San Juan County.

146. San Juan County Commissioners are responsible for the repayments to the Utah Navajo Trust Fund.

147. San Juan County Commissioners were acting *ultra vires* at the time plaintiffs claims arose.

148. SJHSD board members do not accurately represent the racial apportionment for San Juan County in the numbers of Navajos on the board. Exhibit 6.

149. SJHSD does not adhere to merit system principals of the Utah Code 17A-106

through 603.

150. SJHSD has not referenced the Navajo Preference in Employment Act in its personnel policy and procedures manuals.

151. SJHSD has not advertised administrative or other positions on Navajo Nation radio or in the Navajo Nation newspaper.

152. SJHSD has not advertised for Mrs. Singer's replacement in a Navajo Nation paper or a Navajo Nation radio station.

153. SJHSD has not fully accounted for how the UNTF start up funds for Montezuma Creek Clinic were used.

154. SJHSD placed expenses of the hospital on to Montezuma Creek Health Clinic's expense budget.

155. SJHSD knew Mrs. Singer had time card problems for years.

156. SJHSD alleges that Mrs. Singer was responsible for over nearly all others employees' time cards at Montezuma Creek Health Clinic.

157. Mrs. Singer apologized for making her time card mistakes.Exhibits 27,28,and 32.

158. SJHSD, through its administrator Mr. Wood wanted to make Mr. Riggs responsible for nearly all of the Montezuma Creek Health Clinic personnel's time cards.

159. SJHSD, through its administrator Mr. Wood wanted to make Mr. Riggs responsible for nearly all of the Montezuma Creek Health Clinic personnel's time cards.

160. Mr. Riggs is one of the most valuable employees at Montezuma Creek Health Clinic. Exhibits 52, and 53.

161. Mr. Riggs had received a pay raise granting him additional compensation for his bilingual duties at Montezuma Creek Health Clinic. Exhibit 53.

162. SJHSD knew Mr. Riggs had no training on time cards.

163. SJHSD's Personnel Policy and Procedures mandate training and orientation of employees. Exhibit 63.

164. SJHSD has a time card policy that does not indicate discharge is the remedy for mistakes. Exhibit 58.

165. SJHSD changed the progressive discipline policy to be in the supervisor's discretion in 1995. Exhibit 62.

166. SJHSD was under a fiduciary obligation to be sensitive to the special conditions of the Indian populations it serves at Montezuma Creek Health Clinic and Monument Valley Clinic. Exhibit 11.

167. SJHSD violated the cultural sensitivity portion of their Indian Health Service contracts. Exhibits 9,10, and 13.

168. SJHSD has failed to meet its fiduciary responsibilities of their UNTF contract. Exhibits 7,8,9,13,14,15, and 16.

169. SJHSD ignored the Aneth and Red Mesa resolutions to reinstate Mrs. Singer and Mr. Riggs. Exhibit 1.

PLAINTIFFS' CLAIMS

The Right to Free Speech as protected by the Navajo Nation, the United Nations, and the United States.

170. All facts so stated above will bee incorporated herein.

171. Mr. Riggs, Mrs. Singer, and Mr. Dickson all spoke out in order to notify a supervisor or board of an illegal or potentially illegal act. Exhibits 17,64,65,60, and 57.

172. Mr. Riggs spoke out about discrimination and had a promotion withdrawn. Exhibit 45.

173. SJHSD refuses to remove their fallacious charge from Mr. Riggs file.

174. SJHSD refuses to remove their fallacious charge from Mrs. Singer's file.

175. SJHSD refuses to hire Mr. Dickson as a regular employee.

176. Mr. Riggs was punished for charging Mr. Wood with discrimination. Exhibit 45.

177. SJHSD Personnel Policies and Procedures prevent any recriminations to employees for grieving. Exhibit 54.

178. It is against the law to threaten, coerce, or restrain in any manner a person who may testify about discrimination.

179. Mr. Singer spoke out about private hospitals coming into Blanding and was criticized and labeled as and 'enemy' to the hospital; a liar and a cheat; and evil. Exhibits 17, and 64.

180. Mr. Dickson spoke out about the CIB policy and Mr. Woods reference liking it to a 'dog tag' and has not been given his full time employee status. Exhibit 57.

181. Plaintiffs Navajo witnesses have been threatened with having their employment

positions moved eighty or so miles away to Monticello for reporting Mrs. Nielsen and Mr. Woods racially insensitive and derogatory comments.

182. The right to speak freely is a property interest that is protected and justifies compensation when taken under Navajo custom and traditions and law.

183. Navajo law provides greater protections for free speech than the State of Utah or the United States government.

Freedom to Assemble as Protected by the Navajo Nation, the United Nations, and the United States

184. All facts so stated above are incorporated herein.

185. Mrs. Singer has been spoken to in sharp and/or condescending tones twice, by Mr. Wood, for attending Navajo chapter meetings on her own time.

186. Mrs. Singer has been told by Mr. Wood that she was in the wrong place when she was attending public board meetings.

187. Mr. Wood told the Montezuma Creek Clinic employees they were not to talk to Mr. Riggs and Mrs. Singer when Mr. Riggs and Mrs. Singer were put on administrative leave.

188. Mrs. Singer has not attended SJHSD board meetings since her December 1998 dismissal.

189. Dr. Jones has been spoken to in harsh, angry condescending tones for his association with Mrs. Singer.

190. The right to freely assemble is part of the right of a person to seek redress in their community for injuries they have suffered.

The right to Due Process protected by the Navajo Nation, United Nations, and the United States

191. All facts so stated above are incorporated herein.

192. That the San Juan Health Service District has denied Mrs. Singer, Mr. Riggs, and Mr. Dickson of their due process rights by acting in a manner that is contrary to the applicable Personnel Policies and Procedures of the San Juan Health Services District; the Navajo Preference in Employment Act; the Navajo Bill of Rights; the United States, and/or the applicable Utah Merit System act of the State of Utah. Exhibits 4,21,22,59,62.

Mrs. Singer and Mr. Riggs

193. SJHSD denied the plaintiffs their right to a pre-discharge and pre-disciplinary hearing with her supervisor. Exhibit 59 and 19.

194. SJHSD denied plaintiffs their right to identify and be confronted by their accuser.

195. SJHSD denied plaintiffs their right to present evidence and compulsory witnesses on their own behalf, and,

196. SJHSD denied plaintiffs their right to know ahead of time what charges, evidence and witnesses will confront them; and,

197. SJHSD denied plaintiffs their right to have a fair and impartial hearing officer decide the matter of the allegations made against them.

198. SJHSD denied plaintiffs their right to have a clear and unequivocal statement of the charges upon which Mrs. Singer's discharge, and Mr. Riggs' discipline and RIF pay

cut, and Mr. Dickson's non permanent status, is based. Exhibits 34, 35, 36, and 48,49, and 50, and 51.

199. SJHSD's charges against Mrs. Singer and Mr. Riggs involve 'misconduct' which is a charge involving willfulness. Exhibit 36 and 37.

200. SJHSD failed to clearly and unequivocally 'warn' the plaintiffs. Exhibit 26.

201. SJHSD had no authority to charge Mrs. Singer with time card fraud, misconduct, or violations, for time card problems because by policy she was FSLA exempt. Exhibit 38.

202. SJHSD had no authority to charge Mr. Riggs with time card fraud, misconduct, or errors or any other issue with time cards due to his nearly twenty three years of being FSLA exempt, even at the time administered.

203. SJHSD never gave Mr. Riggs a letter stating the just cause for putting Mr. Riggs on of time cards. Exhibit 46.

204. SJHSD could have corrected Mr. Riggs and Mrs. Singer's problems by simply taking them off of time cards, as indicated in the San Juan Personnel Policies and Procedures. Exhibit 62.

205. SJHSD denied the plaintiffs their right to a clearly enumerated list of evidence upon which the discharge and discipline and failure to reinstate or make them whole are based.

206. SJHSD denied the plaintiffs their right to a hearing panel that is not inherently structurally flawed nor tainted.

207. For Mr. Dickson to grieve Mr. Woods action, he would have to first grieve to Mr. Woods who already purposefully misrepresented Mr. Dickson's work history to Mr. Bailey. Exhibit 51.

208. Mrs. Singer grieved her discharge. Exhibit 44.

209. SJHSD denied the plaintiffs their right to a timely hearing and timely decision. Exhibit 62.

210. SJHSD denied the plaintiffs their right to a decision with clearly stated the unambiguous facts upon which administration relied and their conclusions of law.

211. SJHSD denied the plaintiffs their right to have the burden of proof of their 'fraud' allegation rest with the accuser, rather than San Juan Health Services District placing the burden of proving their innocence upon the plaintiffs.

212. SJHSD denied the plaintiffs their right to have and expect employment policies to be carried out in an impartial and uniform manner throughout the employees of the San Juan Health Services District. Exhibit 59.

Mr. Dickson

213. SJHSD denied the plaintiff Mr. Dickson's right to any type of a fair and impartial hearing to be given his permanent full time status, as evidenced by all the above violations by the defendants and Mr. Wood's statement referencing that since no action was taken, there was none to grieve. Exhibit 51.

214. SJHSD denied Mr. Dickson's right to any type of impartial hearing officer, as the person denying him his permanent status is now the CEO of San Juan Health

Services District.

Wrongful Hiring

215. All facts so stated above are incorporated herein

216. San Juan County, acting by and through its alter ego, SJHSD, when it hired Mr. Wood without a thorough SJHSD Administrative Control Board interviews of Mr. Wood, did initiate the eventual harm perpetrated upon the employees.

217. But for the hiring of Mr. Wood, the employee plaintiffs may never have been harmed.

218. The burden of the SJHSD Administrative Control Board with fiduciary duties to taxpayers, employees, and patients to ask probing and investigative questions prior to hiring, including examining the person's experience in dealing with Native Americans, is not overly burdensome.

219. San Juan County and SJHSD had a responsibility to examine Mr. Wood's background from other sources than Mr. Woods.

220. Mr. Wood during the previous fifteen (15) years of work prior to coming to SJHSD had no experience with Indian Health Service contracts, and the Yavapai and Apache who lived within 20 miles of the Marcus J. Lawrence Hospital Mr. Wood previously managed, had to travel 120 miles for clinic and hospital needs.

Defamation and Tortuous Interference with Future Contractual Relations

221. All facts stated above are incorporated herein.

222. The fraud charges have harmed Mr. Riggs and Mrs. Singer's reputation.

223. Charges of criminality such as fraud are presumed at law to cause harm.

224. There are people who have known Mrs. Singer for many years who now have grown suspect that Mrs. Singer is a 'liar and a cheat', of the further evidences the harm such scurrilous charges have caused Mrs. Singer.

225. Her health deteriorated from the stress of having gone through such a vicious discharge, to the point of where she almost died and has had infections that were difficult to overcome. Exhibit 41.

226. Mr. Wood has defamed Mrs. Singer by calling her the 'enemy' to other employees with the SJHSD.

227. Mr. Wood has defamed Mrs. Singer by viscously attacking her as 'evil', involved in 'cancerous' activities, as being a 'liar and a cheat', among other names, to other employees in SJHSD.

228. Mr. Riggs has suffered from having a fraud allegation on his previously 23 year flawless record.

229. Mr. Dickson has suffered personal embarrassment from being labeled rebellious and insubordinate and having this label published in the newspaper.

Theft claims

230. All facts stated above are incorporated herein.

231. A theft occurs when things, that people have property rights to are taken, or used without permission, for a special purpose without compensation.

232. Mrs. Singer and Mr. Riggs had their reputations taken and all the Plaintiffs had their

speech taken in violation of Article 12 of the United Nations Declaration of Human Rights. Exhibit 4.

233. Based on the foregoing facts, Mrs. Singer and Mr. Riggs' reputations

a) were taken by charging them with fraud,

b) For the public purpose of stopping time card errors in a government tax-funded entity {a public purpose},

c) Without compensation to the plaintiffs for the taking of their reputations.

d) Under Navajo customs and traditions, a person's words, good name, and reputation is a protected property interest.

234. Based on the foregoing facts, Mrs. Singer and Mr. Riggs' and Mr. Dickson's right to freely speak or their 'words' were taken by arbitrary and capricious acts by a Utah government political subdivision, and meted out to them under the color of their apparent authority.

235. The plaintiffs' reputations and speech were taken or stolen and used for the illegal public purposes of a. being able to conduct SJHSD business without being questioned, criticized, or informed of possible SJHSD illegalities and b. not having Mrs. Singer or Mr. Riggs compete against SJHSD if they should try to find work elsewhere.

236. SJHSD gave the plaintiffs no compensation for using them as an example, or for sacrificing their good names and reputations.

237. SJHSD's manual, as approved by the SJHSD Administrative Control Board, has

a) Discretionary discipline; Exhibit 19.

b) At will discharge; Exhibit 20.

c) At will employment; Exhibit 18.

238. SJHSD never informed Mr. Wood of the merit system established for SJHSD in 1992.

239. Mr. Halls, specifically, never informed San Juan county, San Juan District, or Mr. Woods that a merit system existed under Utah Code or the NPEA under Navajo Nation law applied.

240. Others SJHSD employees feared to speak out as a result of SJHSD administrators acts, and SJHSD-Administrative Control Board's tacit approval of SJHSD's actions, and San Juan County's lack of protection for their rights, creating an intimidating and hostile work environment.

241. Mr. Wood never inquired into the applicability of a merit system applicable to San Juan County.

242. The United Nations Declaration of Human Rights supports the precepts of earning a living freedom and not having one's reputation injured.

The Right to Equal Protection Specifically Protected by the Navajo Nation, the United Nations, the United States

243. All facts so stated above are incorporated herein.

244. SJHSD denied plaintiffs fundamental equal protection rights under the Navajo Bill of Rights, Navajo Custom and Traditions, San Juan Health Service District's