contracts with Indian Health Service, Medicaid, and Medicare, and the Navajo Preference in Employment Act, United Nation Declaration of Human Rights, United States Bill of Rights, federal regulations and Utah's Constitution and statutes, as they were obliterated when the defendant's acting under color of law treated Montezuma Creek Health Clinic employees and Navajo Nation patients differently than others.

Discrimination as part of an ongoing pattern

245. Plaintiffs claim they were denied Equal Protection of the laws that protect them as part of a pattern of discrimination that negatively effects the SJHSD facilities, employees, patients situated within the 'Indian Country'.

246. San Juan County, by and through its alter ego, SJHSD, has not implemented a cross cultural training program for non-Indian administrators, supervisors, or managers as required by the NPEA.

247. San Juan County, by and through its alter ego, SJHSD, as an employer on or near the Navajo Nation, has failed to advertise SJHSD administrative positions to Navajos according to the NPEA requirements essentially eliminating Indians from the prospective employment pool.

248. In the November, 1998 medical staff meeting, Mr. Wood, acting in his official and private capacity, did generally represent to the doctors present that they did not want a private hospital coming into Blanding, Utah because it was being run by a little Arab and he would bring in 'Arab doctors, and their families' and then there

would be 'east Indians' running around the County and the doctors did not want that.

249. In a January 5, 1999, staff meeting at Montezuma Creek Health Clinic in the presence of four Navajo billing clerks 91) Mr. Wood, acting in his official and private capacity, asked if 'CIBs' (Certificate of Indian Blood) were like 'dog tags', and (2) Mary Nielsen, in her official and private capacity, said it was better patients did not get treated than SJHSD no get paid, and (3) no Indians without their 'CIB' on file or on their person would receive treatment.

250. That medical care and service entitlements were "prepaid" by Navajo and other Native American peoples, band, and tribes as a matter of treaty.

251. That Mr. wood has stated to the effect "that there is no hospital; no clinic; not one, where a person can go to and receive treatment without providing a means of payment" as justification for implementing the CIB policy.

252. The Navajo billing clerks attesting to the CIB policy statements had their positions threatened with removal to Monticello Hospital, approximately 80 miles away, by Mrs. Nielsen, acting in her official and individual capacity, at a January 19998 SJHSD board meeting.

253. Mrs. Nielsor, acting in her official and individual capacity, stated she "got mad" when her words were used back against her at the same time she threatened the Navajo billing clerk positions.

254. SJHSD implemented the 'CIB policy' whereby persons without their 'CIB' medicare

or medicaid proof of eligibility, are to be denied treatment except in a 'true emergency or ob'.

255. The 'CIB policy' often leaves determining a 'true emergency' to a non medical personnel to determine if a Doctor or Physician's Assistant should be called in to treat a person, or they be turned away.

256. The 'CIB policy' is in violation of federal regulations.

257. Mrs. Nielson, acting in her official and individual capacity, publicly labeled the Navajo billing clerks who documented her racially insensitive remarks in the January 5, 1999 staff meeting, 'rebellious' and 'insubordinate' for not posting the 'CIB policy' sign.

258. Mrs. Nielsen never sent the CIB sign to Montezuma Creek Clinic, as requested by a Montezuma Creek Clinic billing clerk to Montezuma Creek Clinic, making compliance with her orders to post the CIB policy impossible.

259. Mrs. Nielsen's labeling of the billing clerks as 'rebellious' and 'insubordinate' in public SJHSD board meeting was published in the newspaper in San Juan County.

260. The CIB policy signs posted at SJHSD's Monument Valley facility are primarily in the English language.

261. Many Navajos visiting the SJHSD clinics to Montezuma Creek and Monument Valley clinics have not had the educational opportunities to learn to read, much less read English.

262. A 'CIB number' is not the same as Beneficiary Identification Card per 42 CFR §

36.16.

263. IHS regulations prohibit denial of treatment to an otherwise eligible Indian who lacks his/her proof of IHS eligibility.

264. The policy, appearing facially neutral, has an enormous disparate impact upon the Navajo due to the great distances and poor roads within the Navajo Nation and a greater reliance on tribal rather than federal identification records.

265. The CIB sign insisted upon by SJHSD administration does not meet Medicaid sign requirements.

266. On February 12, 1999, Mr. Riggs, in the presence of interim SJHSD

267. CEO/Executive Director /San Juan county Administrative Aide Mr. Bailey, explained the disparate impact of SJHSD's 'CIB policy' with an example of a small child with an ear ache who may not have a life threatening emergency, but if the child is not treated and the parents have expended all their resources to get to the clinic, including possibly hitch hiking many miles over rough roads, then by the time the child gets back home, the child may have meningitis or other serious disorder, and the parents will have no way to get back to the clinic. Mr. Wood responded by accusing Mr. Riggs of assuming that Navajos were not 'responsible' [to bring their 'CIB' with them], whereas he, Mr. Wood, believed they would be just as 'responsible' as anyone else. Mr. Wood's response to Mr. Riggs' example focused on the 'CIB' necessity of payment, rather than the disastrous disparate impact the 'CIB policy' has on an innocent child when parents, being human, may sometimes

forget identification, or not have a 'CIB' and be under extreme hardship just to get to the clinic, notwithstanding the inconvenience of obtaining the irrelevant identification of the 'CIB'.

268. That SJHSD board promoted Mr. Wood, after being made aware of plaintiff's claims, by making him permanent SJHSD CEO two months earlier than his six months initial probation period.

269. SJHSD promised Dr. Walker, at Monument Valley Clinic, also within the Navajo Nation boundaries, a computer to place patients names and enrollment numbers and other eligibility information on, and as of this date, SJHSD has not so provided him with one, thus hampering his ability to determine eligibility for the 'CIB policy'.

270. The firing of the PA's in the November 1998 fallacious RIF has prevented a PA from serving at Monument Valley, and therefore preventing Monument Valley from being able to have Medicaid certification, and limits the numbers of patients being seen at that clinic.

271. Approximately $40,000 of the approximately $350,000 of Navajo money held in a fiduciary relationship within the Utah Navajo Trust Fund, has not been accounted for in SJHSD public board meeting records.

272. Expenses of Monticello Hospital show they were transferred to Montezuma Creek Health Clinic, but not Blanding, Utah or Monument Valley, Navajo Nation facilities, as administrative costs on published financial reports.

273. IHS contracts call for equal treatment facilities for Navajos.

274. Covertly shifting expenses of Monticello Hospital to the Montezuma Creek Health Clinic can make SJHSD appear to be spending more per Navajo patient than without these expenses, being false and misleading to the Indian Health Service office.

275. SJHSD expenses for Montezuma Creek listed as 'other professional fees' have to been accounted for.

276. SHJSD expenses for professional recruitment costs for starting up Montezuma Creek have not been accounted for in detail.

277. The Utah Navajo Commission directed Mr. Wood to make an accounting to it for moneys spent on the clinic and Mr. Wood, in his official and individual capacity, chastised the Commission for saddling him with such and obligation, even though he previously had agreed to wok with the Utah Navajo Commission to assist the Navajo Nation in taking over the Montezuma Creek Health Clinic.

278. Mr. Wood, in his official and individual capacity, on two separate occasions chided Mrs. Singer for attending Navajo meetings, even though Mr. Wood had previously terminated her.

279. Mr. Wood, acting in his official and individual capacity, ordered the staff not to speak to Mrs. Singer, and at the time, Mr. Riggs , when he placed them on administrative leave for time card fraud charges.

280. Mr. Wood has angrily, and vehemently, on two different occasions, chastised Dr. Jones for associating with Mrs. Singer on company time, when Dr. Jones and Mrs.

Singer attended the Utah Navajo Commission public meeting they were invited to attend on March 10,1999.

Intentional and Negligent Infliction of Emotional Distress

281. The facts so stated above are incorporated herein.

282. SJHSD has broken statutes.

283. SJHSD is breaking statutes.

284. SJHSD has shown no sympathy or concern for Mrs. Singer's and the other plaintiffs emotional well being.

285. SJHSD has shown callous disregard for plaintiffs rights.

286. SJHSD has not disciplined Mr. Riggs with common sense or respect for him as a person.

287. SJHSD has not discharged and otherwise disciplined Mrs. Singer with common sense or respect for her eighteen years of honest labor.

288. SJHSD has not treated Mr. Dickson with common sense or respect for his efforts to learn how to be self supporting.

289. SJHSD has called people defamatory names, flagrantly flouted their treatment of Mr. Riggs and Mrs. signer causing them great emotional distress and public humiliation.

290. A reasonable person within the Navajo Nation would consider the treatment by SJHSD of plaintiffs as intentional and overly harsh to the point of causing emotional distress and public humiliation.

291. Mr. Wood intended to harm Mrs. Singer and Mr. Riggs to make them and the system change.

292. Mr. Wood's vicious and slandering name calling has upset those plaintiff's suffering the brunt of it.

293. Mr. wood has entered onto Montezuma Creek Health Clinic and vehemently and heatedly yelled at Dr. Jones for associating with Mrs. Singer, which has caused the entire staff, including the plaintiffs, emotional distress for cause of working in such a hostile environment.

294. SJHSD's termination has caused the local Navajo chapters and other SJHSD employees distress and concern over the welfare of Montezuma Creek Health Clinic.

295. SJHSD's implementation of a 'CIB policy', among people who are very sensitive and aware of the hardships pertaining to many Navajos and other Native Americans in traveling to the clinics in the Utah Strip, has caused and is causing emotional distress for the plaintiffs.

296. Mrs. Singer has been physically ill from the stress she has suffered.

Violation of Fiduciary Duties

297. All facts stated above are incorporated herein.

298. SJHSD as an agent of Indian Health Service and a contractor with the UNTF has fiduciary duties to the Navajo Nation.

299. SJHSD has violated those fiduciary duties.

300. SJHSD has an obligation to respect, uphold, and enforce Navajo Nation labor laws.

Misfeasance[3]

301. All facts stated above are incorporated herein.

301. San Juan County is responsible for all of SJHSD's actions.

302. San Juan County at all times herein acted within its authority.

303. San Juan County has the ability to withdraw authority from SJHSD if SJHSD is breaking the laws and did not do so.

304. San Juan County Attorney has proclaimed his authority to legally represent the SJHSD.

305. No Statute authorizes the County Attorney to represent the SJHSD.

306. San Juan County Commissioners Redd and Maryboy withdrew from the SJHSD board after being informed of possible statute violations.

307. San Juan county Commissioners had a duty to assure that SJHSD obeyed the law.

308. San Juan Health Service District Administrative Board has a responsibility to diligently research

a) The background and credentials of the SJHSD CEO; and,

b) The claims of employees of statute violations; and,

c) Grieving employees claims and evidence; and,

[3] "Misfeasance" is the improper doing of an act which a person might lawfully do" 1979 BLACK'S LAW DICTIONARY 902

d) Claims of unequal treatment of employees and patients; and,

e) Claims of misrepresentations by SJHSD's administrators; and,

f) Claims of mis-allocations of funds, among other areas of investigation.

309. San Juan Health District Administrative Board;

a. Did not adequately investigate or interview Mr. Woods prior to his hiring; and,

b. Did not impartially investigate the claims of grieving employees of statute violations and racially oriented remarks of Mrs. Nielsen; and,

c. Did discus, ex parte, in the January 1999 SJHSD Administrative Board Meeting Executive Session, the grieving employees' documents and evidence previously presented to the San Juan County Commissioners/SJHSD trustees and County Attorney on January 19,1999, and,

d. Did entertain comments and information of the SJHSD administrators in executive session, about the grieving employees claims and grievance meetings, in executive session, without the grieving employees being present; and,

e. Did acknowledge SJHSD's lack of compliance with their Indian Health Insurance contracts; and,

f. Did not impartially hear, discuss, or review the grieving employees claims; and,

g. Tainted all future grievance proceeding; and,

h. Promoted an administrator, Mr. Wood, to permanent status when the grievances had not been concluded, among other acts that may be identified through discovery.

Malfeasance[4] in Office

310. All the above facts are incorporated herein.

311. San Juan County Commissioners were members of the SJHSD Administrative Control Board in direct contradiction to the SJHSD's organization resolution section 8.

312. San Juan County Commissioner's took steps to purposefully avoid taking responsibility for the SJHSD's acts.

313. There is no statutory authority for Mr. Halls to represent the SJHSD.

314. Mr. Halls has a responsibility to make sure County entities obey the law.

315. Mr. Halls purposely avoided any responsibility for SJHSD's actions after being appraised of their violations of statutes on January 19, 1999.

316. San Juan County Attorney advised the SJHSD in the matter of the plaintiffs' claims; and,

317. San Juan County has assisted SJHSD and/or its agents, employees, etc. in circumventing the law.

---

[4] "Evil doing; ill conduct . . . . Malfeasance is a wrongful act which the actor has no legal right to do, or any wrongful conduct which affects, interrupts, or interferes with performance of official duty, or an act for which there is no authority or warrant of law or which a person ought not to do at all. . . ." 1979 Black's Dictionary 862

318. San Juan County's Administrative Aide Mr. Bailey had no legal authority, in his capacity as the San Juan county Commissioner's Administrative Aide, to be the CEO of SJHSD, as part of his Administrative Aide duties.

319. Mr. Bailey sought out Mr. Wood as the CEO of SJHSD.

320. Mr. Bailey was the grievance meeting officer, when in fact there was no position of 'executive director' as referenced in the SJHSD Personnel Policy and Procedure manual.

321. Mr. Bailey knew Mr. Woods made material misrepresentations to him and did not inform the SJHSD Administrative Control Board.

322. Mr. Bailey knew Mr. Woods made material misrepresentations to him and did nothing to inform the San Juan County Commissioners.

323. Delete [same as 322.]

324. At all times herein, the defendants were acting outside their color of authority.

325. Mr. Bailey was operating as interim CEO without a job description as required under NPEA.

326. Mr. Bailey issued grievance decision letters for Mrs. Singer and Mr. Riggs

a) without clear charges,

b. without clearly identified evidence to justify Mr. Woods' actions,

c. without mentioning NPEA; and,

d. without referencing the mandates of Utah's Special District Personnel Management Act among other acts.

327. Mr. Bailey, by and through the Commissioner's authority, by doing little or nothing to rectify the claims of the plaintiffs has endangered the financial well being of SJHSD, and the public safety, health and welfare of the Navajo Nation surrounding Montezuma Creek Health Clinic.

328. San Juan County had an obligation to investigate the finances of SJHSD by hiring an objective, outside, neutral auditor to ensure SJHSD was obeying the law.

329. Courts have found schools and juries in San Juan county to be discriminatory.

330. Government entities in San Juan County have prolonged litigation for decades in various suits.

331. 331 Mr. Wood has defiled the reputations of innocent employees by charging them with fraud, without any evidence.

332. Mr. Wood did not investigate and thoroughly read Mrs. Singer's or Mr. Riggs' time cards.

333. Mr. Wood took Mrs. Nielsen's word for Mrs. Singer's and Mr. Riggs' 'fraud'.

334. SJHSD recruited and sought to hire Mrs. Singer's replacement prior to her February 12, 1999 grievance meeting.

335. SJHSD wrongfully prolonged the administrative proceedings for plaintiffs' claims long after the period intended in the SJHSD Personnel Policies and Procedures.

336. SJHSD's Administrative Control Board has purposely not informed themselves of the laws that control them in order to act in any manner they so choose.

337. SJHSD has not obeyed their counsel's advice.

338. SJHSD is not an at will employer.

339. SJHSD has misrepresented the employer status of SJHSD to the SJHSD employees.

340. SJHSD withheld the SJHSD Personnel Policy and Procedure manuals subsequent to 1995 FROM THE State department of licnesure.

341. SJHSD violated NPEA by not so much as mentioning it in any of its administrative documents and/or Personnel Policy and Procedure manuals.

342. Mrs. Shafer knew Mrs. Singer was not a dishonest person and did nothing to help her.

343. Mrs. Shafer knew Mr. Wood's charge of fraud for Mr. Riggs and Mrs. Signer was false.

344. Mrs. Shafer could have helped provide a pre-discharge and pre-discipline hearing for Mrs. singer and Mr. Riggs, but did not.

345. Mrs. Shafer acted in concert with Mr. Woods and Mrs. Neilsen to harm the defendants, as in the aforestated claims.

346. At all times herein, the defendants acted under color of authority.

347. Mr. Woods refused to give Mr. Allison Dickson his full time permanence employment status.

348. Mr. Woods made material misrepresentations to SJHSD and his superior.

*Supplemental Claims*

349. The plaintiffs supplemental claims do not supplant the original claims.

350. The plaintiffs add the assertions of:

a. Obstruction of Justice; and.

b. Misuse of Judicial Process; and.

c. Defamation, per se; and.

d. Denial of Due Process; and.

e. Denial of Equal Protection; and.

f. The endangerment of Navajo patients at Montezuma Creek Clinic as an addition to their claims.

*Injuries Arising Since the Filing of the Original Pleadings*

351. These assertions are base upon the court's Findings of Fact in the Court's Preliminary Injunction Order issued on the 28th day of December, 1999.

352. The Court's factual findings therein pertaining to the defendant's counsel including the now named defendants of Farmer's Insurance Companies and Truck Insurance Companies, Dennis Ickes':

a. misrepresentations of fact and law to the Court; and.

b. spoliation/destruction and sandbagging of evidence; and.

c. violation of Rule 9 that require specific pleadings and legitimate and valid proofs in issues of fraud; and.

d. intentional and malicious disruption of operations and services of the Montezuma Creek Health Clinic.

Facts, common to all allegations that are aforesaid stated, are directly attributable to the

arbitrary, capricious acts that were in done in the defendant's official and personal capacities, jointly and severally, and were wholly and abuse of discretion, that have and is causing serious, substantial and irreparable harm to the plaintiffs.

PRAYER FOR RELIEF

WHEREFORE, now having fully stated their cause(s) of action herein as against the defendants, and each of them, both jointly and severally, and each sued in their official and individuals capacities as aforestated, with the exception of Mark Maryboy and Patsy Shumway (and Mary Nielson who has no claims against her), who are sued in their official capacities only, the Plaintiffs would pray for judgement against each defendant as such as follows:

1. Reinstatement of Mrs. Singer to her merit position of employment as manager of the Montezuma Creek Health Clinic; and,

e. Reinstatement of Mrs. Singer's benefits and seniority; and,

f. Reinstatement of Mr. Riggs' to his previous position; and,

g. Reinstatement of back pay and benefits and seniority status; and,

h. Make Mr. Dickson a full time employee with all benefits; and,

i. Expungement of all disciplinary actions taken against the plaintiffs, and non hiring action from their files; and,

j. Back pay, and benefits reinstated as if they had never ceased; and,

k. A public apology in SJHSD board meeting by each defendant individually and specifically for the pain and suffering each has caused them by their

actions or inactions; and,

l. A published retraction of all derogatory comments and allegations made against them and all Montezuma Creek employees in at least three newspapers of general publication;

m. Money damages of $3,000,000 (three million) for the aforesaid injuries to Mrs. Singer.

n. Money damages of $3,000,000 (three million) for the aforesaid injuries to Mr. Riggs; and,

o. Money damages of $3,000,000 for the aforesaid injuries to Mr. Dickson; and,

p. Immediate notification and orientation for the SJHSD employees of their rights and protections under a merit system; and,

q. Immediate and future adherence to a merit system in San Juan County and SJHSD, including the setting up of a merit system; and,

r. Proportionate representation on the SJHSD for Aneth and Red Mesa chapters commensurate with the population of Navajos living in the San Juan county boundaries; and ,

s. Adhere to all provisions of the NPEA, including advertising within the Navajo Nation for all administrative and managerial positions that will have some direct impact upon the Navajo Nation; and,

t. Payment of the damages over a period of time in a schedule of payments and in such a manner to the appropriate trusts of the plaintiffs as approved by the

Court.

REQUEST OF PUNITIVE DAMAGES

Plaintiffs believe San Juan County has a proven record of racial discrimination in schools and juries, and misusing litigation to draw cases out for as long as approximately twenty years, and that their treatment of the plaintiffs is part of this pattern; and,

18. Plaintiff s request another $3,000,000 for each plaintiff (or other amounts as the Court sees fit) in punitive damages to stop San Juan County's treatment of Navajo Nation members with unequal treatment, contrary to contracts and law, within San Juan County and the Navajo Nation; and,

19. Plaintiffs request the payment of damages and punitive damages from the following assets in descending order;

   a. Assets of Mr. Wood, Mr. Bailey, Mrs. Shafer, Mr. Halls and [delete Mary Nielsen] including any homeowners liability Insurance that may be applicable; and next,

   b. Exhausting relief from San Juan County's liability insurance carrier, and then next

   c. Payment of punitive damages is derived from other sources.

SUPPLEMENTAL PRAYER FOR RELIEF

20. The plaintiffs add the following prayer for relief, referencing back to the original prayer for relief, and not supplanting the original prayer for relief.

21. The plaintiffs pray:

a. That each of the defendants, both jointly and severely, be ordered to pay damages to the plaintiffs in the amount of $18,000,000.00 USED (Eighteen Million Dollars); and,

b. That each of the defendants, both jointly and severely, be ordered to pay additional damages to the plaintiffs pursuant to 7 NNC 701 in the amount of $6,000,000.00 USED (Six Million Dollars) to be paid directly to Montezuma Creek Clinic to be used as the management of Montezuma Creek Clinic sees fit in the best interest of the Native American People, and not to be used for employment compensation or to take the place of the insurance payments made in behalf of the Native American patients, without express authority of this Court; and,

c. That the defendants, and each of them, jointly and severely, publicly retract all defamatory or other libelous statements made of any of the plaintiffs or other litigants or counsels herein, by publication in the local newspapers, and radio stations of local circulation to Montezuma Creek Health Clinic and the places of residence of each of the plaintiffs, and the general coverage of the Navajo Nation, retracting any and all statements made in respect to any of the plaintiffs, herein, and issuing statements of apology which are deemed appropriate by this Court and the plaintiffs by prior review; and,

22. The Court grant such other and further relief as the Court deems fit and proper within the bounds of Navajo Customs and Traditions of fairness and justice.

REQUEST FOR A SPECIAL MASTER

1. Plaintiffs request the extraordinary relief of the Labor Commission appointing a special master in order to protect the employment rights of the Montezuma Creek Clinic employees and possibly the Monument Valley Clinic 9also serving the Navajo Nation) based upon:

   1. San Juan County's, by and through their alter ego SJHSD, intentional disregard and disinterest in protecting the rights of the SJHSD employees at Montezuma Creek; and,
   2. The Navajo Nation's requirement to respect the resolutions of the Aneth and Red Mesa chapters; and,
   3. The Navajo Nation's responsibility to provide for continued stable health care in the areas served by Montezuma Creek Health Clinic in compliance with Navajo law, IHS contacts and mandates, federal law, and state law; and,
   4. to protect the lives, health and welfare of the tribal members of the Navajo Nation.

22. Based on the foregoing Plaintiffs also request a fine or sanction that

   a) San Juan county, acting by and through its alter ego, will immediately pay back the amounts owing the Utah Navajo Trust Funds that have not been paid to date with market interest rates compounded daily for the time the San Juan county, through their alter ego SJHSD has appropriated these moneys unto themselves to the detriment of the Trust held for the Navajo Nation;

REQUEST FOR A SPECIAL MASTER

1. Plaintiffs request the extraordinary relief of the Labor Commission appointing a special master in order to protect the employment rights of the Montezuma Creek Clinic employees and possibly the Monument Valley Clinic 9also serving the Navajo Nation) based upon:

   1. San Juan County's, by and through their alter ego SJHSD, intentional disregard and disinterest in protecting the rights of the SJHSD employees at Montezuma Creek; and,
   2. The Navajo Nation's requirement to respect the resolutions of the Aneth and Red Mesa chapters; and,
   3. The Navajo Nation's responsibility to provide for continued stable health care in the areas served by Montezuma Creek Health Clinic in compliance with Navajo law, IHS contacts and mandates, federal law, and state law; and,
   4. to protect the lives, health and welfare of the tribal members of the Navajo Nation.

22. Based on the foregoing Plaintiffs also request a fine or sanction that

   a) San Juan county, acting by and through its alter ego, will immediately pay back the amounts owing the Utah Navajo Trust Funds that have not been paid to date with market interest rates compounded daily for the time the San Juan county, through their alter ego SJHSD has appropriated these moneys unto themselves to the detriment of the Trust held for the Navajo Nation;

and,

b) for the breach of fiduciary duty of San Juan County, by and through its alter ego, SJHSD, an Indian Health Service contractor with a fiduciary duty to care for the Navajos who have already paid for their health care in the Treaty of 1868; and,

c) for SJHSD's callous disregard for the poverty stricken, down trodden, condition of health care within the Navajo Nation, an independent sovereign and federally recognized reservation, due primarily to the historical subjugation of the United States that has precipitated such long standing problems as recognized in federal law.

Sanctions and Fines

Plaintiffs pray for such other and further damages and relief, including, but not limited to such further sanctions, fines, penalties, as the Court feels is necessary and just to protect the health, safety and welfare of the tribal members in the areas of the Navajo Nation.

Exclusion

If the Court deems the plaintiffs' request is appropriate, plaintiffs pray for exclusion of the defendants Mr. Wood, [delete Mrs. Nielsen], and Mrs. Shafer, for all time from coming within the Navajo Nation's territorial boundaries as this Court is authorized under 17 NNC 1901, for endangerment of the public safety and callous disregard for the health

and welfare of the Navajo Nation.

CERTIFICATION

Notice of this action is provided pursuant to Rules 4,5, and 65 et seq of the Navaho Nation Rules of Civil Procedure and will be pending before this Court.

So signed and dated this 14 day of March, 2000

Wm.P.Battles, Counsel for the Plaintiffs
William P. Battles
Battles and Associates
*Attorney for the Plaintiff*
Post Office Drawer 460
Window Rock, Navajo Nation (AZ) 86515
505-871-2525

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

Susan R. Schildmeyer, Utah State Bar No. 7985
*Attorney for Plaintiff*
11091 S. Shilling Ave. Suite 2452
South Jordan, Utah 84095
(801) 576-0091

CERTIFICATE OF SERVICE

The above-captioned COMPLAINT FOR DAMAGES is hereby personally served upon the following defendants:

SAN JUAN COUNTY ATTORNEY
Mr. Craig Halls
297 S. Main
Monticello, Utah 34535

San Juan County Commission
San Juan County Clerk
and to
San Juan County
Mr. Rick Bailey Administrative Aide
297 S. Main
Monticello, Utah 84535

San Juan Health Services District
c/o the secretary of the district
364 West 1st North
Monticello, Utah 84535

Mr. Cleal Bradford
San Juan Health Services District
364 West 1st North
Monticello, Utah 84535

[delete Mary Nielson]

Mrs. Laurie Shafer, PCD
San Juan Health Services District
364 West 1st North
Monticello, Utah 84535

San Juan County Commissioner
San Juan Health Services Board Member and Trustee
J. Tyron Lewis
6771 South Highway 191
Monticello, Utah 84535

Mrs. Karen Adams
San Juan Health Services board member
32 Blue Mountain Drive
Monticello, Utah 84535

Mr. John D. Lewis
San Juan Health Services District board member
97 S. 500 East
Monticello, Utah 84535

Mrs. Patsy Shumway

San Juan Health Services District board member
316 W. 300 N.
Blanding, Utah 84511

Mr. Roger Atcitty, Chairman
San Juan Health Services District board member
316 W. 300 N.
Blanding, Utah 84511

San Juan County Commissioner
San Juan Health Services Board member and trustee
Mr. Bill Redd
182 West 100 North
Blanding, Utah 84511

San Juan County Commissioner
San Juan Health Services Board Member and Trustee
Mr. Mark Maryboy
P.O. Box 190
Montezuma Creek, Ut. 84535

Mr. Reid Wood
160 East Spring Drive
Woodland Hills, Utah

Mr. R. Dennis Ickes
and Farmer's Insurance Exchange
411 W. Ariane Way
Centerville, Utah 84010

Truck Insurance Exchange
Farmer's Insurance Exchange
C/O Registration Agent
Rodney L. Chugg
1485 E. 3900 S.
Salt Lake City, Utah 84121

Mr. Doug Moeller, Esq.

424 West Broadway
Farmington, New Mexico 87401

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF SHIPROCK, NEW MEXICO

MAR 1 2000
SHIPROCK JUDICIAL DISTRICT

| | | |
|---|---|---|
| DONNA SINGER; Fred Riggs C#18570; Alison Dickson C#212,765; Plaintiffs, | ) | |
| vs. | ) | SR-CV-162-99 |
| SAN JUAN COUNTY; San Juan Health Service District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy[1]; John Lewis Commissioner J. Lynn Lewis; Karen Adams; Patsy Shumway[2], and other John and Jane Does as yet unnamed in their personal and official capabilities, Defendants. | ) | ORDER DENYING DEFENDANTS' MOTION TO DISSOLVE OR MODIFY THE PRELIMINARY INJUNCTION ORDER |

THE COURT having received and reviewed (1) the defendants' "Motion to Dissolve or Modify Findings, Opinion and Judgment at Preliminary Injunction" and (2) the plaintiffs' response to the same motion, hereby denies the defendants' motion, and makes the following findings of fact and conclusions of law, that will incorporate herein and add to the original Preliminary Injunction Order raised in issue, as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I. The defendants accuse the Court throughout their motion of the Court denying the defendants due process of law in claiming the defendants were denied the services of an in courtroom certified court reporter.**

*Findings of Fact*

The defendants requested by written motion that they be allowed to have a certified court reporter take oral transcription of the proceedings before the Court. The request was responded, in written response

EXHIBIT

Q.Q.

stipulating to the defendants motion. The Court granted the motion. The defendants never presented any qualified reporters for consideration of the Court. The Court is not responsible for what the defendants did not do.

The defendants were <u>never</u> denied the opportunity to have a Court Reporter present in the Courtroom; were <u>never</u> denied the opportunity to make further motions concerning the said reporter in the numerous hearings between April 24 and November 9, 1999; and were <u>never</u> denied the opportunity to make a written motion at any time in the last nine months. The only restriction on the reporter was that any such reporter would be able to perform their reporting services for non-Navajo, as well as Navajo speaking witnesses, and that counsel for the defendants was advised to seek out the services of the federal interpreters office in Albuquerque, New Mexico, for a listing of qualified Navajo speaking reporters – and it was likewise the case that the Court ordered the reporter to provide copies of the transcripts to both parties and this Court. The plaintiffs even concurred with the motion for the reporter.

Likewise, it was only the plaintiff Riggs, thusfar, who was prejudiced by the lack of a qualified reporter inasmuch as Navajo (his first language) was his preferred language in portions of his testimony, and he was denied the use of his own language in deference to the defense.

Conclusion of Law

The defendants were not denied due process of law and were provided with every opportunity to be heard as required by Navajo common law; by Navajo statutory law; by Navajo Rules of Civil Procedure; by applicable US law; by the Navajo Nation Bill of Rights, and by the 1968 Indian Civil Rights Act.

The defendants submitted motions; two 'Answers'; filed, responded to and argued motions; called witnesses; and even by the defendants own accord they invoked the jurisdiction of this Court on its own initiative by seeking the Court's authority and jurisdiction over its own counterclaims filed in this Court

seeking its own independent damages as against the defendant Singer. No Court rulings prohibited them from further participation in any form or fashion. No Court order denied them the privilege of using a certified court reporter.

*"[T]he fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked."*
Anderson National Bank v. Luckett, 321 U.S. 233, 246.

This court cannot possibly understand why it would be responsible for securing a qualified court reporter on behalf of the defendants. Those duties and responsibilities fall squarely on the shoulders of the defendants and their counsel – the defendants requested the reporter – the defendants motion was granted with conditions – and the defendants failed thereafter to pursue and protect their interests as granted.

It is not the duty of the Court to provide a reporter, other than what is provided under the limited budget of the Court. It is, however, the case that this Court determine the qualifications of those persons to whom it would entrust the record of the Court for purposes of accuracy and trustworthiness of the record. The Court is not obliged to simply rely on the representations of the party seeking the assurance of an independent and qualified court reporter. A court reporter is essentially an officer of the Court, not an agent of the party paying the reporter.

**II. The defendants argue to the Court that they were denied due process of law due to a lack of a perfect record of the proceedings before the Court for cause of interment inaudibles found in the Courts own *recording/reporting* system.**

*Findings of Fact*

The defendants and plaintiffs were ORDERED from the bench to report any problems with the heari transcripts to the Court on November 9, 1999, and neither party did so. Both the defendants and the plainti became aware of concerns in the transcription of the taped proceedings nearly a full month prior to submitti their written conclusions, by written notice, as was the Court. In fact, after the very first proceeding it w

cautioned by counsel for the plaintiffs, Wm. P. Battles, that the record was being garbled and asked that the Court caution the speakers in reference to preserving the record. The defendants, as well as the plaintiffs, were free to make motions for new hearings or other protective motions prior to the filing of their written concluding statements, but failed to do so and instead – like the plaintiffs – submitted their closing arguments on the record as presented.

Wherein the trial record as a whole, including hearings on April 24, 1999; May 14, 1999; June 30, 1999; and November 9, 1999; along with records of the September 23rd and 24th proceedings, of 1999, are all available to this Court and the parties, and well evidence the foundation and outcome of the Courts considerations in rendering the decision to grant the Preliminary Injunction – despite the lack of a "perfect" trial record as claimed required by the defense.

The defendants knew they were obligated to put on evidence to rebut the plaintiffs evidence and simply failed to do so. Indeed, more rather than not, the record and recollection of the Court actually reflects that the majority of the evidence and testimony solicited and presented to the Court by the defendants actually went to support each and every claim of the plaintiffs as raised in these proceedings. Accordingly, the defendants failed to offer the Court barely so much as one piece of evidence that was reliably found to be admissible within the Navajo Nation Rules of Evidence, or in aid to their assertions contrary to those of the plaintiffs.

*Conclusions of Law*

The defendants were not denied due process pursuant to the "harmless error" rule of Chapman v. California, 386 U.S. 18 (1967) that overturned the case of Griffin, upon which the defendants would apparently prefer the Court to rely as they assert – and for which the defendants, through counsel, had a responsibility to inform the court of, in that Griffin had been superseded by Chapman - but failed to do so.

Further, the defendants are not being denied the ENTIRE court record, as found in the cases they rely

91

upon and therefore defendants' case cites are without merit in *this* case – but in misguiding this Court.

The Court therefore concludes that as a matter of law, notwithstanding our own Rule 61 of the Navajo Nation Rules of Civil Procedure, and in agreement to <u>Chapman</u>, the existence of inaudible sections of the tape recordings is harmless, when the record can still remain to be considered in its whole dispositive of the findings, conclusions and orders of the Court.

As offered by the United States Supreme Court -

> *"Since <u>Chapman</u>, we have "consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." <u>United States v. Hasting</u>, 461 U.S. 499, 509 (1983). In <u>Hasting</u>, we again emphasized that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." Id., at 508-509."* <u>United States v. Lane</u> at 474 U.S. 438, 446 (1986).

The Court here, in considering the trial record as a whole, finds the same well supports the findings and conclusions of this Court without any question in the mind of the Court – whatsoever.

**III. The next argument offered by the defendants is that the Preliminary Injunction should be denied or modified because the findings go to the merits of the case.**

*Findings of Fact*

The burden of coming forward in the seeking of a Preliminary Injunction, *premised on the case in chief* under the Navajo Nation Rules of Civil Procedure, is elementary. Pursuant to Rule 65(e) the moving party, here the plaintiffs, are put to the burden of "*presenting evidence sufficient for the court to find <u>all</u> of the following*".

> *That the moving party has or is claiming a protectable right or interest and has a high likelihood of success on the merits;*

> *That irreparable injury, loss, or damage, to that right or interest is likely to occur unless the preliminary injunction is issued;*

92

*That the threatened injury, loss or damage is substantial in nature or character; and,*

*That the moving party does not have an adequate remedy at law.*

Likewise, Rule 65(d) of the Navajo Nation Rules of Civil Procedures, provides, for judicial economy, not dissimilar from any other jurisdiction of our sister sovereign the United States, that:

> *Before or after the commencement of the hearing of a petition for a preliminary injunction, the court may order trial on the merits to be advanced and consolidated with the hearing of the petition. Even when this consolidation is not ordered, any evidence received upon a petition for a preliminary injunction, which would be admissible upon the trial on the merits, becomes part of the record at trial and need not be renewed at trial. This subdivision shall be construed to save the parties any rights they may have to trial by jury.*

The Defendants were warned several times during the proceedings that they were failing to meet their responsibility of rebutting the plaintiffs evidence and testimony and that they were proceeding in nearly a fatal fashion to not only the preliminary injunction but as to the case in chief and that likewise they were thus far actually reinforcing the contentions of the plaintiffs in defense witness after defense witness, and the collective of the evidence and testimony before the Court was overwhelmingly in favor of the plaintiffs.

And accordingly,

The plaintiffs proved absolutely that they were being denied protectable rights which were guaranteed at law and therefore had a certain likelihood of success on the merits – which is largely reduced to damages; and,

The plaintiffs likewise proved that unless relief was granted, by way of a preliminary injunction or otherwise, that such violations on their protectable rights would continue with resulting injuries, losses, and damages.

That the injuries, losses, and damages were substantial in both their nature and character, including injuries ranging from damages to reputation to money damages; and,

And that unless a preliminary injunction was granted the harm, injuries, damages, and losses, would continue unimpeded.

93

Likewise, the Court is obliged by Rule of Court and in the exercise of judicial economy to receive during the proceedings on the preliminary injunction evidence which is likewise admissible in the case in chief as though occurring during the trial on the merits, and that evidence becomes a part of the record at trial and need not be repeated at trial. See Rule 65(d). Such preservation of the record does not go to taint the trial by jury requested by the plaintiff, but does substantially reduce their burden of proof which has already well been met even as to the case in chief. Whereas, as the Court would note, that but for the preservation of a trial by jury, in most instances of preliminary injunctions it is more normal to actually combine the proceedings in chief with the proceedings for the preliminary injunction.

For example, Lauren Schafer, a defendant's witness, admitted on September 24, 1999, that after an exhaustive study of Mrs. Singer's records, she did not have one piece of evidence as to Mrs. Singer's intent to commit fraud.

For example, the Court observed that the person who initiated the termination process, was also the grievance hearing officer (unbeknown to Singer) and admitted he had a problem with being so thinking that it was improper for him to proceed by his own judgment but did nonetheless.

For example, no defenses were made for the treatment of Fred Riggs and AJ Dickson, except that the time card errors diminished after the discipline meted out, supporting the theft claim of the plaintiffs in that their reputations were taken without their permission for use of the district to discourage time card errors and for speaking out regarding discrimination and unequal treatment of Native Americans in employment with the Health Services District.

For example, the defense presented evidence that the reason that Singer was fired was because she allegedly called in to work to have someone punch her time card, and then offered testimony of one witness that such conduct was common among the employees of the Health Services District, and so common in fact that

QA

she herself had certainly done the same thing "at least a hundred times" but had never even been disciplined in any form or fashion. This witness was non-Indian.

For example, human beings being somehow seriously referred to in such a way as to make people believe because they are Native Americans they are being called dogs – is only something this Court would prefer to hear the evidence on only one time – in its life time.

For example, coming to understand that because Native American elders, grandmothers, and grandchildren are being denied medical care and treatment even as under a direct government contract with the United States Government to provide health care to Native Americans because they are being arbitrarily required "to show their Certificate of Indian Blood" to actually receive necessary health services, when the required documentation for Health Services through the Indian Health Service is a "Beneficiaries Identification Card" at most, is something this Court would have preferred to have never heard.

The Court's resources, and the plaintiffs resources are limited – and the findings, facts and case are clear, even as to the merits in chief.

*Conclusions of Law*

The findings of the Court had no alternative but to reach to the merits, as such is the primary burden of the plaintiffs coming forward. The plaintiff had a clear duty to demonstrate to the Court that they are substantially entitled to judgment on their case in chief, in order to prevail on the preliminary injunction. The defendants, likewise, failed to put on any credible evidence to rebut the volume of testimony and evidence of the plaintiffs, after having ample opportunity to have done so.

The Court is therefore well within its rights to find to the merits, the same way as a Court may find for a party if the plaintiff fails to prosecute a claim, in order to protect the due process rights of the plaintiffs, and to protect the Court's processes from being used for harassment and other wasteful and abusive purposes.

95

The Court, given the proceedings to date, the testimony and evidence of record, is obligated to grant relief to the plaintiff and provide relief to those harmed, damaged, and injured.

> *"Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991); Link v. Wabash R. Co., 370 U.S. 626, 630-631 (1962). "The Supreme Court recognized in Kordway Express that outright dismissal of a lawsuit, which has been upheld in Link, is a particularly severe sanction, yet is within the court's discretion. 1st Sess., 6 (1853); Roadway v. Piper, 447 U.S. 752, 765 (1980)."*

The Preliminary Injunction was addressed to rectifying the harm done. The defendants' recommendation fails to address the financial harm suffered by the plaintiffs which has injured their families, as well as, failing to recognize, much less rectify, the harm to their reputations and the patients. As such, the Court finds the Injunctive Order is well within the three prongs of Missouri v. Jenkins, _____ U.S. _____ (1995, at page 16. The defendants neither recognized the three prong test of Missouri in their pleadings, nor recognize the Navajo tradition of compensating injury with money or other things of recognizable uniform value.

The defendants' definition of 'status quo' differs from the Court's, in that, the Court's definition wishes to place the plaintiffs in nearly as good a position as they would have been without the harm of the defendants, and that includes financially.

**IV. The defendants rather vaguely continue to misstate and minimize the Court's jurisdiction.**

*Findings of Fact*

A 'forum of resolution' and the premise of having a hearing for injured parties among Native American people predates the European settlers and is well grounded in Navajo customs and traditions. This tradition has continued through the continuum of history, and in contemporary time has come to include the provisions

97

the United States Cong ess by way of the 1968 Indian Civil Rights Act which colored tribal courts with federal legislative mandates in 25 USCS § 1301.

And accordingly the Court cites to tribal code and Montana and Strate, to further its finding of jurisdiction.

*Conclusions of Law*

The Court has jurisdiction over the defendants partly because they are the named parties who have committed acts within the Navajo Nation territorial boundaries, and as well because the defendants became plaintiffs by filing their counterclaims. In accord with Dodge v. Nakai, 298 F. Supp. 17 (Ariz. dist. 1968) and Clark v. Barnard, 103 U.S. (1883). This Court has jurisdiction.

Alternatively, the Court also has jurisdiction over the defendants because, even if, the defendants are an 'arm of the state', (which they have not shown any evidence to support), the defendants waived any rights of immunity when they filed counterclaims and fully participated in the Court proceedings. The Court therefore concludes that it has legal foundations for jurisdiction in this case, within the Navajo Nation's inherent sovereignty, the Nava o Nation Code, 25 U.S.C.S. §1301 and 1302, the Montana and Strate decisions, and the United States Supreme Court rulings in Clark v. Barnard, 108 U.S. (1883) as cited approvingly in College Savings Bank v. Florida Prep Aid Postsecondary Education Expense Board et al. ______ U.S.______ decided June 23, 1999.

> *"We are relieved, however, from its consideration by the voluntary appearance of the state in intervening as a claimant of the fund in court. The immunity from suit belonging to a state, which is respected and protected by the constitution within the limits of the judicial power of the United States, is a personal privilege which it may waive at pleasure; so that in a suit, otherwise well brought, in which a state had sufficient interest to entitle it to become a party defendant, its appearance in a court of the United States would be a voluntary submission to its jurisdiction; while, of course, those courts are always open to it as a suitor in controversies between it and [108*

Over

*U.S. 436, 448] citizens of other states."* Clark v. Barnard 180 U.S. 436, 448 (1883).

In conclusion, the Court finds the arguments and case cites of the defendants without merit or legal foundations. The Court, despite previous denials, now attempt to justify their placing of Native American patients in danger in a cloud of "confusion" on the 14th day of May, 1999. The prior Temporary Restraining Order directed the defendants to not interfere with the Clinic operations. This effort of the defendants at this juncture lacks sincerity. The defendants' motion to dissolve the preliminary injunction lacked even so much as an apology for the harm they have done over the last nine months of billing indigent Native American patients discouraging their attendance to both emergency and routine health care. The motion of the defendants lacks even the smallest appreciation for their blatant violations of civil rights of the plaintiffs that has torn a family apart, and grossly harmed the plaintiffs, and innocent patients and families relying on the clinic for health care.

Likewise such cold, insensitive, and recalcitrant attitudes on the part of the defendants further goes to illustrate the defendants bad faith to these proceedings and presents a foundation from which so much prejudice can grow from like a scavenging parasite of people ignorant of the harm of their malignant acts, and who lack any remorse for their harm to the plaintiffs, the patients and this Court.

The Preliminary Injunction, and findings of the Court, accordingly shall remain undisturbed. To do so would continue to place Navajo employees and patients who the defendants interact with at both Montezuma Creek Clinic and at Monument Valley, in harm's way. Navajo common law, in customs and traditions, mandate that the Court protect the people, and this Court shall not hesitate to exercise all its powers to do so.

The Motion to Dissolve or Modify the Preliminary Injunction Order be and is, therefore, denied.

IT IS THEREFORE ORDERED that pursuant to the Navajo Nation Rules of Civil Procedure at Rule 11 and this Court's tribal and federal authorities, and the Court's recognized inherent authority to protect its judicial processes, the Court hereby ORDERS as follows pursuant to its Preliminary Injunction:

That the Motion to Dissolve or Modify the Preliminary Injunction Order be and is hereby denied.

The Preliminary Injunction as issued shall be carried out immediately, and no later than the 3rd day of March, 2000, in all respects, with written confirmation delivered to this Court on or by that date, or be subject to the contempt powers of this Court.

That the defendants be and are hereby ordered to immediately reinstate Mrs. Singer as a x-ray and ultrasound technician making her whole to the 1st day of November, 1998, not later than the 3rd day of March, 2000, with written confirmation delivered to this Court on or by the 3rd day of March, 2000, or be subject to the contempt powers of this Court.

That the defendants be and are ordered to immediately reinstate the plaintiff Mr. Riggs to his previous position of employment and compensation as occurring at the time of his reduction in force and reduction of pay with written confirmation delivered to this Court on or by the 3rd day of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to immediately tender to Mr. Dickson full time status as an employee of the Montezuma Creek Clinic and that he be paid all commensurate back pay and benefits as may be due to him from the occasion of his being eligible for such status; and provide written confirmation of such compliance on or by the 3rd day of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to immediately pay all due income from whichever source derived within the District, including but not limited to full back pay and compensation as well as back benefits to the plaintiffs, including but not limited to retirement benefits and other compensations regularly received by the plaintiffs with all such compensations to be credited and/or paid immediately with confirmation of such compliance

WN

delivered in writing to this Court on or by the 3rd day of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to delete and expunge all the charges and writings pertaining to the December 2nd through the December 8th 1998 charges of fraud, discipline, and termination, from Mr. Riggs and Ms. Singer's personnel file, with written compliance delivered to this Court on or by the 3rd of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to not, within the territorial jurisdiction of the Navajo Nation, put Ms. Singer, and other like managers, and Mr. Riggs, and other like Physicians Assistants, on hourly time card keeping requirements for the purposes of salary and compensations or otherwise, and provide a copy of the written policy to this effect on or by the 3rd day of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to not interfere with clinic operations or move any clinic personnel, or be subject to the contempt powers of this Court; and,

That the defendants be and are hereby ordered to issue full payment of attorney's fees, costs, and expenses associated with these proceedings to date to be paid by cashier's check within five working days of the issuance of the injunction and to be paid not later than the _31st_ day of March, 2000, by and through the Registry of this Court, or each and every one of the defendants shall be subject to execution on their personal properties, and otherwise individually subject to the contempt powers of this Court; and,

That the prior Order of the Court waiving any security deposit of the part of the plaintiffs be and is hereby affirmed, and,

That the Defendants be and are hereby prohibited from:

Eliminating any Emergency Medical Technician services and coverage within the territorial jurisdiction of the Navajo Nation in service to the local Navajo and other Native American population for or on behalf of the Montezuma Creek Clinic or any other facility or activity of the San Juan Health Services District conducted within the territorial jurisdiction of the Navajo Nation; and,

Interfering with the laboratory services to the Montezuma Creek Clinic or any other facility or activity of the San Juan Health Services District conducted within the territorial jurisdiction of the Navajo Nation; and,

Interfering with the pharmaceutical services provided to the Montezuma Creek Clinic or any other facility or activity of the San Juan Health Services District Conducted within the territorial jurisdiction of the Navajo Nation.

That the defendant shall immediately make payment of any and all current and past due billings of the Montezuma Creek Clinic occurring before the 1st day of January, 2000, and provide written confirmation of such payments on or before the 3rd day of March, 2000, or be subject to the contempt powers of this Court; and,

That the defendants be and are prohibited from interfering with any form of patient care being provided by the Montezuma Creek Clinic; and,

That the defendants be and are hereby immediately ordered to cease billing eligible IHS patients for medical services; and,

13 That the Court further hereby Orders the defendants to assist the Montezuma Creek Clinic and the local Navajo Chapters, and chapter governments, by any means necessary, including Navajo and Ute language announcements on Navajo Nation wide radio; letters, etc. to help

diabetic IHS patients to return to the Montezuma Creek Clinic for treatment, including informing such Native American patients that as an IHS patient they do not have to directly pay for their health care treatment at the Montezuma Creek Clinic, with written confirmation of such compliance provided to this Court on or before the 3rd of March, 2000, or be subject to the contempt powers of this Court; and,

14. That the Court further Orders that the plaintiffs report any such interference, harassment, or intimidation of Montezuma Creek Clinic operations, patients, and employees immediately to this Court; and,

That the proceedings in chief herein be and are hereby scheduled for initial pretrial conference on the 18th day of APRIL, 2000, unless these proceedings are not earlier settled and compromised by the parties by stipulation on the limited factual, legal, and damage issues remaining as previously noted to the Court.

So Signed and Ordered this 1 day of March, 2000.

JUDGE, District Court of the Navajo Nation

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

1. That in the event that the defendants fail to obey the Order of this Court, commencing the 4th day of March, 2000, the defendants shall be fined at the rate of $10,000.00 (Ten Thousand Dollars) per day, for each and every day the Order of this Court is not carried out in its entirety.*****
2. That each and every personal defendant and defendants counsel will pay $1000 per day of the $10,000 daily fine beginning on March 2, 2000, from their own personal assets.
3. That any and all appeals or attempted appeals will not forestall these fines if the Preliminary Injunction Order is not carried out in accord with this Order.
4. Such fines are a fair and just means for this Court to protect its judicial processes, and to ensure its orders that protect the people, will be carried out.

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF SHIPROCK, NEW MEXICO

MAR 7 2000 SHIPROCK JUDICIAL DISTRICT

| | |
|---|---|
| DONNA SINGER, Fred Riggs C#18579; Alison Dickson C#212,765, Plaintiffs, | SR-CV-162-99-CV |
| vs. | SPECIAL ORDER IN AID TO SATISFACTION OF PRELIMINARY INJUNCTION |
| SAN JUAN COUNTY; San Juan Health Service District: Rick Bailey; Reed Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy; John Lewis; Commissioner J. Tyron Lewis; Karen Adams; Patsy Shumway; and other John and Jane Does as yet unnamed in their personal and official capabilities, Defendants. | |

NOW COMES THE COURT and having received and reviewed the plaintiffs' motion for a special order and finding good cause therein hereby Orders as follows:

1. That the defendants are hereby restrained from alienatingany and all money, property and assets of any type until the plaintiffs are paid their relief as granted in the Preliminary Injunction Order; and
2. That a list of all assets be immediately given to the plaintiffs since the defendants admitted in their concluding statement that the defendants state of finances were in a precarious position; and
3. That defendants immediately list the plaintiffs first in order of priority as secured creditors on the files of the County Recorder of San Juan County and any other county wherein their property is located; and
4. That the defendants provide a complete income tax return for 1998 and 1999, including all attachments and schedules submitted to the IRS with the returns; and
5. That any disobedience to this Order will be viewed as contempt of the Court and

warrants for the arrest of the defendants disobeying this Order will issue; and

6. That the plaintiffs are granted leave to seek enforcement of this Order as appropriate in any Utah or federal Court where it will be enforce pursuant to principles of comity and applicable law.

So signed and this 6 day of [illegible], 2006.

JUDGE RAYMOND A. BEGAYE

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF
SHIPROCK

MAR 15 2000
SHIPROCK JUDICIAL DISTRICT

DONNA SINGER; Fred Riggs C#18570; Alison Dickson C#212,765,
Plaintiffs,

vs.

SAN JUAN COUNTY; San Juan Health Service District; Rick Bailey; Reid Wood; Lauren Schafer; Craig Halls; Commissioner Bill Redd; Roger Atcitty; Commissioner Mark Maryboy[1]; John Lewis; Commissioner J. Tyron Lewis; Karen Adams; Patsy Shumway, and R.Dennis Ickes, Farmers/Truck Insurance Co. and John and Jane Does as yet unnamed in their personal and official capabilities,
Defendants.

SR-CV-162-99-CV

ORDER MANDATING THAT ALL DEFENDANTS' TO BE BOUND BY THE PRELIMINARY INJUNCTION ORDER

RECEIVED
MAY 03 2000

Now comes the Court, having received and reviewed the plaintiffs' motion to bind the defendants R. Dennis Ickes, Esq. and Farmer's Insurance Group of Companies and/or Truck Insurance by the Preliminary Injunction Order, based upon the findings of the Court in the Preliminary Injunction Order, after approximately 6 hearings over a nine month period. The Court bases this Order upon the following findings of fact and Conclusions of Law.

1. On December 28, 1999, the Court made factual findings pertaining to misrepresentation of case law and facts, intimidation of witnesses, spoilation of evidence, upon which the plaintiffs have made a motion for a supplemental pleading, and that said activities were known, or should have been discovered easily by a reasonable investigation that is required pursuant to NNRCP at Rule 11; and.

[1] In his official capacity only.
[2] In her official capacity only.

\r\n

3. That the new defendants, Mr. Ickes and Farmer's Insurance Group of Companies and/or Truck Insurance, as based upon the Court's findings, did participate in these activities prior to the issuance of the preliminary injunction order, and,

4. That the new defendants, Mr. Ickes and Farmer's Insurance Group of Companies and/or Truck Insurance, did participate fully in all the proceedings from approximately April 23, 1999 through November 9, 1999, and in the defendants' motion to dissolve or modify the Preliminary Injunction Order, dated December 28, 1999; and,

5. That Mr. Ickes, and Farmer's Insurance Group of Companies and/or Truck Insurance Company, as his employer, were aware, or should have been aware, of the actions of the defendants, and their own actions in privity with the defendants, based upon a reasonable investigation as required pursuant to NNRCP at Rule 11, and,

Therefore, the Court now Orders that Mr. Ickes and Farmer's Insurance Group of Companies and/or Truck Insurance Company are to be bound in privity with the previous defendants in this action as now identified John and Jane Does, who prolonged the proceedings, and further deprived the plaintiffs' of due process and equal protections of the law, and are hereby bound by the Preliminary Injunction Order of December 28, 2000, and their names will be herein after, added to the defendants' caption, and are officially declared to have responsibility for all legal liabilities incurred by the defendants as declared in the December 28, 1999, Preliminary Injunction Order.

Signed this 27 day of 2000.

Judge Raymond Begaye

"I hereby certify that this is a true and correct copy of the instrument on file in the District Court of the Navajo Nation."

Clerk, District Court of the Navajo Nation

109

**AGREEMENT BETWEEN THE SECRETARY OF THE DEPARTMENT OF THE INTERIOR AND THE NAVAJO NATION**

A. Authority and Purpose

1. Authority

This agreement, denoted a Self-Determination Contract (referred to in this agreement as the "Contract"), is entered into by the Secretary of the Interior or the Secretary of Health and Human Services (referred to in this agreement as the "Secretary"), for and on behalf of the United States pursuant to Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450, et seq.) and by the authority of the Navajo Nation (referred to in this agreement as the "Contractor"). The provisions of Title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450, et seq.) are incorporated in this agreement.

2. Purpose

Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450, et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities and programs (or portions thereof), that are otherwise contractible under Section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor: Judicial Program.

B. Terms, Provisions and Conditions

1. Term

Pursuant to Section 105(c)(1) of the Indian Self-

-1-

Determination and Education Assistance Act (25 U.S.C. 450j(c)(1)), the term of this contract shall be three years. Pursuant to Section 105(d)(1) of such Act (25 U.S.C. 450j(d), upon the election by the Contractor, the period of this Contract shall be determined on the basis of a calendar year, unless the Secretary and the Contractor agree on a different period in the annual funding agreement incorporated by reference in subsection(F)(2).

2. **Effective Date**

This Contract shall become effective upon the date of the approval and execution by the contractor and the Secretary, unless the Contractor and the Secretary agree on an effective date other than the date specified in this paragraph.

3. **Program Standards**

The Contractor agrees to administer the program, services, functions and activities (or portions thereof) listed in subsection (A)(2) of the Contract in conformity with the following standards: in accordance with Navajo Nation law and the Indian Civil Rights Act.

4. **Funding Amount**

Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (F)(2). Such amount shall not be less than the applicable amount determined pursuant to Section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j-1).

5. **Limitation of Costs**

The Contractor shall not be obligated to continue

performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract. If, at any time, the Contractor has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the Contractor shall provide reasonable notice to the appropriate Secretary. If the appropriate Secretary does not take such action as may be necessary to increase the amount of funds awarded under this Contract, the Contractor may suspend performance of the Contract until such time as additional funds are awarded.

4. **Payment**

A. In general - Payments to the Contractor under this Contract shall:

(i) be made as expeditiously as practicable; and

(ii) include financial arrangements to cover funding during periods covered by joint resolutions adopted by Congress making continuing appropriations, to the extent permitted by such resolutions.

B. Quarterly, semiannual, lump-sum, and other methods of payment:

(i) In general - Pursuant to section 108(b) of the Indian Self-Determination and Education Assistance Act, and notwithstanding any other provision of law, for each fiscal year covered by this

contract, the Secretary shall make available to the Contractor the funds specified for the fiscal year under the annual funding agreement incorporated by reference pursuant to subsection (F)(2) by paying to the Contractor, on a quarterly basis, one-quarter of the total amount provided for in the annual funding agreement for that fiscal year, in a lump-sum payment or as semiannual payments, or any other method of payment authorized by law, in accordance with such method as may be requested by the Contractor and specified in the annual funding agreement.

(ii) Method of quarterly payment - If quarterly payments are specified in the annual funding agreement incorporated by reference pursuant to subsection (F)(2), each quarterly payment made pursuant to clause (i) shall be made on the first day of each quarter of the fiscal year, except that in any case in which the Contract year coincides with the Federal fiscal year, payment for the first quarter shall be made not later than the date that is 10 calendar days after the date on which the Office of Management

and Budget apportions the appropriations for the fiscal year for the programs, services, functions and activities subject to this Contract.

(iii) Applicability - Chapter 39 of Title 31, United States Code, shall apply to the payment of funds due under this Contract and the annual funding agreement referred to in clause (i).

7. Records and Monitoring

A. In general - Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the recordkeeping system of the Department of the Interior or the Department of Health and Human Services (or both), records of the Contractor shall not be considered Federal records for purposes of Chapter 5 of Title 5, United States Code.

B. Recordkeeping System - The Contractor shall maintain a recordkeeping system and, upon reasonable advance request, provide reasonable access to such records to the Secretary.

C. Responsibilities of Contractor - The Contractor shall be responsible for managing the day-to-day operations conducted under this Contract and for monitoring activities conducted under this Contract to ensure compliance with the contract and applicable Federal requirements. With respect to the monitoring activities of the Secretary, the routine monitoring visits shall be limited to not more than one performance monitoring

visit for this Contract by the head of each operating division, departmental bureau, or departmental agency, or duly authorized representative of such head unless:

(i) the Contractor agrees to one or more additional visits; or

(ii) the appropriate official determines that there is reasonable cause to believe that grounds for reassumption of the Contract, suspension of Contract payments, or other serious Contract performance deficiency may exist.

No additional visit referred to in clause (ii) shall be made until such time as reasonable advance notice that includes a description of the nature of the problem that requires the additional visit has been given to the Contractor.

e. Property

A. In general - As provided in section 105(f) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j(f)), at the request of the Contractor, the Secretary may make available, or transfer to the Contractor, all reasonably divisible real property, facilities, equipment, and personal property that the Secretary has used to provide or administer the programs, services, functions, and activities covered by this contract. A mutually agreed upon list specifying the property, facilities, and equipment so furnished shall also be prepared by the Secretary, with the concurrence of the Contractor, and periodically revised by the Secretary, with the concurrence of the

contractor.

B. Records - The Contractor shall maintain a record of all property referred to in subparagraph (A) or other property acquired by the Contractor under Section 105(f)(2)(A) of such Act for purposes of replacement.

C. Joint Use Agreements - Upon the request of the Contractor, the Secretary and the Contractor shall enter into a separate joint use agreement to address the shared use by the parties of real or personal property that is not reasonably divisible.

D. Acquisition of Property - The Contractor is granted the authority to acquire such excess property as the Contractor may determine to be appropriate in the judgment of the Contractor to support the programs, services, functions, and activities operated pursuant to this contract.

E. Confiscated or Excess Property - The Secretary shall assist the Contractor in obtaining such confiscated or excess property as may become available to tribes, tribal organizations, or local governments.

F. Screener Identification Card - A screener identification card (General Services Administration form numbered 2946) shall be issued to the Contractor not later than the effective date of this Contract. The designated official shall, upon request, assist the Contractor in securing the use of the card.

G. Capital Equipment - The Contractor shall determine the capital equipment, leases, rentals, property, or services the Contractor requires to perform the obligations of the Contractor under this subsection, and shall acquire and maintain

-7-

records of such capital equipment, property rentals, leases, property, or services through applicable procurement procedures of the Contractor.

9. Availability of Funds

Notwithstanding any other provision of law, any funds provided under this contract.

A. shall remain available until expended; and

B. with respect to such funds, no further:

(i) approval by the Secretary, or

(ii) justifying documentation from the Contractor,

shall be required prior to the expenditure of such funds.

10. Transportation

Beginning on the effective date of this Contract, the Secretary shall authorize the Contractor to obtain interagency motor pool vehicles and related services for performance of any activities carried out under this Contract.

11. Federal program guidelines, manuals, or policy directives

Except as specifically provided in the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450, et seq.) the Contractor is not required to abide by program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Contractor and the Secretary, or otherwise required by law.

12. Disputes

A. Third-Party Mediation Defined - For the purposes of this Contract, the term "third-party mediation" means

a form of mediation whereby the Secretary and the Contractor nominate a third party who is not employed by or significantly involved with the Secretary of the Interior, the Secretary of Health and Human Services, or the Contractor, to serve as third-party mediator to mediate disputes under this Contract.

B. Alternative Procedures - In addition to, or as an alternative to, remedies and procedures prescribed by Section 110 of the Indian-Self-Determination and Education Assistance Act (25 U.S.C. 450m-1), the parties to this Contract may jointly:

(i) submit disputes under this Contract to third-party mediation;

(ii) submit the dispute to the adjudicatory body of the Contractor, including the tribal court of the Contractor;

(iii) submit the dispute to mediation processes provided for under the laws, policies, or procedures of the Contractor; or

(iv) use the administrative dispute resolution process authorized in subchapter IV of Chapter 5, Title 5, United States Code.

C. Effect of Decisions - The Secretary shall be bound by decisions made pursuant to the procedures set forth in subparagraph (B), except that the Secretary shall not be bound by any decision that significantly conflicts with the interests of Indians or the United States.

13. Administrative Procedures of Contractor

Pursuant to the Indian Civil Rights Act of 1968 (25 U.S.C. 1302, et seq.), the laws policies, and procedures of the

Contractor shall provide for administrative due process (or the equivalent of administrative due process) with respect to programs, services, functions, and activities that are provided by the Contractor pursuant to this Contract.

14. Successor Annual Funding Agreement

A. In general - Negotiations for a successor annual funding agreement, provided for in subsection (F)(2), shall begin not later than 120 days prior to the conclusion of the preceding annual funding agreement. Except as provided in Section 105(c)(2) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450(c)(2)), the funding for each successor annual funding agreement shall only be reduced pursuant to Section 106(b) of such Act (25 U.S.C. 450j-1(b)).

B. Information - The Secretary shall prepare and supply relevant information, and promptly comply with any request by the Contractor for information that the Contractor reasonably needs to determine the amount of funds that may be available for a successor annual funding agreement, as provided for in subsection (F)(2) of this Contract.

15. Contract Requirements, Approval by Secretary

A. In general - Except as provided in subparagraph (B), for the term of the contract Section 2103 of the Revised Statutes (25 U.S.C. 81) and Section 16 of the Act of June 18, 1934 (48 Stat. 987, Chapter 576; 25 U.S.C. 476) shall not apply to any contract entered into in connection with this Contract.

B. Requirements - Each Contract entered into by the Contractor with a third party in connection with performing the obligations of the Contractor under this Contract shall

(i) be in writing;

(ii) identify the interested parties, the authorities of such parties, and purpose of the Contract;

(iii) state the work to be performed under the Contract; and

(iv) state the process for making any claim, the payments to be made, and the terms of the Contract, which shall be fixed.

C. Obligation of the Contractor

1. Contract Performance

Except as provided in subsection (D)(2), the Contractor shall perform the programs, services, functions, and activities as provided in the annual funding agreement under subsection (F)(2) of this Contract.

2. Amount of Funds

The total amount of funds to be paid under this Contract pursuant to Section 106(a) shall be determined in an annual funding agreement entered into between the Secretary and the Contractor, which shall be incorporated into this Contract.

3. Contracted Programs

Subject to the availability of appropriated funds, the Contractor shall administer the programs, services, functions, and activities identified in this Contract and funded through the annual funding agreements under subsection (F)(2).

4. Trust Services for Individual Indians

A. In general – To the extent that the annual funding agreement provides funding for the delivery of trust

services to individual Indians that have been provided by the Secretary, the Contractor shall maintain at least the same level of service as the Secretary provided for such individual Indians, subject to the availability of appropriated funds for such services.

B. Trust Services to Individual Indians - For the purposes of this paragraph only, the term "trust services for individual Indians" means only those services that pertain to land or financial management connected to individually held allotments.

4. Fair and Uniform Services

The Contractor shall provide services under this Contract in a fair and uniform manner and shall provide access to an administrative or judicial body empowered to adjudicate or otherwise resolve complaints, claims, and grievances brought by program beneficiaries against the contractor arising out of the performance of the Contract.

D. Obligation of the United States

1. Trust Responsibility

A. In general - The United States reaffirms the trust responsibility of the United States to the Navajo Nation to protect and conserve the trust resources of the Navajo Nation and the trust resources of individual Indians.

B. Construction of Contract - Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the tribe(s) or individual Indians. The Secretary shall act in good faith in upholding such trust responsibility.

2. Good Faith

To the extent that health programs are included in this Contract, and within available funds, the Secretary shall act in good faith in cooperating with the contractor to achieve the goals set forth in the Indian Health Care Improvement Act (25 U.S.C. 1601, et seq.).

3. Programs Retained

As specified in the annual funding agreement, the United States hereby retains the programs, services, functions, and activities with respect to the tribe(s) that are not specifically assumed by the Contractor in the annual funding agreement under subsection (F)(2).

E. Other Provisions

1. Designated Officials

Not later than the effective date of this Contract, the United States shall provide to the Contractor, and the Contractor shall provide to the United States, a written designation of a senior official to serve as a representative for notices, proposed amendments to the Contract, and other purposes for this Contract.

2. Contract Modifications or Amendment

A. In general – Except as provided in subparagraph (B), no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to the Contract, and the Contractor and the Secretary provide written consent for the modification.

B. Exception – The addition of supplemental funds for programs, functions, and activities (or portions thereof) already

included in the annual funding agreement under subsection (F)(2), and the reduction of funds pursuant to Section 106(b)(2), shall not be subject to subparagraph (A).

3. Officials Not to Benefit

No Member of Congress, or resident commissioner, shall be admitted to any share or part of any contract executed pursuant to this Contract, or to any benefit that may arise from such contract. This paragraph may not be construed to apply to any contract with a third party entered into under this Contract if such contract is made with a corporation for the general benefit of the corporation.

4. Covenant Against Contingent Fees

The parties warrant that no person or selling agency has been employed or retained to solicit or secure any contract executed pursuant to this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business.

F. Attachments

1. Approval of Contract

Unless previously furnished to the Secretary, the resolution of the Intergovernmental Relations Committee of the Navajo Nation Council authorizing the contracting of the programs, services, functions, and activities identified in this Contract is attached to this Contract as attachment 1.

2. Annual Funding Agreement

A. In general - The annual funding agreement under this Contract shall only contain:

(i) terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment; and

(ii) such other provision, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agreed.

B. Incorporation by Reference - The annual funding agreement is hereby incorporated in its entirety in this Contract and attached to this Contract as attachment 2.

James S. Hadg. 1420-4162-029

Albert Hale, President
THE NAVAJO NATION

for Secretary, Department of the Interior
UNITED STATES OF AMERICA

ANNUAL FUNDING AGREEMENT

BETWEEN

THE NAVAJO NATION

AND

THE UNITED STATES OF AMERICA
SECRETARY OF
THE DEPARTMENT OF THE INTERIOR

This Annual Funding Agreement ("AFA") is entered into between the Navajo Nation and the United States Department of the Interior ("DOI"), pursuant to the agreement between the Navajo Nation and DOI for Judicial Program, pursuant to Title I of the Indian Self-Determination and Education Assistance Act, as amended, (hereinafter referred to as the "Contract").

1. The Navajo Nation shall administer the programs identified in the Scope of Work, attached hereto and incorporated by reference herein as Attachment A, during the term of this AFA in accordance with the provisions of the Contract and this AFA and any attachments hereto.

2. Subject to the availability of funding, DOI shall provide the direct program funding amount of $ 700,800.00 for the term of this AFA, exclusive of any Central Office or Area shares, direct contract support, startup costs and indirect costs, in one lump sum payment to the Navajo Nation in accordance with Article 5, Section 6 of the Contract. Payment shall be made within 10 days of execution of this AFA. Accounting and budget data are attached hereto and incorporated by reference herein as Attachment B.

3. In addition to the amount referred to in Paragraph 2 of this AFA, DOI shall pay the sum of $ -0- representing Central

Office and Area shares as determined by the document attached hereto and incorporated by reference herein as Attachment C. This amount only reflects the Central Office and Area shares associated with this AFA, it does not reflect Central Office or Area shares which the Navajo Nation has requested or included in other 1996 P.L. 93-638 contracts.

A. In addition to the amount in Paragraph 3 the Navajo Nation has identified additional contract support needs of $ -0-. This amount and any other additional contract support amount needed are subject to negotiation between the Navajo Nation and DOI. The Navajo Nation shall be entitled to contract support cost funds to the full extent specified in Section 106(a)(2) of P.L. 93-638, as amended, and related provisions. The Navajo Nation's request for contract support costs for new and expanded programs is subject to the availability of appropriations for that purpose.

B. It is understood by the parties that additional contract support funds may not be initially available to the Navajo Nation. However, upon becoming available by Congressional appropriation for this purpose or through the identification of appropriate budget savings from Contract Support Cost line items, the Navajo Nation shall participate in the distribution of those shortfall funds. If, during the term of this AFA, it is not possible to pay all contract support amounts, DOI shall make a good faith effort, subject to applicable law, to identify funds or to obtain an appropriation to address this shortfall. In any event,

if there is a contract support shortfall, DOI will report all shortfalls to Congress, and simultaneously provide the Navajo Nation with such report.

4. In addition to the amount identified in Paragraph 3 of this AFA, the Navajo Nation shall receive indirect costs applicable to the period covered by this AFA as determined pursuant to the applicable Indirect Cost Agreement, negotiated between the Navajo Nation and its cognizant agent. In the event that sufficient funds are unavailable to fully pay indirect costs associated with this AFA, DOI will pay any shortfall in indirect costs when, and to the extent that, such contract support costs shortfall funds are appropriated by Congress. In no event does the Navajo Nation waive its right to recover 100% of the indirect costs associated with this AFA.

5. In the event that funding of this AFA is reduced because of Congressional action, the Navajo Nation retains the option to renegotiate the Scope of Work with DOI contained in Attachment A of this AFA, consistent with Section 106 of P.L. 93-638, as amended.

6. A. The title to all property acquired or used under predecessor P.L. 93-638 contracts or grants presently used in connection with the programs covered by this AFA shall be transferred to the Navajo Nation. A list of such property shall be prepared by DOI and shall be reconciled by the parties within 60 days after execution of this AFA.

b. Employees of the programs (including those providing substantial support to the contracted program) covered by this AFA shall be eligible for housing from DOI on the same basis as Department of the Interior employees for vacant housing.

c. The Navajo Nation has identified a need for office space. Whenever feasible, DOI shall make such office space available to the Navajo Nation, together with such maintenance services as may be necessary for that office space. When not available and tribal buildings are used, DOI will enter into a lease pursuant to Section 105(l) of the Act and Part K of the Regulation.

7. The Navajo Nation shall maintain a fiscal accounting system which will provide accurate, current and complete information with respect to this AFA, consistent with federal statutory and regulatory requirements.

8. Unless otherwise stated elsewhere in this AFA or through an approved and executed Intergovernmental Personnel Agreement, all personnel employed by the Nation to carry out the Contract, AFA, Scope of Work and any other attachments hereto shall meet the qualifications set forth by the Navajo Nation Department of Personnel Management. Further, all personnel employed by the Navajo Nation under this AFA will adhere to applicable Navajo Nation personnel policies and procedures, including sick leave, holidays, pay schedules and pay tables.

9. Pre-award costs with respect to the performance of this Contract and AFA may be paid with funding under this AFA to

the extent (a) that such costs are otherwise reasonable, allowable and allocable to performance of the attached Scope of Work, and (b) that the Nation informed DOI of costs consistent with Section 106(a)(6) P.L. 93-638, if this AFA covers the initial year of a contract.

10. Consistent with Section 7(c) of P.L. 93-638, as amended, the Navajo Business Preference Law (5 N.N.C. Section 201, et seq.) and the Navajo Preference in Employment Act (15 N.N.C. Section 601, et seq.) shall apply to the administration of the Contract and this AFA.

11. The following individuals are designated by the respective parties to receive notices and other information with respect to this AFA:

A. For the Navajo Nation:

Contracting Officer
Navajo Nation Office of Contracts and Grants
P.O. Box 9000
Window Rock, Arizona, 86515

B. For the Department of the Interior:

James Marjo, Contracting Officer
BIA-Navajo Area Office
P.O. Box 1060
Gallup, NM 87305

12. In the performance of the Contract and this AFA, the Navajo Nation agrees to comply with all applicable federal and Navajo Nation regulations and executive orders. The parties shall renegotiate and modify the language of this AFA to conform with any applicable federal and Navajo Nation laws which are passed after the effective date of this agreement. It is the responsibility of

DOI to inform the Navajo Nation of all federal laws, regulations and executive orders it believes apply to this AFA within 30 days of execution.

13. During the course of this AFA, the Navajo Nation shall submit quarterly reports with respect to this AFA.

14. The provisions of this AFA are severable. If any provision of this AFA is determined to be invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the remainder of the AFA.

15. Nothing in this AFA shall be construed as waiving the sovereign immunity of the Navajo Nation. The parties agree that nothing in this AFA shall waive any rights of the parties under applicable federal law.

16. This AFA shall be effective as of January 1, 1997, and remain in effect until January 1, 1998, or until a successor AFA is negotiated and becomes effective.

Albert Hale, President December 23,1996
NAVAJO NATION Date

for Secretary [illegible] 12-31-96
UNITED STATES DEPARTMENT OF INTERIOR Date

-6-

PROPOSAL FOR MODEL CONTRACT

JUDICIAL BRANCH OF THE NAVAJO NATION

CONTRACT NO.:

A PUBLIC LAW 93-638 CONTRACT FOR

THE JUDICIAL BRANCH OF THE NAVAJO NATION
POST OFFICE DRAWER 520
WINDOW ROCK, ARIZONA 86515

FUNDED BY

U.S. DEPARTMENT OF THE INTERIOR
B. I. A. - NAVAJO AREA OFFICE

FOR

CALENDAR YEAR 1997, 1998, AND 1999

Beginning in 1959, the Navajo Tribe created the Navajo Tribal Courts and the Bureau of Indian Affairs has continued to provided funds for the operation of the court system.

| | |
|---|---|
| NAME OF CONTRACTOR: | Judicial Branch of the Navajo Nation<br>Post Office Box 520<br>Window Rock, Arizona 86515 |
| TRIBE APPLY AND BENEFITING: | The Navajo Nation |
| DATE OF REQUEST: | September 30, 1996 |
| SUBMITTED TO: | Wilson Barber, Jr., Area Director<br>Navajo Area Office<br>Bureau of Indian Affairs |
| AUTHORIZED SIGNATURE: | Robert Yazzie, Chief Justice<br>Judicial Branch of the Navajo Nation |
| RESOLUTION OF TRIBAL COUNCIL: | Will be submit "as soon as possible" |
| CONTRACT TERMS: | Three Years<br>January 01, 1997 to December 31, 1999 |
| PROPOSED 1997 BUDGET: | Attached |
| SCOPE OF WORK: | Attached |
| PLAN OF OPERATION: | Attached |

## Section 100 - Scope of Work

101. Purpose:

The purpose of the Judicial Branch contract is to provide judicial and related services which, prior to 1959, were provided by the Courts of Indian Offenses, and the Navajo Nation created the Navajo tribal courts in 1959 to replace the Courts of Indian Offenses.

The BIA continues to provide partial funds for the operation of the Navajo Nation courts.

102. Operation Guidelines

- Title 2 and Title 7 of the Navajo Nation Code provides that the Judicial Branch shall operate as a separate branch of the tribal government.
- Laws of the Navajo Nation enacted by the Navajo Nation Council and Rules of Procedure adopted by the courts are used to hear cases and render decisions.
- The twelve (12) set objectives for achievement of the following goals of the Judicial Branch:
  1) Hear and decide cases justly, promptly, and economically.
  2) Maintain the Navajo courts as an independent and respected branch of the government.

103. Operation, Methods, and Procedures

The Judicial Branch of the Navajo Nation is composed of the Office of the Chief Justice (administration), Supreme Court, Peacemaker Division, district courts, and family courts. The courts provide a fair and impartial forum for interpretation of the Navajo Nation Code, the 1968 Indian Civil Rights Act, and applicable federal laws and regulations. The requirements that attorneys and advocates be members of the Navajo Nation Bar Association also ensures that the standards of the courts are upheld for the benefit of the general public. The Judiciary Committee of the Navajo Nation Council has oversight responsibility for the Judicial Branch.

The Chief Justice supervises the operations of the courts through the judges, justices, and administrators. He also presides over the Supreme Court which is comprised of himself and two associate justices. The Chief Justice, President of the Navajo Nation, and the Speaker of the Navajo Nation Council meet periodically to address the needs of the people.

The district courts are courts of general jurisdiction at 7 N.N.C. §253. The family courts assure that each child receives care, guidance, and protection in accordance with the laws of the Navajo Nation. The family courts also have jurisdiction over probate and domestic relations issues pursuant to 7 N.N.C. §253.




104. Measurement for Progress and Accomplishments
The quarterly and annual reports provide details on the accomplishments of the goals and objectives of the Judicial Branch. The Chief Justice, through his supervisory authority, evaluates the courts. The Judiciary Committee of the Navajo Nation Council also has a method to evaluate the performance of all judges periodically.

105. Personnel System and Position Descriptions
Personnel issues are guided by the Judicial Branch Personnel Rules (1996), authorized at 7 N.N.C. §404.

-2-